**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| MRP PROPERTIES COMPANY, LLC, §<br>VALERO REFINING COMPANY - §<br>OKLAHOMA, THE PREMCOR §<br>REFINING GROUP, INC., and §<br>ULTRAMAR, INC. §<br>  §<br>*Plaintiffs*, §<br>  §<br>v. §<br>  §<br>THE UNITED STATES OF AMERICA.§<br>  §<br>  §<br>*Defendant.* § | Case No. _____ |

**COMPLAINT**

Plaintiffs, MRP PROPERTIES COMPANY, LLC ("MRP"), VALERO REFINING COMPANY – OKLAHOMA ("Valero Oklahoma"), THE PREMCOR REFINING GROUP, INC. ("Premcor"), and ULTRAMAR INC. ("Ultramar"), (collectively, the "Valero Companies" or "Plaintiffs"), by and through their undersigned attorneys, allege the following against Defendant, THE UNITED STATES OF AMERICA ("Defendant" or the "Government"):

**INTRODUCTION**

1. Before and during World War II, the Government exercised control over the refining industry broadly – and the Valero Companies' subject refineries specifically – so as to direct and control the type and amount of wastes generated at each refinery, as well as the disposal of such waste. The Valero Companies

supported the country in the war effort and were left with the responsibility of addressing contamination and incurring response costs associated with the Government's operations at the Valero Companies' refineries that are the subject of this action (the "Sites"). The Valero Companies have requested that the Government pay its fair share of these cleanup costs through a negotiated process, but the Government has refused. Thus, the Valero Companies are bringing this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), for response costs arising from or related to the investigation and cleanup of contamination at the Sites.

## JURISDICTION

2.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action arising under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief). Jurisdiction is also proper in this Court under 42 U.S.C. §§ 9613(b) and 9613(g)(2) (CERCLA).

## VENUE

3.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), 1391(c)(2) and 1391(e)(1)(A) and 42 U.S.C. § 9613(b).

## PARTIES

4.     Plaintiff, MRP Properties Company, LLC ("MRP"), is a limited liability company organized under the laws of the State of Michigan.

5. Plaintiff, Valero Refining Company – Oklahoma ("Valero Oklahoma"), is a corporation organized under the laws of the State of Michigan.

6. Plaintiff, The Premcor Refining Group, Inc. ("Premcor"), is a corporation organized under the laws of the State of Delaware.

7. Plaintiff, Ultramar Inc. ("Ultramar"), is a corporation organized under the laws of the State of Nevada.

8. Defendant, the United States of America ("Defendant" or the "Government"), is named for the actions of its departments, agencies and instrumentalities, including but not limited to: the Reconstruction Finance Corporation and the Defense Supplies Corporation; the War Production Board; the Petroleum Administration for War, including its predecessors the Office of the Petroleum Coordinator for National Defense and Petroleum Coordinator for War (collectively, the "Petroleum Administration for War" or "PAW"); and the Department of the Interior as successor to the Petroleum Administration for War.

## FACTUAL ALLEGATIONS

**A. GOVERNMENT CONTROL OF THE REFINING INDUSTRY**

9. In response to the escalation of World War II ("WWII"), and in the interest of national defense, the Government wielded extensive authority and control over the entire refining industry through regulations, orders, directives, direct involvement, and other means designed to control operations at America's refineries

and increase manufacturing outputs of certain wartime products, often at the expense of appropriate waste management and pollution control practices.

10. The National Defense Act of 1916 and the Selective Training and Service Act of 1940 combined to give the President the authority to take immediate possession of any refinery and manufacture products or materials "as may be required." Under the very real threat of seizure, refineries were obligated to comply with Government orders for materials and products. Plaintiffs, like many refiners across the country, undertook actions at the direction and control of the Government and in support of war efforts.

11. In August 1940, the Reconstruction Finance Corporation established the Defense Supplies Corporation to, in part, buy and sell aviation gasoline ("avgas") and make loans to private companies to construct avgas production facilities. These construction projects, combined with other Government allocation and operations authority, led to the overhaul of facilities and allowed the Government to configure day-to-day operations at refineries in a way that maximized production of prioritized products without making any corresponding modifications to waste management or pollution control.

12. On March 11, 1941, the Lend-Lease Act was enacted to provide military supplies and equipment to Great Britain and other nations at war with

Germany, as well as to the Republic of China who was at war with Japan. The Lend-Lease Act increased wartime manufacturing and production needs dramatically.

13. In July 1941, the Office of the Petroleum Coordinator sent telegrams to refining companies to ascertain their ability to increase the production of avgas necessary for the war effort.

14. The United States declared war on Japan on December 8, 1941, and on Germany on December 11, 1941. That same month, Congress enacted the First War Powers Act of 1941, granting broad war powers to the President.

15. In January 1942, President Roosevelt issued Executive Order 9024, which granted similarly unprecedented wartime powers of procurement and production to the War Production Board. The War Production Board had the power to impose mandatory policies and procedures for the most effective prosecution of war procurement and materials production. Increased manufacturing output often came at the expense of overall efficiency and waste management. This was an expected and intended consequence of the victory-at-all-costs atmosphere surrounding WWII. For example, during WWII, the War Production Board controlled approval of the construction of necessary refinery units and equipment, and denied refinery construction projects relating to pollution control that were deemed non-essential to the war effort. As evidenced by waste management and disposal systems implemented after the war, the Government's control of materials,

equipment, and process decisions prevented the implementation of many refinery waste-related projects.

16. In March 1942, Congress enacted the Second War Powers Act, which granted the President the power to prioritize and allocate any materials that were critical or essential to the war effort. Various materials necessary to the day-to-day operations of the refining industry were strictly limited by the President's broad allocation authority.

17. In December 1942, President Roosevelt issued Executive Order 9276 to establish PAW. Executive Order 9276 provided PAW with broad discretionary authority. PAW regularly exercised its right to take appropriate action to enforce its orders and directives to the petroleum industry to ensure the petroleum industry's supply of products needed for the successful prosecution of the war. PAW was also authorized to issue "Recommendations" and "Directives"[1] as necessary to achieve military goals, requiring refineries to change operations and refinery yields at a moment's notice. For example, through various "Recommendations," PAW mandated compliance with orders controlling the use of crude oil and base stocks, blending agents, manufacturing processes, and transportation.

---

[1] While PAW initially issued "Recommendations," in December 1942, PAW was authorized to issue "petroleum directives" or "petroleum administrative orders," which were more consistent with their scope and purpose to, among other things, direct the production, refining, storage, shipment, and distribution of petroleum products.

18. Through PAW and other related agencies, the Government imposed significant regulatory controls over the operations of the refining industry to ensure that octane-enhancing agents were only used to manufacture high-octane avgas. Refinery operations were fully coordinated by the Government—such that the entire industry operated as one Government-controlled enterprise—to maximize the overall production of avgas and other war products. These controls included the types and specifications of the war-related materials to be manufactured at each of the refineries, the pricing of war-related materials, the supply and price of certain raw materials and components processed at the refineries, the equipment used at the refineries, and various other operational aspects of these units.

19. Together, these comprehensive Government regulations and controls directly and significantly impacted day-to-day operations. The Government effectively controlled the nation's supply of crude oil and other resources during WWII and established permissible manufacturing runs at the nation's refineries. By controlling and pervasively regulating supply chain allocation and manufacturing outputs, the Government exercised control over the refining industry in a way that specifically dictated the type and amount of wastes generated at each refinery, as well as the disposal of such waste. This level of control is sufficient to establish liability under CERCLA.

20. The Valero Companies have incurred and will continue to incur response costs consistent with the National Contingency Plan as a result of hazardous wastes disposed of at the Sites during the Government's control of the entire refining industry's operations.

### B. GOVERNMENT CONTROL OF SPECIFIC REFINERY SITES

21. The various wartime operations conducted under Government control at the Sites resulted in the generation and disposal of significant amounts of hazardous wastes. As a result, the Valero Companies have incurred and will continue to incur response costs consistent with the National Contingency Plan.

#### 1. The Alma Site

22. The former Leonard Refinery is located in Alma, Michigan (the "Alma Site"). The Leonard Refinery was also subject to comprehensive Government regulation during the wartime period, including Government directives and a third-party contract to provide avgas components to the Standard of Louisiana's Baton Rouge refinery at prices established by PAW.

23. The Leonard Refinery produced avgas and avgas components at the direction of the Government. During times of shortage, PAW directives required the Leonard Refinery to change its operations in order to produce the maximum yields of kerosene. The Government also urged the Leonard Refinery to convert its

catpoly plant to codimer production, a critical war product for its ability to boost octane levels.

24. By dictating the production of war products, which necessitated changes in refining processes, the Government acted as an operator and changed the pollution profile of the refinery without addressing related waste processing and disposal needs. MRP has incurred and will continue to incur response costs at the Alma Site.

### 2. The Ardmore Site

25. The former Bell Refinery is located in Ardmore, Oklahoma ("Ardmore Site"). The Bell Refinery was subject to comprehensive Government regulation during the wartime period, including Government directives. The Bell Refinery produced avgas and avgas components at the direction of the Government.

26. The Bell Refinery made various grades of avgas, 80-octane all-purpose gasoline, avgas components (including codimer), kerosene, and other products for or at the direction of the Government. Additionally, the Bell Refinery was required by the Government to change its operations in order to maximize the production of Navy diesel fuel and kerosene during the wartime period.

27. The Bell Refinery entered into a contract with the Army Air Forces for the production of avgas. The Bell Refinery also entered into an avgas contract with the Navy.

28.     By dictating the production of war products, which necessitated changes in refining processes, the Government acted as an operator and changed the pollution profile of the refinery without addressing related waste processing and disposal needs.  Valero Refining Company - Oklahoma has incurred and will continue to incur response costs at the Ardmore Site.

### 3.  The Port Arthur Site

29.     The Port Arthur Refinery is located in Port Arthur, Texas (the "Port Arthur Site").  During WWII, the Port Arthur Site was owned by Gulf Oil Corporation ("Gulf").  At the time, the Port Arthur Refinery had one of the largest throughput capacities in the nation.

30.     The Port Arthur Refinery was subject to pervasive Government regulation through various recommendations, directives, orders, and other regulations during WWII.  The Government also controlled operations through direct communications to Port Arthur Site personnel and Gulf.  Due to its size and capacity, the refinery was of particular interest to the Government in its effort to control the petroleum supply chain and coordinate wartime manufacturing across the country.

31.     In 1942, Gulf entered into a 100-avgas sales contract with the DSC that dictated prices, construction and expansion activities, inventory requirements, and oriented refinery operations to meet the ever-shifting demands of the Government.

The contract also limited profits, as set by the Government. Through the provisions of the contract and other means, the Government acted as an operator of the Port Arthur Site.

32. Through comprehensive and direct regulation that controlled day-to-day operations, including decisions about product runs, the Government created new and different waste streams and disposal obligations, without addressing waste processing and disposal needs. Premcor has incurred and will continue to incur response costs at the Port Arthur Site.

### 4. The Hanford Site

33. The former Caminol Hanford Refinery is located in Hanford, California (the "Hanford Site"). The Caminol Hanford Refinery was subject to comprehensive Government regulation during the wartime period, including Government directives.

34. The Caminol Hanford Refinery produced avgas and alkylation feed at the direction of the Government. In fact, the Government urged the Caminol Hanford Refinery to limit the production of more profitable motor gasoline runs in order to maximize production of avgas and residual fuel. Upon confirmation of the refinery's ability to produce avgas, the Government requested that Caminol arrange its yields to maximize production of critical war products.

35. During the wartime period, Caminol entered into a contract with the Army Air Forces, a predecessor of the Department of Defense, for the production of 91-octane and 87-octane avgas.

36. By dictating the production of war products, which necessitated changes in refining processes, the Government acted as an operator and changed the pollution profile of the refinery without addressing related waste processing and disposal needs. Ultramar has incurred and will continue to incur response costs at the Hanford Site.

### 5. The Santa Fe Springs Site

37. The former Caminol Santa Fe Springs Refinery is located in Santa Fe Springs, California (the "Santa Fe Springs Site") and was subject to comprehensive Government regulation during the wartime period, including Government directives.

38. The Caminol Santa Fe Springs Refinery produced avgas and avgas blending stock at the direction of the Government. The Caminol Santa Fe Springs Refinery, also at the request of the Government, installed specific equipment and facilities to make various grades of avgas and alkylation feed and naphtha blending stock as needed by the Government.

39. As outlined in paragraph 34 and incorporated herein by reference, the Government also urged Caminol to limit the production of more profitable motor

gasoline runs at the Santa Fe Springs Site in order to maximize production of critical wartime products.

40. As outlined in paragraph 35 and incorporated herein by reference, the avgas contract at the Hanford Site also applied to the Santa Fe Springs Site.

41. By dictating the production of war products, which necessitated changes in production processes, the Government acted as an operator and changed the pollution profile of the refinery without addressing related waste processing and disposal needs. Ultramar has incurred and will continue to incur response costs at the Santa Fe Springs Site.

### 6. The Arkansas City Site

42. The former Kanotex Refinery is located in Arkansas City, Kansas ("Arkansas City Site"). The Kanotex Refinery was subject to comprehensive Government regulation during the wartime period, including Government directives.

43. The Kanotex Refinery produced avgas and avgas components at the direction of the Government. The Kanotex Refinery also entered into a contract to produce 7-0-2 diesel fuel for the Navy Department. Kanotex was required by the Government to change its operations in order to maximize the production of both Navy diesel fuel and kerosene during the wartime period.

44. The Government also impacted and controlled personnel at the Kanotex Refinery. For example, PAW prevented the refinery's chief engineer from

being drafted so that the refinery could continue to produce critical wartime products.

45. By dictating the production of war products, which necessitated changes in refining processes, the Government acted as an operator and changed the pollution profile of the refinery without addressing related waste processing and disposal needs. MRP has incurred and will continue to incur response costs at the Arkansas City Site.

### 7. The Blue Island Site

46. The former Worth Refinery is located in Blue Island, Illinois ("Blue Island Site"). The Worth Refinery was subject to comprehensive Government regulation during the wartime period, including Government directives.

47. The Government issued directives requiring the Worth Refinery to maximize production of Navy diesel fuel and/or 80-octane all-purpose gasoline. Worth Refinery was also told to maximize kerosene production during supply shortages.

48. By dictating production runs at the refinery, the Government acted as an operator and impacted the pollution profile of the facility without addressing related waste processing and disposal needs. Premcor has incurred and will continue to incur response costs at the Blue Island Site.

## FIRST CLAIM FOR RELIEF:

### Response Cost Recovery under CERCLA 107(a), (42 U.S.C. § 9607(a))

49. Paragraphs 1 - 48 are incorporated herein by reference.

50. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, *inter alia*:

Notwithstanding any other provision of rule of law, and subject only to the defenses set forth in subsection (b) of this section –

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, or hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --

…

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan…

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs [(B)].

51. Defendant is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

52. Plaintiffs are informed and believe, and on that basis allege, that there have been releases and threatened releases of "hazardous substances," within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22), at or near the Sites. Plaintiffs are further informed and believe, and on that basis allege, that the releases or threatened releases are ongoing.

53. All releases of hazardous substances have occurred at a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

54. Plaintiffs have incurred and will incur necessary costs of response pursuant to CERCLA §107(a), 42 U.S.C. § 9607(a), consistent with the NCP 42 U.S.C. § 9607(a)(4), as a result of releases and/or threatened releases (within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22)) of hazardous substances at and from the Site.

55. Defendant is a covered person defined in CERCLA § 107(a)(1), (2), (3), and/or (4), 42 U.S.C. § 9607(a)(1 – 4). Defendant is therefore jointly and severally liable for all response costs incurred or to be incurred by Plaintiffs.

**SECOND CLAIM FOR RELIEF:**

**Declaratory Relief Under CERCLA § 113(g)(2)(42 U.S.C. § 9613(g)(2))
and the Declaratory Judgment Act(28 U.S.C. § 2201)**

56. Paragraphs 1 - 55 are incorporated herein by reference.

57.     CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides in pertinent part: In any action described in this subsection the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

58.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), further states: In a case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration.

59.     An actual controversy now exists between Plaintiffs and Defendant in that Plaintiffs contend that Defendant is a party liable under CERCLA § 107(a), 42 U.S.C. § 9607(a) for all response costs incurred and to be incurred by Plaintiffs in connection with the release or threatened release of hazardous substances at or around the Sites.

60.     Plaintiffs seek a judicial declaration of rights with respect to the Defendant pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, binding the Defendant in any subsequent action or actions to recover further response costs or other damages incurred by Plaintiffs, as appropriate and in the interest of justice.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as follows:

## FIRST CLAIM FOR RELIEF

For payment of all necessary costs of response, removal and/or remedial action costs, costs of abatement and liability incurred by Plaintiffs as a result of any release or threatened release of hazardous substances at the Sites.

## SECOND CLAIM FOR RELIEF

For a declaratory judgment that Defendant is jointly and severally liable for all (or some portion) of any costs, damages and liability Plaintiffs may incur as a result of any release or threatened release of hazardous substances at the Sites.

## ON ALL CLAIMS FOR RELIEF

a. For Plaintiffs' costs of suit herein;

b. For interest on any money judgment;

c. For Plaintiffs' reasonable attorneys' fees; and

d. For such other and further relief as the Court may deem just or equitable.

Dated: April 13, 2017                    Respectfully submitted,

/s/Givonna S. Long
KELLEY DRYE & WARREN LLP
333 West Wacker Dr., Suite 2600
Chicago, IL 60606
Telephone: (312) 857-7070
Facsimile: (312) 857-7095
glong@kelleydrye.com