UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MRP PROPERTIES, LLC, et al.,

              Plaintiffs,                              Case No. 17-cv-11174

v.                                           Honorable Thomas L. Ludington

UNITED STATES OF AMERICA,

              Defendant.

_____/

## ORDER GRANTING MOTION TO DISMISS AND DISMISSING COMPLAINT WITHOUT PREJUDICE

Plaintiffs MRP Properties, et al., filed their complaint against Defendant United States of America on April 13, 2017, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). Plaintiffs seek payment of response costs arising from investigation and cleanup of contamination at Plaintiffs' refineries, contending that the United States exercised control over the refineries before and during World War II. Am. Compl., ECF No. 1. Plaintiffs did not initially serve the Complaint on Defendant, but filed an Amended Complaint on July 5, 2017, which was served on Defendant. Am. Compl, ECF No. 4.

Defendant filed a motion to dismiss all Plaintiffs other than MRP Properties as improperly joined under Rule 20 or, in the alternative, to sever and transfer those Plaintiffs to a proper venue. Mot. Dismiss, ECF No. 13; Fed. R. Civ. P. 20. The answer deadline was stayed pending the Court's decision on the motion to dismiss or sever. ECF No. 22. The motion to dismiss or sever was denied. ECF No. 26. On January 4, 2018, Defendant filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 32.

Plaintiffs responded on January 25, 2018. ECF No. 34. Defendant replied on February 8, 2018. ECF No. 35.

## I.

Plaintiffs are six wholly owned subsidiaries or affiliates of the Valero Energy Corporation. *See* Discl. Corp. Aff., ECF No. 5. Plaintiffs collectively own twelve refinery sites (the Sites) located in Michigan, Oklahoma, Kansas, Tennessee, Illinois, Texas, and California. With one exception, Plaintiffs did not own the refineries during WWII, but acquired the refineries afterward. Plaintiffs allege that before and during WWII, the Government controlled the operations of the refining industry. Am. Compl. at 5. Pursuant to Executive Order 9276, President Roosevelt established the Petroleum Administration for War (PAW), and vested PAW with broad discretionary authority to carry out the national plans, policies, and objectives for the petroleum industry. *Id.* at 7. The PAW divided the nation into districts, and implemented the national policy at a regional and refinery level by orders and directives controlling operations and refinery yields. *Id.* at 7–8. The executive order provides, in part:

> There is established a Petroleum Administration for War, at the head of which shall be a Petroleum Administrator who shall be directly responsible to the President . . . The Administrator shall: a. Subject to the provisions of this order, establish basic policies and formulate plans and programs to assure for the prosecution of the war the conservation and most effective development and utilization of petroleum in the United States and its territories and possessions, issue necessary policy and operating directives to parties engaged in the petroleum industry . . . c. (1) Obtain from the Departments of War and the Navy, the Office of Lend-Lease Administration, the Department of State and the Board of Economic Warfare, the several divisions and branches of the War Production Board, and such other Federal departments and agencies as may be appropriate, estimates of the amounts of petroleum which will be required from the United States, its territories and possessions, to meet direct and indirect military, and essential industrial and civilian, requirements; and compile and analyze such estimates and submit them to the War Production Board with recommendations for the allocation of petroleum to meet such requirements. (2) Prepare and recommend to the War Production Board estimates of the quantities and kinds of material needed by the petroleum industry to produce, refine, store, distribute

(excluding transportation), or otherwise make available the amount of petroleum recommended by the Administrator for allocation by the War Production Board.

Exec. Order No. 9276, 7 FR 100912 (1942).

In their common allegations of fact, Plaintiffs allege that PAW proceeded to operate the nation's refineries by directing and controlling, at the refinery level: "(i) the allocation—by time and amount—of crude oil and other feed stocks . . .; (ii) the procurement priorities to obtain services, equipment and parts . . .; (iii) the types and specifications of war-related products to be manufactured; (iv) the levels of production for each of those products; (v) the price of the products and profits made; and (vi) to whom the products would be sold within the Government-controlled supply chain." *Id.* at 9. Plaintiffs allege that by serving as the "de facto operator" of the refineries, the Government released hazardous wastes into the environment and disposed, or intentionally arranged for the disposal, of hazardous waste streams into the environment." *Id.* at 11. Plaintiffs also allege that the Government specifically exercised control over the hazardous waste management process itself by controlling approval of war-time construction projects, denying approval for some projects "relating to pollution control that were deemed non-essential to the war effort" while approving other projects. *Id.* at 24.

With respect to specific refineries, Plaintiffs allege that the Government controlled day-to-day operations at each refinery. *Id.* ¶¶ 31, 38, 46, 54, 62, 65, 70, 78, 85, 91, 101, 115, 121. Plaintiffs' amended complaint further alleges that the Government's control of all inputs and outputs necessarily impacted the hazardous waste profile of their refineries. For example, at eight of the twelve refineries, Plaintiffs allege that Defendant dictated that the refineries would be allocated "sour" crude, whereas the refineries were only equipped to process "sweet" crude. *Id.* ¶¶ 32, 39, 47, 55, 63, 71, 79, 86. "Due to its higher sulfur content, sour crude was highly corrosive and caused leaks and other problem in equipment that was designed at the time to

process sweet crude oil." *Id.* The Government also controlled the outputs, and issued directives prohibiting refineries from manufacturing certain products (such as civilian gasoline), and specifically directing them to manufacture other products such as kerosene, 100-octane aviation gas (avgas), avgas components (i.e. codimer), 80-octane all-purpose gasoline, and 7-0-2 Navy diesel, among others. *Id.* ¶¶ 32, 40, 48, 56, 64, 72, 80, 87, 93, 102, 116, 122. The Government also "oversaw" or "dictated" the amount and type of wastes generated and released at each refinery and tracked these production loss statistics. *Id.* ¶¶ 35, 43, 51, 59, 67, 75, 82, 89, 98, 118, 124. Refinery operations and/or facilities had to be converted to accommodate the Government's demands. *Id.* ¶¶ 33, 41, 49, 57, 65, 73, 80, 88, 96, 107, 117.

In sum, the Government did everything other than "manually turn the levers and valves." *Id.* ¶ 23. Thus, Plaintiffs contend that the level of control exercised by PAW was "well beyond the Government's regulatory role," and that the Government is appropriately responsible as an operator and as an arranger under CERCLA. *Id.* ¶ 26. As such, Plaintiffs contend the Government must pay its share of response costs that Plaintiffs have incurred and continue to incur to dispose of hazardous waste arising from the Government's operation of their refineries during the wartime period.

Plaintiffs' first claim for relief seeks response cost recovery under CERCLA section 107(a), codified at 42 U.S.C. 9607(a). Plaintiffs assert a second claim for relief arising under CERCLA section 113(g)(2), codified at 42 U.S.C. 9613(g)(2), and the declaratory judgment act, 28 U.S.C. 2201(a), seeking a declaratory determination binding the Defendant in subsequent actions to pay response costs or damages.

## II.

Defendant argues that Plaintiffs' allegations regarding wartime regulatory authority do not state a claim for operator liability at 11 of the 12 refineries.[1] Mot. at 10-11. Defendant characterizes the Government's control over petroleum inputs, products, prices, and purchasers as "general procurement activities" insufficient to give rise to operator liability under CERCLA. Mot. at 12–14. Defendant contends that Plaintiffs' remaining allegations concerning the Government's control over hazardous waste generation, release, and disposal are conclusory and not entitled to a presumption of truth because they require an unsupported inferential leap. *Id.* at 14–16. Defendant argues that Plaintiffs have not specifically alleged that the Government "manage[d], direct[ed], or conduct[ed] . . . operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 11 (citing *Bestfoods*, 524 U.S. at 61).

Defendant further contends that Plaintiffs have failed to allege a nexus between the alleged control exercised by the Government and the hazardous waste released at each refinery. *Id.* Defendant also argues that Plaintiffs have not stated a claim for arranger liability, as Plaintiffs have not alleged that the Government owned or possessed hazardous waste, nor have Plaintiffs alleged that the Government took intentional steps to dispose of hazardous waste. *Id.* at 18–21. Finally, Defendant contends that Plaintiffs have not pled facts demonstrating that the costs incurred are necessary and consistent with the national contingency plan. *Id.* at 21–24.

Plaintiffs argue that the allegations of pervasive Government control over refinery operations including inputs, outputs, prices, and purchasers, are all that is required to state a claim for operator liability. Resp. at 9. Plaintiffs contend those allegations, taken as true, show

---

[1] Defendant notes that "for purposes of this Motion, the United States does not challenge the sufficiency of Plaintiffs' allegations as to the Government's owner or operator status at the Eastern States Houston Refinery."

that the Government managed, directed, and controlled operations having to do with pollution. *Id*. Plaintiffs argue that they have gone above and beyond their pleading requirement by further alleging: 1) that Government-controlled operations utilized equipment and processes that leaked hazardous waste, 2) that the Government tracked losses and maintained authority over construction projects, 3) that the Government directed immediate changes to refinery yields, altering waste profiles at the refineries, and 4) that the Government allocated corrosive "sour crude" which the refineries were not equipped to process, further contributing to the waste profile of the refineries. *Id*. at 10. Plaintiffs question Defendant's reliance on the *Exxon* case from the Southern District of Texas, which Plaintiffs argue imposes a new requirement of "day-to-day" decision making regarding waste disposal. *Id*. at 17–18. Plaintiffs argue that this is inconsistent with the standard set forth by the Supreme Court in *Bestfoods*. *Id.* at 17.

Plaintiffs argue that the Government is also an arranger based on its "constructive possession" of waste in its control. *Id.* at 19–20. Plaintiffs contend that the Government's "final review, approval, and authorization of plans submitted by the Refineries for equipment and process designs that necessarily included waste disposal" support an inference that the Government intended and planned for the disposal of wastes. *Id.* at 21. Finally, with respect to cost necessity and compliance with the national contingency plan, Plaintiffs argue that this is a fact intensive inquiry which, under applicable law, is neither a matter to be considered at the 12(b)(6) stage nor is it an element of Plaintiffs' prima facie case. *Id.* at 22–24.

## III.

"To establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a "facility"; (2) a release or threatened release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur "necessary costs of

response" consistent with the NCP; and (4) the defendant falls within one of the four categories of potentially responsible parties." *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001). Defendant only challenges the sufficiency of the allegations with respect to the third and fourth elements. The fourth element will be addressed first, followed by the third.

Under § 107(a)(2)-(3), "Covered persons" (potentially responsible parties) include "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of," (owner and operator liability) and "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances" (arranger liability). 42 U.S.C. § 9607(a)(2)-(3). Operators and arrangers are liable for necessary response costs incurred consistent with the national contingency plan.[2] 42 U.S.C. § 9607(a)(4)(B).

## A.

In the statute, "[t]he phrase 'owner or operator' is defined only by tautology . . . as 'any person owning or operating' a facility." *United States v. Bestfoods*, 524 U.S. 51, (1998) (quoting § 9601(20)(A)(ii)). Courts have not interpreted the term "operator" uniformly.

In *FMC*, the owner of a former textile rayon facility brought an action to recover response costs incurred based on the Government's role in operating the facility during World War II. *FMC Corp. v. U.S. Dep't of Commerce*. 29 F. 3d 833, 843 (1994). The court noted that "the Government can be liable when it engages in regulatory activities extensive enough to make

---

[2] The national contingency plan will be discussed in more detail in the analysis section.

it an operator of a facility or an arranger of the disposal of hazardous wastes." *Id.* at 840. In

determining whether the Government was an operator, the court considered whether the

Government exercised "*actual and substantial control* over the corporation's day-to-day

operations and its policy making decisions." *Id.* (emphasis added). The court determined that the

Government controlled the "product the facility would produce, the level of production, the price

of the product, and to whom the product would be sold," and therefore exercised "substantial

control" over plaintiff's production facility so as to subject the Government to operator liability.

*Id.*

In *Bestfoods*, the United States brought an action for the costs of cleaning up industrial

waste generated by a chemical plant. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). The

issue before the Supreme Court was whether and when a parent corporation may be held liable as

an operator of a polluting facility owned by its subsidiary. A brief overview of the procedural

history helps to explain the principles established by *Bestfoods*. The District Court explained as

follows:

> a parent corporation is *directly liable* under section 107(a)(2) as an operator only
> when it has exerted power or influence *over its subsidiary* by actively
> participating in and exercising control *over the subsidiary's business* during a
> period of disposal of hazardous waste. A parent's actual participation in and
> control over a subsidiary's functions and decision-making creates 'operator'
> liability under CERCLA; a parent's mere oversight of a subsidiary's business in a
> manner appropriate and consistent with the investment relationship between a
> parent and its wholly owned subsidiary does not.

*Bestfoods*, 524 U.S. at 59 (quoting *CPC Int'l, Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549,

572 (W.D.Mich.1991)) (emphasis added). The District Court applied this "participation and

control" test and determined that the parent entity was liable as an operator, as it exercised

control over the subsidiary's business by selecting its board of directors, populating its ranks

with officials, and playing a significant role in shaping its environmental policy. *Id.* The District

Court observed that, in addition to direct liability as described above, the parent may also be subject to indirect or vicarious liability for the subsidiaries actions when the corporate veil can be pierced under state law. *Id.* The Sixth Circuit Court of Appeals reversed in part, rejecting the District Court's direct liability analysis (largely without explanation), and found that the corporate veil could not be pierced so as to establish indirect liability. *Id.* at 59–60 (citing *United States v. Cordova Chem. Co. of Michigan*, 59 F.3d 584 (6th Cir.)). The Supreme Court reversed, finding that, although the Court of Appeals "correctly rejected the District Court's analysis of direct liability," the Court of Appeals "erred in limiting direct liability under the statute to a parent's sole or joint venture operation." *Id.*

The Supreme Court rejected the District Court's application of the "actual control test" (or "participation-and-control test") for determining direct liability as an operator under CERCLA. *Id.* at 68. The Court found that the District Court improperly focused on the parent corporation's control over the operation of the *subsidiary's business* (which is only relevant to indirect liability under veil piercing), whereas the proper focus of the direct liability inquiry under CERCLA is control over the operation of the *polluting facilities* themselves:

> The well-taken objection to the actual control test, however, is its fusion of direct and indirect liability; the test is administered by asking a question about the relationship between the two corporations (an issue going to indirect liability) instead of a question about the parent's interaction with the subsidiary's facility (the source of any direct liability). If, however, direct liability for the parent's operation of the facility is to be kept distinct from derivative liability for the subsidiary's own operation, the focus of the enquiry must necessarily be different under the two tests. The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, *and that operation is evidenced by participation in the activities of the facility*, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language.

*Id.* at 67–68. The Court offered a more specific description of activities that would or would not give rise to operator liability:

Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability. *The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.*

*Id.* at 72 (emphasis added) (internal citations and quotations omitted). The Court ultimately defined "operator" under CERLA as follows:

An operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, *operations having to do with the leakage or disposal of hazardous waste*, or decisions about compliance with environmental regulations.

*Id.* at 66–67 (emphasis added). Notably, the Court underscored that "[i]n our enquiry into the meaning Congress presumably had in mind when it used the verb 'to operate,' we recognized that the statute obviously *meant something more than mere mechanical activation of pumps and valves*, and must be read to contemplate 'operation' as including *the exercise of direction over the facility's activities*." *Id* at 71. (emphasis added).

Later that same year, in an unrelated case, the Sixth Circuit Court of Appeals (Boggs, Circuit Judge) decided *Brighton Township. United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998). The United States brought an action against a township and property owner to recover response costs incurred in cleaning up a dumpsite on the property. *Id.* The Township had contracted with the property owner to use his land as a dump site for township residents. *Id.* at 310. The District Court found that, in addition to the property owner, the Township was also liable as an operator for response costs. *Id.* The Sixth Circuit vacated and remanded to the District Court.

Judge Boggs delivered the opinion of the court, with Judge Moore concurring in result, and Judge Dowd dissenting in part and concurring in part. Judge Boggs noted that "authority to control" is insufficient to give rise to operator liability, but that the exercise of "actual control" is required. *Id.* at 313. In discussing the standard, Judge Boggs noted that the court must apply the plain meaning of the word "operator" as set forth by the Supreme Court in *Bestfoods*, regardless of whether the case involved Government entities or corporations. *Id.* at 313. Notwithstanding the fact that the Third Circuit's *FMC* opinion pre-dated *Bestfoods*, Judge Boggs found *FMC* instructive, and determined that "mere regulation does not suffice to render a Government entity liable, but actual operation (or "macromanagement") does." *Id.* at 316. Applying that standard to the case at hand, the court determined that it could not conclude whether the Township was an operator. The court noted the following facts precluded it from concluding as a matter of law that the Township was not an operator:

> As noted by the district court, the record showed that the agreement with Collett specified that the dump meet the specifications of and be under the supervision of the Board of Appeals. The township was not operating at arm's length with a contractor. Rather, it made repeated and substantial ad hoc appropriations, and it made arrangements (including with the local Junior Fire Department) for bulldozing and other maintenance when Collett himself proved unequal to the task. It also took responsibility for ameliorating the unacceptable condition of the dump, before and after scrutiny from the state Government, at least as early as 1965.

*Id.* at 315.

Judge Moore concurred in result, agreeing that the "actual control" standard is applicable, but noting that Judge Boggs "fail[ed] to define this standard clearly so as to provide the lower courts with direct guidance as to when a Governmental entity engages in regulatory activities extensive enough to make it an operator of the facilities in question."[3] *Id.* at 325 (Moore, J.,

---

[3] Judge Boggs noted that the inquiry is fact intensive, and courts are not bound to weigh particular factors that do not apply to the facts of their case.

concurring in result). Judge Moore defined actual control as follows: "A Governmental entity exercises actual control over a facility where its involvement extends beyond 'mere regulation' and amounts to 'substantial control,' or 'active involvement in the activities' at the facility." *Id.* at 325.

Judge Dowd dissented in part and concurred in part, noting disagreement with his colleagues "that a Governmental entity should be held to a lower threshold level of control which would give rise to liability. Instead, I find that *Bestfoods'* standard should be applied to both corporate form and Governmental entities situations."[4] *Id.* at 332 (Dowd, J., dissenting in part and concurring in part). Judge Dowd also found *FMC* instructive, and found that operator liability required that an entity manage "the day-to-day activities of a facility." *Id.* Applying that standard, Judge Dowd noted that he would hold that the Township's actions were insufficient to render it liable as an operator. *Id.*

On remand, the District Court again found the Township liable as an operator, largely without explanation (*Brighton II*). On appeal before the same panel, the Sixth Circuit again reversed because the District Court had not applied any of the standards set forth in the opinion. *United States v. Twp. of Brighton*, 282 F.3d 915, 917 (6th Cir. 2002). The Sixth Circuit's discussion highlights the fragmented nature of the first *Brighton* opinion, and provides insight regarding how the Sixth Circuit viewed the precedential value of its first opinion:

> *Brighton I* produced three separate opinions but no majority opinion; despite the fragmented nature of the panel, however, *Brighton I* provided the district court with standards for defining "operator" liability under CERCLA and for determining whether the recovery costs incurred by the Government were divisible. Specifically, Judges Boggs and Moore agreed that *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), provided the

_____

[4] Judge Boggs explicitly noted that his opinion "should not be read to suggest, as Judge Dowd characterizes it, that a Governmental entity should be held to a lower threshold level of control." *Id.* at 334, n. 7.

appropriate standard for determining whether Brighton Township was liable as an "operator" of the facility in question

*United States v. Twp. of Brighton*, 282 F.3d 915, 918 (6th Cir. 2002).

More recently, Exxon Mobile brought an action in the Southern District of Texas to recover response costs incurred in connection with the Government's alleged operation of their refineries during World War II. On cross motions for summary judgment, the District Court held, in relevant part, that the United States was not an operator of the plaintiff's oil refineries under CERCLA. *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015). The court interpreted the standard promulgated in *Brighton* as inconsistent with *Bestfoods*: "The distinction that opinion drew between the Government-entity and private-entity cases, applying the "regulation" versus "macromanagement" test only when a Government entity is involved is not consistent with *Bestfoods*." *Id.* at 522. The District Court also found that the *FMC* test of "actual control" was rejected by *Bestfoods* as too broad.

The court surveyed three decisions from other circuits which "have recognized that *FMC's* test is unhelpful after *Bestfoods*." *Id.* at 521. In *Lockheed Martin*, following a 12-day bench trial the court found that the United States was not an operator of rocket motor production facilities, and observed that "*FMC's* 'substantial control' test . . . is in tension with *Bestfood's* focus on a party's particularized control over hazardous waste disposal processes" but declined to opine as to whether *FMC* remains good law. *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 149 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016). In *Miami-Dade County*, following a 16-day bench trial, the court found that the United States was not responsible as an operator for environmental contamination at an airport, and noted that "The Third Circuit's reasoning in *FMC* does not assist this Court, because *FMC* is inconsistent with *Bestfoods*." *Miami-Dade Cty., Fla. v. United States*, 345 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004). In

*Steadfast*, on the Government's motion for summary judgment, the court found that the United States was not an operator of sites which previously manufactured explosive materials. *Steadfast Ins. Co. v. United States*, 2009 WL 3785565, at *8 (C.D. Cal. Nov. 10, 2009). The court discussed the *FMC* standard, but its decision was ultimately based on the specific language in *Bestfoods* requiring that an operator "manage, direct, or conduct, operations specifically related to pollution." *Id.*

Applying the *Bestfoods* standard, the *Exxon* court found that the Government was engaged in "procurement activities" but did not "manage, direct, or conduct … operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* The court also found that *Bestfoods* required a "direct nexus between the Government's activities and the decisions in the refineries' waste leakage, disposal, or environmental compliance," and that no such nexus was present. *Id.* at 524.

**B.**

Under § 107(a)(3), arranger liability attaches to "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

"Circuit precedent also makes clear that one may not become an arranger through inadvertence. The party must have some *intent to make preparations for the disposal of hazardous waste*, though that intent goes to the matter of disposing waste generally, not to disposing of it in a particular manner or at a particular location." *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 446 (6th Cir. 2004) (emphasis added). In *GenCorp*, the Sixth Circuit affirmed the

District Court's holding that a co-venturer (*Gencorp*) was an arranger, liable for its share of costs to remediate waste generated by the venture:

> GenCorp and Olin entered into the 1962 Agreement to build a manufacturing plant that would convert TDA . . . into TDI. The generation of toxic waste was a natural byproduct of this manufacturing process. And even if GenCorp somehow did not realize that this process would generate hazardous waste when it entered into the contract . . . it necessarily appreciated this reality when it approved the plant design specifications and capital expenditure requests. The construction plans specifically provided that the hazardous waste generated by the TDI Plant would be placed in drums and buried at an offsite location.

*Id.* at 446.

The court also noted other facts supporting arranger liability, including "(1) the TDI Committee . . . discussed TDI residue disposal; (2) GenCorp Committee members in particular researched and recommended waste disposal locations; (3) the TDI Committee approved methods to reduce the volume of waste sent offsite . . . through capital improvements to the plant; and (4) Olin and GenCorp both funded research aimed at further reducing the volume of residue waste that needed to be disposed offsite." *Id*. The court concluded that "considered together, these facts amply show that GenCorp 'intended to' (and actually did) 'enter into a transaction that included an 'arrangement for' the disposal of hazardous substances." *Id.*

## C.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

## IV.

"To establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a "facility"; (2) a release or threatened release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur "necessary costs of response" consistent with the NCP; and (4) the defendant falls within one of the four categories of potentially responsible parties." *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001). Defendant only challenges the sufficiency of the allegations with respect to the third and fourth elements. The fourth element will be addressed first, followed by the third.

## A.

In their first amended complaint, Plaintiffs allege that Defendant is a covered person under two of the four categories of potentially responsible parties (PRPs). Specifically, Plaintiffs allege that Defendant is liable as an operator under § 107(a)(2) and as an arranger under § 107(a)(3).

## i.

Plaintiffs have stated a claim for operator liability under § 107(a)(2). Plaintiffs allege that the Government controlled day-to-day operations at each refinery. Am. Compl. ¶¶ 31, 38, 46, 54, 62, 65, 70, 78, 85, 91, 101, 115, 121. Specifically, the Government controlled the type of crude

allocated, allocating corrosive "sour" crude to refineries that were only equipped to process "sweet" crude, thereby contributing to pollution. *Id.* ¶¶ 32, 39, 47, 55, 63, 71, 79, 86. The Government also controlled what that crude would be processed into. They issued directives prohibiting the production of certain products such as civilian gasoline, and directing the production of others such as 100-octane aviation gas. *Id.* ¶¶ 32, 40, 48, 56, 64, 72, 80, 87, 93, 102, 116, 122. This, in turn, necessitated the conversion of refinery operations to meet wartime demands, thereby affecting the waste profile at those refineries. *Id.* ¶¶ 32, 40, 48, 56, 64, 72, 80, 87, 93, 102, 116, 122. Plaintiffs also allege that the Government specifically exercised control over the hazardous waste management process itself by controlling approval of war-time construction projects, denying approval for some projects "relating to pollution control that were deemed non-essential to the war effort." *Id.* ¶ 24. The Government also "oversaw" or "dictated" the amount and type of wastes generated and released at each refinery and tracked these production loss statistics. *Id.* ¶¶ 35, 43, 51, 59, 67, 75, 82, 89, 98, 118, 124.

These allegations, accepted as true, support a finding that Defendant "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." *Bestfoods*, 524 U.S. at 66–67. Plaintiffs allege that the Government essentially controlled all aspects of refinery operations other than manually turning the levers and valves. Am. Compl. ¶ 23. Thus, the Government did not physically "conduct" operations themselves. *Bestfoods* recognized, however, "that the statute obviously meant something more than mere mechanical activation of pumps and valves, and *must be read to contemplate 'operation' as including the exercise of direction over the facilities activities*." *United States v. Bestfoods*, 524 U.S. at 51. Indeed, Plaintiffs allege that the Government exercised extensive direction over production activities at their facilities. Thus,

Plaintiffs allege that the Government "directed" operations related to pollution, leakage, and disposal, which were inherent in the refining operations. *Id.* ¶ 25. Plaintiffs allege the Government also "managed" operations related to pollution, leakage, and disposal, by controlling approval of war-time construction projects, denying approval for some projects "relating to pollution control that were deemed non-essential to the war effort." *Id.* ¶ 24.

*Bestfoods* did not offer substantial guidance regarding what it meant by operations "specifically related to pollution" or operations "having to do with leakage or disposal of hazardous waste." *Bestfoods*, 524 U.S. at 66–67. *Brighton I* provides limited guidance. As recognized in *Brighton II*, "*Brighton I* produced three separate opinions but no majority opinion." *United States v. Twp. of Brighton*, 282 F.3d 915, 918 (6th Cir. 2002). Judge Boggs found *FMC's* "actual control test" instructive, and determined that "mere regulation does not suffice to render a Government entity liable, but actual operation (or "macromanagement") does." *Id.* at 316. Judge Moore concurred in result, offering her own definition of "actual control": "A Governmental entity exercises actual control over a facility where its involvement extends beyond 'mere regulation' and amounts to 'substantial control,' or 'active involvement in the activities' at the facility." *Id.* at 325. In dissent, Judge Dowd reached a different result, but also found *FMC* instructive, noting that operator liability requires that an entity manage "the day-to-day activities of a facility." 332.

*FMC* is quite factually analogous to the present case. The owner of a former textile rayon facility brought an action to recover response costs incurred based on the Government's role in operating the facility during World War II. *FMC Corp*, 29 F. 3d at 843 (1994). In determining whether the Government was an operator, the court considered whether the Government exercised "actual and substantial control over the corporation's day-to-day operations and its

policy making decisions." *Id.* The court determined that the Government controlled the "product the facility would produce, the level of production, the price of the product, and to whom the product would be sold," and therefore exercised "substantial control" over the plaintiff's production facility so as to subject the Government to operator liability. *Id.* Plaintiffs' allegations in the present case are strikingly similar to the plaintiff's allegations in *FMC.*

Defendant notes that several courts have found *FMC* inconsistent with *Bestfoods*. At this point, it is fair to say that the main divergence between Plaintiffs' and Defendant's arguments is whether *FMC* or *Exxon* is more consistent with *Bestfoods* and with the statutory text itself. This is particularly true given *Brighton's* limited precedential value, the factual dissimilarities between *Brighton* and the present case, and the lack of any other Sixth Circuit authority on point.

Defendant finds *Exxon* instructive. Exxon Mobile brought an action in the Southern District of Texas to recover response costs incurred in connection with the Government's alleged operation of their refineries during World War II. *Exxon*, 108 F. Supp. 3d 486. The court found that "the Government played the role of a very interested consumer in its wartime contracts," and that the Government's wartime influence over the refineries "stemmed from voluntarily contractual relationships with Exxon's predecessors" in which Exxon's predecessors had bargaining power. *Id.* at 523. The court noted that the output contracts included provisions stating that "the prices, specifications and quantities of [100-octane avgas . . .] shall be *determined by negotiation* between the parties, and [Standard] shall not be required to deliver such products unless and until an agreement has been reached." *Id.* (emphasis in original).

The court rejected Exxon's argument that "the specter of having the refineries seized and cutting crude oil-suppliers coerced its predecessors into taking orders from the federal Government." *Id.* The court observed that "while the Government had seizure authority, it did

not seize, or threaten to seize [either refinery]. Indeed, there was no need; Exxon's predecessors appeared to be willing partners enthusiastic to support the nation's defense needs." *Id.* at 524.

There are several reasons to question Defendant's reliance on *Exxon*,[5] beginning with the procedural posture of that case compared to the present one. The *Exxon* court reached its decision on cross motions for summary judgment, with the benefit of an extensive evidentiary record developed during years of discovery.[6] Here, by contrast, the factual information available is limited to the allegations set forth in the amended complaint. Based on the those allegations, the Court cannot conclude that any wartime influence over Plaintiffs' refineries "stemmed from voluntary contractual relationships" with Plaintiffs' predecessors in which Plaintiffs' predecessors had "bargaining power." *Id.* at 523. Indeed, the allegations in the complaint cut the opposite way. In other words, *Exxon* based its decision in part on the lack of coercive control wielded by the Government over refining operations. The same decision cannot be made in the present case without an evidentiary record.

*Exxon*'s rejection of *FMC* was also based on a misreading of *Bestfoods*. The *Exxon* court stated that "[i]n Bestfoods, the Supreme Court described the 'actual control' test as too broad and stated a narrower standard for operator liability." *Id.* at 521. The *Exxon* court also quoted the following language from *Bestfoods*: "the well-taken objection to the actual control test, however, is its fusion of direct and indirect liability; the test is administered by asking a question about the

---

[5] Insofar as the majority of Defendant's arguments are derived from *Exxon* itself, addressing the *Exxon* opinion will address those arguments as well.

[6] Indeed, none of the cases cited by Defendant (and cited by *Exxon*) involved dismissal for failure to state a claim. In *Lockheed Martin*, following a 12-day bench trial the court found that the United States was not an operator of rocket motor production facilities. *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 149 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016). In *Miami-Dade County*, following a 16-day bench trial, the court found that the United States was not responsible as an operator for environmental contamination at an airport. *Miami-Dade Cty., Fla. v. United States*, 345 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004). In *Steadfast*, on the Government's motion for summary judgment, the court found that the United States was not an operator of sites which previously manufactured explosive materials. *Steadfast Ins. Co. v. United States*, 2009 WL 3785565, at *8 (C.D. Cal. Nov. 10, 2009).

relationship between the two corporations (an issue going to indirect liability) instead of a question about the parent's interaction with the subsidiary's facility (the source of any direct liability).")." *Id.* (quoting *Bestfoods*, 524 U.S. at 66). First, *Bestfoods* never cites *FMC*, much less overrules it. Second, the "actual control" test itself was not rejected by *Bestfoods*. Rather, the *application* of that test by the lower court is what *Bestfoods* rejected. Stated another way, the "actual control" test applied in *FMC* bears no resemblance to the test applied by the District Court in *Bestfoods*. More importantly, the Supreme Court's reasoning for rejecting the District Court's test in *Bestfoods* is entirely inapplicable to *FMC*:

> The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, *and that operation is evidenced by participation in the activities of the facility*, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language.

*Bestfoods*, 524 U.S. at 67–68. Thus, the Court concluded, the District Court's error was not the fact that it employed the "actual control" test, but rather that the District Court focused on the control asserted by the parent over the subsidiary's *business* (which would give rise to indirect liability under veil piercing), rather than focusing on the control asserted over the subsidiary's *facilities* (which would give rise to direct statutory liability as an operator). Thus, the Supreme Court's rejection of the District Court's test in *Bestfoods* did not constitute a rejection of the *FMC* test. In *FMC*, the Third Circuit correctly focused on whether the Government exercised 'substantial control over the [polluting] facility" itself, and not just whether the Government exercised control over the business in general. FMC Corp., 29 F.3d at 843. This is precisely what *Bestfoods* instructs. This is made even more apparent by *Bestfoods'* description of activities that would or would not give rise to operator liability:

> Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of

the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability. *The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.*

*Bestfoods*, 524 U.S. at 67–68. (emphasis added).

Much of the dicta from *Exxon* also reveals that the court was applying a novel standard altogether: "the Government's role focused on allocating scarce materials, not on deciding *whether, when, or how* Exxon's predecessors should dispose of wastes at either facility." *Id.* at 528. This reveals that *Exxon* based its decision in part on an overly restrictive view of the type of control required by CERCLA and *Bestfoods*, one which this Court declines to adopt. CERCLA imposes liability on any person who operates a facility at which hazardous substances are "disposed" of. 42 U.S.C. § 9607(a)(2). The *Exxon* court clearly regarded "disposal" as an intentional task akin to remediation; i.e. the processes by which an operator ameliorates the pollution generated at its facilities.

The statute, however, does not adopt such a restrictive definition. CERCLA's definition of "disposal" borrows from the Solid Waste Disposal Act. 42 U.S.C.A. § 9601(29). The Solid Waste Disposal Act, in turn, defines "disposal" as "discharge, deposit, injection, dumping, *spilling*, *leaking*, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C.A. § 6903(3) (emphasis added). Thus, "disposal" includes both intentional activities such as "depositing," "dumping," and "placing" waste, as well as unintentional activities such as "spilling," and "leaking" waste. This undermines any notion that operator liability is limited to intentional decision making concerning "whether, when, and how" waste is disposed of. Spilling

and leaking can occur regardless of whether an operator "decides" it will happen or is even aware of its occurrence.

Nor does *Bestfoods* support *Exxon's* notion that intentional decision making concerning the "whether, when, and how" of waste disposal is a requirement for operator liability. Rather, *Bestfoods* provides that control over operations "having to do with leakage or disposal of hazardous wastes," gives rise to operator liability. *United States v. Bestfoods*, 524 U.S. at 67. *Exxon*'s focus on "day-to-day waste-disposal decisions" is inconsistent with *Bestfoods* and places undue emphasis on intentionality and "decision making" concerning waste remediation processes. Indeed, *Bestfoods* identified such decision making as *a second avenue* for liability, not the only avenue: "operations having to do with leakage or disposal of hazardous waste, *or decisions about compliance with environmental regulations*." *Bestfoods*, 524 U.S. at 67 (emphasis added).

This also undermines Defendant's argument (derived from *Exxon*) that the *Bestfoods* standard "requires a *direct nexus* between the Government's activities and the *decisions in the refineries' waste leakage, disposal, or environmental compliance*." Mot. at 13 (citing *Exxon*, 108 F. Supp. 3d at 523–24) (emphasis added). In support of this requirement, *Exxon* simply cites to the portion of the *Bestfoods* opinion at which it articulated the definition of "operator." First, no such "direct nexus" requirement appears in the definition articulated in *Bestfoods*, or anywhere else in the opinion. Furthermore, the "decision making" requirement *Exxon* identifies maps onto the second avenue for liability recognized by the *Bestfoods* definition of "operator", namely "decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 67. No such decision making requirement attaches to the first avenue for liability identified by *Bestfoods*, namely managing, directing, or conducting "operating having to do with leakage or

disposal of hazardous waste." *Id.* Indeed, *Bestfoods* "employed broad, passive language" here. *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 382 (3d Cir. 2013). *Exxon*'s articulation of the relevant standard is not supported by that language.

Thus, *Exxon* imposes its own requirement that the Government exercise intentional control over decisions concerning the time, manner, and method ("whether, when, or how") of waste disposal in order to be considered an operator. This requirement is misplaced in the context of *operator liability*. Rather, this requirement is much more closely associated with *arranger liability*, which attaches to a party who has "*some intent to make preparations for the disposal of hazardous waste . . .*" *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 446 (6th Cir. 2004). CERCLA sets forth operator liability and arranger liability as two independent avenues for a person/entity to be found liable for waste remediation costs. In order to give effect to that statutory intent, it is important to interpret those two avenues so as to give each of them independent meaning, and not to blur their requirements together.

Statutory intent also weighs in favor of rejecting *Exxon's* formulation of the operator liability standard. Imposing operator liability only where the Government exercises specific, intentional control over the time, manner, and method of waste remediation is inconsistent with the purpose of the statute. Such a focus would reward the Government for deliberate indifference or ambivalence to waste remediation matters. This would enable them to control production activities of polluting facilities with impunity, resulting in waste generation and leakage. Under *Exxon's* standard, they would nonetheless be absolved of operator liability so long as they take no position on whether or how any efforts are undertaken at those facilities to ameliorate the waste. Such a standard would undermine, rather than advance, CERCLA's goal of holding responsible parties strictly liable for remediation of hazardous substances. *See CPC Int'l, Inc. v.*

*Aerojet-Gen. Corp.*, 731 F. Supp. 783, 791 (W.D. Mich. 1989). ("by imposing strict liability on broad categories of Defendants, Congress also evidence its intent to make the responsible parties pay for the costs of the cleanup."). The remedial purpose of CERCLA encourages operators of facilities at which hazardous substances are generated to properly ameliorate that waste. *Id.* ("the purpose of CERCLA is certainly to encourage remedial and removal actions."). The failure to take any action with respect to that waste cannot be the very fact that absolves an entity of operator liability when that entity has otherwise asserted substantial control over production operations at polluting facilities.

In sum, *Bestfoods* did not explicitly disturb the holding of *FMC*. It did, however "sharpen" the definition of an "operator" for CERLCA purposes by focusing the "actual control" inquiry on control over "operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 61. The definition of "operator" offered by *Bestfoods* cannot be interpreted, as *Exxon* does, to transform the standard for operator liability into one that would be indistinguishable from arranger liability, and would be altogether inconsistent with CERCLA's text and remedial purpose. Nor should the definition of "operator" offered by *Bestfoods* be read in a vacuum. Rather, it should be considered alongside other dicta from the opinion which help to elucidate the principles *Bestfoods* established:

> The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, *and that operation is evidenced by participation in the activities of the facility*, not the subsidiary . . . . *The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.*

As explained above, Plaintiffs allege that the Government exercised an eccentric degree of control over the operations of their polluting facilities which extended to control over waste

generation, leakage, and disposal. These allegations are sufficient to state a claim for operator liability. A key factual question in this case is whether and to what extent the Government's alleged control of inputs, outputs, conversion of facility operations, and constructions projects, was specifically brought to bear on operations having to do with leakage or disposal of hazardous waste. Another key question will be whether such coercive "control" existed at all, or whether the operations at Plaintiffs' polluting facilities were the result of voluntary contractual arrangements (as was the case in *Exxon*). The answers to these questions must be developed during discovery. At the pleading stage, Plaintiffs need not provide exhaustive descriptions of every fact that might support operator liability. They have plead sufficient facts to support a reasonable inference that Defendant was an operator of their polluting facilities.

### ii.

Plaintiffs have not stated a claim for arranger liability under § 107(a)(3).[7] In contrast to operator liability, which attaches to any person who operates a facility at which hazardous substances were disposed of, arranger liability attaches to persons who specifically arrange for the disposal of that hazardous waste. An arranger must 1) own or possess the hazardous waste in question, and 2) take intentional steps to dispose of it. *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 448 (6th Cir. 2004). One does not become an arranger through inadvertence. *Id.* at 448. Rather, "the party must have some intent to make preparations for the disposal of hazardous waste, though that intent goes to the matter of disposing waste generally, not to disposing of it in a particular manner or at a particular location." *Id.*

None of Plaintiffs' allegations suggest that Defendant took intentional steps to dispose of waste. That is, Plaintiffs simply do not allege that Defendant made any arrangements with respect to waste disposal. Nor do Plaintiffs allege that Defendant owned or possessed the

---

[7] Notably, neither Plaintiffs nor Defendant devote much discussion to arranger liability.

hazardous waste in question. In support of their claim, Plaintiffs cite to three paragraphs of the amended complaint in which they allege that the Government 1) controlled the entire petroleum products supply chain, 2) tracked "losses" from Government-directed operations, and 3) took a lead role in wartime refinery reconfiguration. Resp. at 20 (citing Am. Compl. at ¶¶ 23, 33, 35). Even under the liberal pleading standard of Rule 8, these allegations are simply too nonspecific to support an inference that the Government took intentional steps with respect to arranging for waste disposal.

Plaintiffs note that "intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances." Resp. at 20 (citing *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 845 (6th Cir. 1998)). Plaintiffs further note that knowledge of waste disposal may, in some instances, support an inference of intent. *Id.* Plaintiffs cite to *GenCorp* as an example of one such instance, in which the Sixth Circuit found that arranger liability existed where the party "necessarily appreciated [hazardous waste generation] when it approved the plant design specifications and capital expenditure requests." *Id.* at 20 (citing GenCorp, 390 F.3d at 446). Notably, the court in *Gencorp* observed the following additional facts in support of its finding of arranger liability:

> the TDI Committee (whose membership included equal numbers of representatives from Olin and GenCorp) discussed TDI residue disposal; (2) GenCorp Committee members in particular researched and recommended waste disposal locations; (3) the TDI Committee approved methods to reduce the volume of waste sent offsite (*i.e.,* to the Big D landfill) through capital improvements to the plant; and (4) Olin and GenCorp both funded research aimed at further reducing the volume of residue waste that needed to be disposed offsite. *See* D. Ct. Op. at 45–46. Considered together, these facts amply show that GenCorp "intended to" (and actually did) "enter into a transaction that included an 'arrangement for' the disposal of hazardous substances."

*GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 446 (6th Cir. 2004). Thus, *GenCorp* was intimately involved in decisions relating to specific waste disposal processes. The only allegation Plaintiffs

make in the instant case concerning approval of design specifications or waste disposal processes is the allegation that the Government controlled approval of war-time construction projects, denying approval for some projects "relating to pollution control that were deemed non-essential to the war effort." Am. Compl. ¶ 24. Even when coupled with Defendant's knowledge of the waste generated, this does not resemble the level of intentionality GenCorp exercised with respect to waste disposal plans and processes.

With respect to the "possession" or "ownership" requirement, Plaintiffs again cite to *GenCorp* for the proposition that constructive ownership or constructive possession is sufficient to support arranger liability. Resp. at 21. The *GenCorp* court found that GenCorp had constructive ownership and possession of the waste where it "had an active interest in the facility through its option to buy the plant, secured by its 'earnest money'—its contribution of one half of the construction costs." *GenCorp*, 390 F.3d at 449. Plaintiffs do not allege that the Government had any similar economic interest in its facilities. The facts of *GenCorp* as they relate to "constructive ownership" are simply not readily comparable to the instant case. *GenCorp* involved apportioning liability between two co-ventures with economic interests in the venture. The *Gencorp* court also found that GenCorp had constructive possession over the waste where GenCorp "had equal representation on the Committee that oversaw the construction, operation and management of the TDI Plant" and "approved the design plans, capital appropriations requests and the budgets of the TDI Plant, all of which contemplated continued offsite waste disposal." *Id.* Again, as discussed above, there is no allegation that the Government exercised that type of intentional control over decision making concerning waste disposal processes. Thus, Plaintiffs have not pled facts to support a reasonable inference that the Government was an arranger under § 107(a)(3).

**B.**

In addition to establishing that Defendant is a covered person under § 107(a), Plaintiffs will ultimately have to establish that its remediation costs were necessary and compliant with the National Contingency Plan (NCP). *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001). "Costs are necessary if incurred in response to a threat to human health or the environment . . . . Conversely, costs incurred at a time when the plaintiff was unaware of any threat to human health or the environment are not necessary." *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006).

A contamination cleanup is consistent with the NCP "if, taken as a whole, it is in 'substantial compliance' with 40 C.F.R. § 300.700(c)(5)-(6), and results in a 'CERCLA-quality cleanup.'" *Id.* at 707 (citing *Franklin County,* 240 F.3d at 543)). A "CERCLA-quality cleanup" is a response action that "(1) protects human health and the environment, (2) utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable, (3) is cost-effective, (4) satisfies Applicable and Relevant or Appropriate Requirements ("ARARS") for the site, and (5) provides opportunity for meaningful public participation." *Franklin Cty.*, 240 F.3d at 543. The NCP sets out "extensive requirements governing hazardous substance response." *City of Spokane v. Monsanto Co.*, 237 F. Supp. 3d 1086, 1094 (E.D. Wash. 2017).

These technical requirements include a Remedial Investigation, Feasibility Study, Remedial Design, and Record of Decision (RI/FS/ROD/RD). *Franklin County,* 240 F.3d at 544. A Remedial Investigation (RI) "emphasizes data collection and site characterization," while the Feasibility Study (FS) uses that data "to define the objectives of the response action and to develop remedial action alternatives." *Id.* (citing 40 C.F.R. § 300.5). The Record of Decision

(ROD) is "a document setting forth the proposed remedy as recommended in the RI/FS." *Id.* The Remedial Design (RD) stage "includes the actual design of the selected remedy, as well as its implementation." *Id.* An immaterial or insubstantial deviation from NCP requirements will not result in a cleanup that is "not consistent" with the NCP. 40 C.F.R. § 300.700(c)(4); *Reg'l Airport*, 460 F.3d at 707

As Plaintiffs appear to acknowledge, the amended complaint does little more than assert that Plaintiffs have incurred "necessary costs of response . . . consistent with the NCP." Am. Compl. at ¶ 131. This simply will not suffice, even under the liberal pleading standard of rule 8. Plaintiffs assert that cost necessity and compliance with the NCP is a "fact-intensive, technical issue not suitable for 12(b)(6) consideration." Resp. at 22. In support of this assertion Plaintiffs cite to *Buffalo Color Corp. v. Alliedsignal*, Inc., 139 F. Supp. 2d 409, 417-418 (W.D.N.Y. 2001) (finding evaluating NCP compliance normally requires trial or a full record). In *Buffalo Color Corp*, the court found that summary judgment must be denied because no factual record had been established to determine compliance with the NCP. *Id.* Notably, the court had bifurcated the litigation, "ordering that initial discovery and motion practice be limited to liability issues." *Id.* Thus, there was no evidentiary record upon which to render a judgment as to recoverability of specific costs. First, no such bifurcation has taken place in this case. Second, the fact that summary judgment could not be entered in *Buffalo Corp* does not at all support Plaintiffs' contention that they are excused from any pleading requirements concerning cost necessity and compliance with the NCP. Indeed, *Buffalo Color Corp* specifically identified cost necessity and compliance with the NCP as elements of the plaintiff's prima facie case. *Id.* at 415.

Plaintiffs also cite to two cost recovery complaints filed by the Government in the Sixth Circuit since 2006, in which the Government has allegedly made "allegations as to NCP

compliance nearly identical to those allegations in the Complaint here." Resp. at 22–23 (citing *U.S. v. Riverview Trenton R.R. Co.*, 2:14-cv-14707-PDB-MJH, ECF No. 1 at ¶ 25 (filed Dec. 12, 2014) (E.D. Mich. 2014) (alleging that "[t]he response action taken at the Site and the costs incurred incident thereto was not inconsistent with the [NCP]"); *U.S. v. Belle Tire Distrib., Inc.*, *et. al*, 1:06-cv-00816, ECF No. 13 at ¶ 25 (filed Aug. 5, 2007) (W.D. Mich. 2006) (alleging that "[t]he response actions taken and the response costs incurred by the United States at the Site are not inconsistent with the [NCP]").

As Defendant notes, however, those cost recovery actions were brought pursuant to section 107(a)(4)(A), which provides for recovery of "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe *not inconsistent with* the national contingency plan." 42 U.S.C. 9607(a)(4)(A) (emphasis added). This places the burden upon defendants to prove *inconsistency* with the NCP in actions brought by the United States, individual States, or an Indian Tribe. *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989) ("As noted, [Defendant] bears the burden of demonstrating that the costs sought under CERCLA's liability provisions are inconsistent with the NCP."). Plaintiffs, in contrast, have brought an action pursuant to section 107(a)(4)(B), which provides for recovery of "any other *necessary* costs of response incurred by another person *consistent with* the national contingency plan." 42 U.S.C. 9607(a)(4)(B) (emphasis added). Cost necessity and NCP consistency are elements of Plaintiffs' prima facie case, which places the burden on Plaintiffs to plead and prove those elements. *See Franklin Cty.*, 240 F.3d at 541; *Reg'l Airport*, 460 F.3d at 703.

Plaintiffs identify two cases in which the Sixth Circuit has listed the elements of the prima facie case and not included NCP compliance as elements. Resp. at 23 (citing *Kalamazoo*

*River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000); *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347-48 (6th Cir. 1998)). Plaintiffs do not, however, identify any reason why the two more recent cases cited above, namely *Franklin Cty* and *Reg'l Airport* (which *do* list NCP compliance as a required element) should be disregarded. Furthermore, the omission of NCP compliance from a list of required prima facie elements is not equivalent to an affirmative statement that NCP compliance is *not* a required element of the prima facie case.

Plaintiffs also cite to *Hobart Corp* for the proposition that "conclusory allegations of consistency with the NCP are not necessarily fatal to the counterclaim." Resp. at 23 (citing *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2017 WL 3773146, *7 (W.D. Ohio Aug. 29, 2017)). However, the quotation is taken out of context. The court first noted that the counterclaimant had "not alleged that it offered an opportunity for public comment or that its response resulted in a CERCLA-quality cleanup" and further noted that "[i]n recent years, several courts have dismissed CERCLA claims containing conclusory allegations of consistency with the NCP." *Hobart Corp.*, 2017 WL 3773146, at *7. Thereafter, the court observed that "[n]evertheless, the Sixth Circuit has held that certain '*initial' or 'preliminary' investigation and monitoring costs* may be recoverable by private parties regardless of compliance with the NCP. *Id.* (emphasis added). The court therefore concluded that "[g]iven that DP&L seeks to recover *costs of sampling and monitoring*, its conclusory allegations of consistency with the NCP are not necessarily fatal to the counterclaim." *Id.* Thus, the *Hobart* court, consistent with Sixth Circuit precedent, excused the NCP pleading requirement with respect to "initial" or "preliminary" investigations and monitoring costs, but not with respect to all response costs.

*Hobart* does not, however, support Plaintiffs contention that they are excused from pleading any factual information concerning its response costs. After observing that initial investigation and monitoring costs need not comply with the NCP, the court observed as follows: "There are, however, other pleading deficiencies that are not so easily overcome. As Plaintiffs note, DP&L does not allege *why, when, or under what circumstances* it conducted its own groundwater sampling and monitoring . . ." *Id.* (emphasis in original). Indeed, the court ultimately dismissed the counterclaims as insufficient to state a claim upon which relief could be granted. *Id.* at *9. Similarly, Plaintiffs offer no facts concerning when, where, why, or under what circumstances remediation efforts were undertaken resulting in response costs being incurred.

Other courts have dismissed CERLCA claims for failure to sufficiently allege cost necessity and NCP compliance. In *Spokane*, counterclaimant Monsanto alleged as follows:

> As a result of the City's discharges, Defendants/Counter–Claimants have incurred and will continue to incur response costs to investigate alleged PCB contamination in the Spokane River. In addition to past costs, Defendants/Counter–Claimants will continue to incur response costs as the investigation proceeds. Defendants/Counter–Claimants have incurred legal and other costs defending the legal action(s) attributable to and caused by the City's own discharges . . . Defendants/Counter–Claimants have paid and will continue to pay necessary response costs consistent with the National Contingency Plan, within the meaning of CERCLA § 101(31), 42 U.S.C. § 9601(31), including costs to assess and investigate contamination caused by the City's releases and/or disposal of hazardous substances to the Spokane River. Additionally, if Defendants/Counter–Claimants are found liable to the City for contamination of the Spokane River, Defendants/Counter–Claimants will incur costs to investigate and/or remediate the hazardous substances that the City has released and/or disposed of to the Spokane River.

*City of Spokane v. Monsanto Co.*, 237 F. Supp. 3d 1086, 1094 (E.D. Wash. 2017). The court found that, based on these allegations, it could not plausibly conclude: 1) whether "Monsanto's alleged response costs were necessary to the actual containment and cleanup of hazardous

releases;" 2) whether the response costs were consistent with the NCP; or 3) whether any response costs were even incurred at all. *Id.* Similarly, Plaintiffs' amended complaint does not contain much more than a bare assertion that they have incurred "necessary costs of response . . . consistent with the NCP." Am. Compl. at ¶ 131. In fact, Monsanto's allegations in *Spokane* contained even more relevant detail than Plaintiffs' amended complaint. Monsanto specified the pollutant, namely PCB, as well as the location where the cleanup took place, namely the Spokane River. *Monsanto*, 237 F. Supp. 3d at 1094.

Accordingly, Plaintiffs' amended complaint will be dismissed without prejudice. The allegations are legally insufficient as is, but the deficiency can potentially be cured, and Plaintiffs may seek leave to file an amended complaint to cure these deficiencies pursuant to Local Rule 15.1.[8] Plaintiffs will be granted 60 days to file a motion to amend.

## V.

Accordingly, it is **ORDERED** that the motion to dismiss, ECF No. 32, is **GRANTED**.

It is further **ORDERED** that the amended complaint, ECF No. 4, is **DISMISSED without prejudice**.

It is further **ORDERED** that Plaintiffs shall have until **June 4, 2018**, to file a motion to amend their complaint.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 4, 2018

---

[8] Plaintiffs appended a request for leave to amend to their response brief. This is not a proper motion under Local Rule 15.1. A motion to amend under Local Rule 15.1 should set out the basis for the motion and attach the proposed amended complaint.

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 4, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager