# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MRP PROPERTIES COMPANY, LLC, § <br> VALERO REFINING COMPANY- § <br> OKLAHOMA, VALERO REFINING § <br> COMPANY-TENNESSEE, L.L.C., § <br> THE PREMCOR REFINING GROUP § <br> INC., VALERO REFINING-TEXAS, § <br> L.P. and ULTRAMAR INC. § <br> § <br> *Plaintiffs*, § <br> § <br> v. § <br> § <br> THE UNITED STATES OF AMERICA.§ <br> § <br> § <br> *Defendant.* § | Case No.: 1:17-cv-11174-TLL-PTM |

## SECOND AMENDED COMPLAINT

Plaintiffs, MRP PROPERTIES COMPANY, LLC ("MRP"), VALERO

REFINING COMPANY-OKLAHOMA ("Valero-OK"), VALERO REFINING

COMPANY-TENNESSEE, L.L.C. ("Valero-TN"), THE PREMCOR REFINING

GROUP INC. ("Premcor"), VALERO REFINING-TEXAS, L.P. ("Valero-TX")

and ULTRAMAR INC. ("Ultramar") (collectively, the "Valero Companies" or

"Plaintiffs"), by and through their undersigned attorneys, allege the following

against Defendant, THE UNITED STATES OF AMERICA ("Defendant" or the

"Government"), in this Second Amended Complaint:

**INTRODUCTION**

1.     Leading up to and during World War II ("WWII"), the Government controlled the operation of the nation's petroleum refining industry broadly and the nation's refineries specifically to ensure the manufacture and availability of petroleum products necessary to win the war.   Government control was complete and pervasive.  At the refinery level, the Government determined allocations and sources of crude oil and other feed stocks, what products to produce from those materials, the level of production, and the prices at which, and the purchasers to whom, products would be sold.  The Government had and exercised the authority to cut off crude oil supplies entirely or to seize a refinery in the event of non-compliance with Government directives.  Simply put, during the wartime period, refineries were run in the way the Government required them to be run.

2.     Today, the Valero Companies are addressing contamination and incurring environmental response costs associated with the Government's wartime operations at certain refineries the Valero Companies now own.  To be clear, with the exception of Ultramar, the Valero Companies did not own or operate the refineries that are the subject of this action (the "Sites") during the wartime period. The Valero Companies purchased the Sites much later in time.   The Valero Companies have requested that the Government pay its fair share of these response costs through a negotiated process, but the Government has refused to do so.  Thus,

the Valero Companies are bringing this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), for response costs related to the wartime contamination at the Sites. After all, it was the Government—and not the Valero Companies or anyone else— that directed and controlled the type and amount of wastes generated and, ultimately, released at each of the Sites during the wartime period.

## JURISDICTION

3.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action arising under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief). Jurisdiction is also proper in this Court under 42 U.S.C. §§ 9613(b) and 9613(g)(2) (CERCLA).

## VENUE

4.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), 1391(c)(2) and 1391(e)(1)(A) and 42 U.S.C. § 9613(b).

## PARTIES

5.    Plaintiff, MRP Properties Company, LLC ("MRP"), is a limited liability company organized under the laws of the State of Michigan.

6.    Plaintiff, Valero Refining Company-Oklahoma ("Valero-OK"), is a corporation organized under the laws of the State of Michigan.

7.      Plaintiff, Valero Refining Company-Tennessee, L.L.C. ("Valero-TN"), is a limited liability company organized under the laws of the State of Delaware.

8.      Plaintiff, The Premcor Refining Group Inc. ("Premcor"), is a corporation organized under the laws of the State of Delaware.

9.      Plaintiff, Valero Refining-Texas, L.P. ("Valero-TX"), is a limited partnership organized under the laws of the State of Texas.

10.     Plaintiff, Ultramar Inc. ("Ultramar"), is a corporation organized under the laws of the State of Nevada.

11.     Defendant, the United States of America ("Defendant" or the "Government"), is named for the actions of its departments, agencies and instrumentalities, including but not limited to: the Reconstruction Finance Corporation, the Defense Supplies Corporation and the Defense Plant Corporation; the War Production Board, including its predecessors, the Office of Production Management and the Supplies Priorities and Allocation Board (collectively, the "War Production Board" or "WPB"); the Petroleum Administration for War, including its predecessors, the Office of the Petroleum Coordinator for National Defense and Petroleum Coordinator for War (collectively, the "Petroleum Administration for War" or "PAW"); and the Department of the Interior, as successor to the PAW.  The Government has been served and has appeared in this lawsuit.

# FACTUAL ALLEGATIONS

## A.    THE BASES OF GOVERNMENT AUTHORITY OVER THE REFINING INDUSTRY.

12.    In response to WWII, and in the interest of national defense, the Government wielded broad authority over the entire petroleum refining industry. With comprehensive wartime powers, the Government controlled the operations of the refining industry by issuing regulations, orders and directives; through direct involvement by government personnel; by controls over labor; and by other means, all designed to increase manufacturing outputs of wartime products.  Some of these wartime powers were in place well before the United States entered WWII as a combatant following the attack on Pearl Harbor on December 7, 1941.

13.    The National Defense Act of 1916 and the Selective Training and Service Act of 1940 each gave to the President the authority to take immediate possession of any manufacturing plant and produce munitions, war products or other materials "as may be required."   Under the very real threat of seizure—the Government did, in fact, seize refineries during the wartime period—refineries were obligated to comply with Government orders to manufacture specific materials and products.

14.    In August 1940, the Reconstruction Finance Corporation ("RFC"), itself a Government corporation, established several subsidiary corporations to aid in the defense of the nation.  The Defense Supplies Corporation ("DSC") was

formed, in part, to buy and sell high-octane aviation gasoline ("avgas"), a new product for which the Government was the primary market. The Defense Plant Corporation ("DPC") was created to finance, and to construct with Federal funds, facilities for the production of war products including avgas and avgas components. The market created, and the facilities financed and constructed through these Government corporations, led to the expansion, conversion and reconfiguration of privately-owned refinery facilities for the manufacture of war products under the supervision and control of the Government.

15.    On May 27, 1941, the President declared a state of Unlimited National Emergency. On the following day, he appointed Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense and created the Office of the Petroleum Coordinator ("OPC"). The OPC was given the mandate to make petroleum and its products continuously available "in the proper forms, at the proper places[,]" to satisfy both military and civilian requirements. The OPC was the predecessor agency to the PAW.

16.    The United States declared war on Japan on December 8, 1941, and on Germany on December 11, 1941. That same month, Congress enacted the First War Powers Act of 1941, granting broad war powers to the President.

17.    In January 1942, President Roosevelt issued Executive Order 9024, which granted unprecedented wartime powers of procurement and production to the

WPB.  The WPB had the power to impose mandatory policies and procedures for the most effective prosecution of war procurement and materials production.

18.     In March 1942, Congress enacted the Second War Powers Act, which granted the President the power to prioritize and allocate any materials that were critical or essential to the war effort.  Various materials necessary for the day-to-day operations of the refining industry—such as steel and other materials necessary to repair or replace aging or failing facilities—were strictly limited by the President's broad allocation authority.

19.     In December 1942, President Roosevelt issued Executive Order 9276 to establish the PAW as the successor to the OPC.  Executive Order 9276 provided the PAW with broad discretionary authority.  The PAW carried out and expanded national plans, policies and objectives for the petroleum industry initiated by the OPC and controlled industry production on a national level to meet wartime demands.  The PAW divided the country into districts, which implemented national objectives at a regional level and carried out the administration of orders and directives.  The PAW organized the district offices in the same manner as the PAW's national headquarters, creating district industry committees and specific departments for production, refining, supply and transportation, and distribution and marketing. District offices had a detailed understanding of regional refineries.

20.    Both the OPC and later the PAW issued "Recommendations" and "Directives"[1] as necessary to achieve military goals, requiring refineries to alter operations and refinery yields at a moment's notice.  The PAW regularly exercised its right to enforce its orders and directives to the petroleum industry and its refineries to ensure the supply of products needed for the successful prosecution of the war.

## B.    THE GOVERNMENT EXERCISED ITS AUTHORITY TO CONTROL THE REFINING INDUSTRY.

21.    Through the PAW, the WPB and other agencies, the Government directed, managed and controlled the operations of the refining industry, such that the entire industry operated as one Government-controlled and integrated enterprise during the wartime period.  As A.P. Frame, Director of PAW's Refining Division, told the U.S. Senate shortly after the end of the war, the refining industry "had met every demand of the military for all kinds of petroleum products.  The small refiners as well as the larger ones had been required to utilize their productive capacity to the maximum[.]  [I]t had in effect been operated as if its various refineries were component parts of one huge Nation-wide refinery."

22.    More specifically, the Government operated the nation's refineries by controlling and directing the following, *inter alia*, at the refinery level:  (i) the

---

[1] While the PAW initially issued "Recommendations," in December 1942, the PAW was authorized to issue "petroleum directives" or "petroleum administrative orders," which were more consistent with their scope and purpose to, among other things, direct the production, refining, storage, shipment and distribution of petroleum products.

allocation—by type and amount—of crude oil and other feed stocks, without which a refinery could not run; (ii) the procurement priorities to obtain services, equipment and parts required to keep refineries operating; (iii) the types and specifications of the war-related products to be manufactured; (iv) the levels of production for each of those products; (v) the price of the products and the profits made; and (vi) to whom the products would be sold within the Government-controlled supply chain.

23.     To ensure the consistent production of prioritized war products, the Government was intimately involved in virtually every aspect of the refineries' operations, from the raw materials, to the production processes and equipment, to labor issues, and more.  Perhaps the only thing the Government did not do was to manually turn the levers and valves at the refineries.

24.     Increases in production and other required changes to product yields often came at the expense of overall refinery efficiency and waste management.  This was an expected and inherent consequence of the victory-at-all-costs policy of the Government in WWII.  For example, during WWII, the WPB controlled approval of the construction of necessary refinery units and equipment.  In some instances, it denied refinery construction projects relating to pollution control that were deemed non-essential to the war effort.

25.     The Government also authorized and approved designs for refinery construction and unit conversion projects for the manufacture of war products, which

projects altered waste outputs, changed waste management obligations, and/or contemplated using existing refinery waste handling and disposal infrastructure. Moreover, in the process of reviewing, evaluating and authorizing wartime construction and conversion projects, the PAW project analyses show that the Government necessarily contemplated the disposal of waste products inherent in such processes and designs.

26.     The unique wartime relationship between the Government and the nation's refineries rose to a level well beyond the Government's regulatory role. The Government intimately involved itself in refinery operations to meet the otherwise unattainable demand for wartime products, particularly avgas. The Government suspended antitrust laws in order to freely coordinate the entire petroleum industry across company lines and required that refineries share intellectual property to maximize production. Refineries that did not comply risked the loss of crude allocations or seizure. As J. Howard Marshall (who served during the war as the OPC's and the PAW's chief counsel and, later, the PAW's assistant deputy administrator) wrote in his autobiography:

> Nothing less than a full-fledged partnership between all of government and all of the oil industry gave any promise of making ends meet. Given federal control of supplies from the oil industry and critical materials supplied to that industry – steel, pipe, pumps, chemicals, and equipment for example – it could be done… No statutory authority was needed to coordinate the whole industry, given our control (direct or indirect) of the critical materials without which firms could not long survive. Perhaps it was extralegal, but it was practical.

27.    Through comprehensive control, the Government, on a day-to-day basis, operated the nation's refineries, including the Sites that are the subject of this action.  The Government's control necessarily extended to the generation of waste and its release into the environment.  By creating the waste—and dictating the type and amount of such waste from each given crude oil allocation—the Government contemplated, understood and was necessarily involved in waste operations at each Site.  Contamination of the Sites resulted from day-to-day operations and inevitable releases from operating units and other equipment.

28.    As the *de facto* operator of the Sites, the Government released hazardous wastes into the environment and disposed of hazardous waste streams into the environment.  Through its sweeping control and authority over day-to-day refinery operations, and its unprecedented regulatory authority over the entire petroleum refining industry, the Government possessed or maintained constructive possession of known hazardous waste products involved in Government-controlled manufacturing processes at the refineries.

C.    GOVERNMENT CONTROL OF SPECIFIC REFINERY SITES.

29.    The various wartime operations conducted under Government control at the Sites resulted in the generation, release and disposal of significant amounts of hazardous wastes or substances, which has, at least in part, caused the contamination for which response costs are being incurred.  As set forth in more detail below, this

contamination created a threat to human health and/or the environment that warranted investigation and appropriate response actions under regulatory oversight. As a result, the Valero Companies have incurred and will continue to incur response costs consistent with the National Contingency Plan ("NCP") and investigation and monitoring costs to which the NCP does not apply.

### 1. The Leonard Alma Refinery

30.    The former Leonard Refineries, Inc. owned and operated a refinery located in Alma, Michigan (the "Leonard Alma Refinery"). During the wartime period, the Government exercised day-to-day control over the operations of the Leonard Alma Refinery.

31.    The Leonard Alma Refinery was subject to the Government's specific allocations of crude oil. As a small wartime refinery, the Leonard Alma Refinery was particularly susceptible to Government control as the amount of crude oil allocated by the Government dictated the refinery's product yields. When crude oil allocations were insufficient, the Leonard Alma Refinery was directed to contact the PAW to request supplemental allocations of crude oil. In short, the PAW maintained final control over petroleum inputs (crude oil allocation) at the refinery. By controlling the raw materials available to the refinery (*i.e.*, the inputs), the Government effectively controlled the day-to-day operations of the Leonard Alma Refinery.

32.    In addition to limiting the amount of crude oil available to the Leonard Alma Refinery, the Government also controlled the type of crude oil allocated.  Most refineries in PAW-District II (which included the Leonard Alma Refinery) were equipped to process "sweet" crude oil.  As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which had a higher sulfur content and required additional refining and processing in order to manufacture finished products.  Due to its higher sulfur content, sour crude oil was highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil.  By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

33.    The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Leonard Alma Refinery during the wartime period.  Such control extended to the type and specifications of the war products and their level of production.  For example, the Government directed that the Leonard Alma Refinery "shall not manufacture or blend any civilian gasoline" except in conformity with Government directives.  The PAW issued instructions in a telegram requiring the Leonard Alma Refinery to change its operations in order to immediately produce maximum yields of kerosene when that product was in short

supply.  The Leonard Alma Refinery expanded its facilities to produce avgas components at the direction of the Government, which authorized the refinery to change its product yields to meet wartime needs.  The Leonard Alma Refinery converted its catpoly plant to codimer production, a critical war product necessary in the production of 100-octane avgas for its ability to boost octane levels.  By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

34.    In addition to controlling the inputs and outputs at the Leonard Alma Refinery, the Government also directed the prices at which, and the purchasers to whom, products were sold.  For example, one contract to supply avgas components (*i.e.*, codimer) to the Standard of Louisiana's Baton Rouge refinery established that the "price to be paid by Buyer to Seller for the product described is that agreed upon between Seller and Petroleum Administrator for War."  While some negotiation over price occurred during the wartime period, the Government maintained final approvals over wartime product pricing and refiner profits were systematically limited.

35.    The Government's control over the Leonard Alma Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not

only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Leonard Alma Refinery. PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters. The Leonard Alma Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time. Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Leonard Alma Refinery. As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

36.    Investigations into contamination at the Leonard Alma Refinery site have revealed the presence of CERCLA-listed hazardous substances, such as volatile organic compounds, semi-volatile compounds, and metals, including varying amounts of cyanide, cobalt, mercury, selenium, hexavalent chromium, lead, iron, manganese, and arsenic. Groundwater contamination at the site presented a potential migration threat. This contamination was determined to pose a threat to human health and/or the environment and necessitated the response actions taken at the site to date, prompting the Michigan Department of Environmental Quality ("MDEQ") to, among other things, enter into consent orders.

37.     The response activities at the site have been performed in substantial compliance with the NCP and under the supervision of and in coordination with MDEQ and EPA.  For example, environmental consultants were retained and site assessments were performed to characterize the site.  Multiple surface soil sampling, ambient air sampling, soil vapor sampling, sub-slab vapor sampling, and non-aqueous phase liquid assessment boring investigations have been conducted in accordance with a RCRA Facility Investigation Work Plan.  Risk of exposure to workers was considered in the RCRA Facility Investigation ("RFI").  Response actions have focused on characterization, interim responses at the perimeter of the site, and addressing highly toxic or highly mobile "principle threats" that represent a significant risk to human health and/or the environment.  Accordingly, initial efforts have focused on stabilizing plume migration and controlling contamination through a groundwater control system.   Initial response actions specifically contemplated future action necessary to evaluate the degree of source remediation and/or controls necessary to prevent off-site migration.   The Environmental Protection Agency ("EPA") and the MDEQ have overseen the cleanup.  Agency requirements, requests, submissions, and oversight (including as set forth or provided in the consent orders), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

38.    The Leonard Alma Refinery was shut down in 1999.  Pursuant to an asset purchase agreement, in 2008 Plaintiff MRP purchased the Leonard Alma Refinery site and acquired certain rights and benefits that encompass the right to pursue cost recovery claims.  Since that time, MRP has incurred and will continue to incur additional response costs in addressing contamination resulting, at least in part, from the Government's operations of the Leonard Alma Refinery during the wartime period.

### 2.    The Mid-West Alma Refinery

39.    The former Mid-West Refineries, Inc. owned and operated a refinery located in Alma, Michigan (the "Mid-West Alma Refinery").  During the wartime period, the Government exercised day-to-day control over the operations of the Mid-West Alma Refinery.

40.    The Mid-West Alma Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period.  For example, in July 1943, the Mid-West Alma Refinery informed the PAW that it was receiving 500 barrels per day less than its crude oil allocation.  As a result, the refinery was forced to notify certain customers that it would be unable to supply gas oils and light-grade fuel oils due to a shortage of crude oil.  One intended effect of PAW's crude oil allocations was to control the refinery's product yields and limit the manufacture of certain products that the PAW deemed non-essential to the war

effort.  By limiting the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Mid-West Alma Refinery.

41.    In addition to limiting the amount of crude oil available to the Mid-West Alma Refinery, the Government also controlled the type of crude oil allocated. Most refineries in PAW-District II (which included the Mid-West Alma Refinery) were equipped to process "sweet" crude oil.  As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which had a higher sulfur content and required additional refining and processing in order to manufacture finished products.  Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil.  By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

42.    The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Mid-West Alma Refinery during the wartime period.  Such control extended to the type and specifications of the products and the level of production.  For example, the Government directed the Mid-West Alma Refinery to produce avgas components (*i.e.*, codimer) and 80-octane all-purpose

military gasoline.  The Government also attempted to require the refinery to make 7-0-2 Navy diesel fuel, but it was determined such production would compromise codimer production at the facility.  The Government authorized certain product runs, and denied others, depending on changing priorities.  By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

43.     The Mid-West Alma Refinery also converted its operations to produce critical war products, particularly codimer.  In 1942, the Mid-West Alma Refinery submitted a proposal to the Government to convert an existing catalytic polymerization unit to the production of codimer, which the OPC subsequently approved.  The Mid-West Alma Refinery was also forced to sacrifice production of motor gasoline in order to make the requisite feedstocks necessary to manufacture codimer.   Then, in 1945, the Government expressly, though conditionally, authorized the discontinuation of codimer production at the refinery, granting permission to Mid-West to "utilize the units involved in the future as you see fit unless specifically requested to do otherwise."  By authorizing or restricting how refinery equipment would be used during the war, and maintaining final approval authority over all construction projects, the Government assumed responsibility for the waste products and disposal practices inherent in refining operations of the time.

44.     In addition to controlling the inputs and outputs at the Mid-West Alma Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold.  For example, the Government reviewed and rejected the cost formula for determining prices at which the Mid-West Alma Refinery could sell codimer to third parties.  The PAW also changed the companies to whom Mid-West was authorized and required to supply war products.

45.     The Government's control over the Mid-West Alma Refinery extended to hazardous waste generation, releases and disposal.   Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Mid-West Alma Refinery.  PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters.   The Mid-West Alma Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Mid-West Alma Refinery.  As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

46.     Investigations into contamination at the Mid-West Alma Refinery site have revealed the presence of CERCLA-listed hazardous substances.  An MDEQ review of site information found that hazardous substances have been released, been deposited, or come to be located at the Mid-West Alma Refinery site in concentrations exceeding cleanup requirements.  Elevated levels of comingled hydrocarbons, phenols, and metals, including lead and mercury, were detected in groundwater wells and sampling.  This contamination necessitated certain response activities, and MDEQ requested that certain obligations be met.

47.     Response actions taken at the Mid-West Alma Refinery site have been performed in substantial compliance with the NCP and under the supervision of and in coordination with MDEQ.  For example, MDEQ requested planned evaluation activities, response activities determined by MDEQ to be technically sound and necessary, and the creation of a Remedial Action Plan that would achieve cleanup criteria consistent with state law.  Groundwater monitoring wells have been installed at the site and a comprehensive evaluation of LNAPL bodies took place in 2017. MDEQ requirements, requests, submissions, and oversight, and other community relations and notice activities, have satisfied any applicable community relations requirements.

48.     The Mid-West Alma Refinery was shut down in 1964.  Pursuant to an asset purchase agreement, in 2008 Plaintiff MRP purchased the Mid-West Alma

Refinery site and acquired certain rights and benefits that encompass the right to pursue cost recovery claims. Since that time, MRP has incurred and will continue to incur additional response costs in addressing contamination resulting, at least in part, from the Government's operations of the Mid-West Alma Refinery during the wartime period.

### 3.    The Roosevelt Mount Pleasant Refinery

49.    The former Roosevelt Oil Company owned and operated a refinery located in Mount Pleasant, Michigan (the "Roosevelt Mount Pleasant Refinery"). During the wartime period, the Government exercised day-to-day control over the operations of the Roosevelt Mount Pleasant Refinery.

50.    The Roosevelt Mount Pleasant Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period. The Roosevelt Mount Pleasant Refinery routinely requested additional allocations of crude oil (and tetra-ethyl lead) from the Government. At one point, C.L. Maguire, President of Roosevelt Oil Company, wrote to the PAW complaining of the desperate shortage of crude oil and its effect on the refinery's outputs. After enumerating his complaints, Maguire noted the company would "of course be good patriots and abide by [PAW's] decision" regarding his request to increase the refinery's crude oil allocation. One intended effect of PAW's crude oil allocations was to control the refinery's product yields and limit the manufacture of certain

products that the PAW deemed non-essential to the war effort. By limiting the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Roosevelt Mount Pleasant Refinery.

51.     In addition to limiting the amount of crude oil available to the Roosevelt Mount Pleasant Refinery, the Government also controlled the type of crude oil allocated. Most refineries in PAW-District II (which included the Roosevelt Mount Pleasant Refinery) were equipped to process "sweet" crude oil. As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which had a higher sulfur content and required additional refining and processing in order to manufacture finished products. Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil. By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

52.     The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Roosevelt Mount Pleasant Refinery during the wartime period. Such control extended to the type and specifications of the products and the level of production. The Government authorized certain product runs, and denied others, depending on changing priorities. For example, the Government

directed the Roosevelt Mount Pleasant Refinery to decrease gasoline yields to make various grades of intermediate products, including kerosene, tractor fuel and diesel fuel. The Government also determined that the crude oil run at the Roosevelt Mount Pleasant Refinery was more suited for the production of special naphtha than motor gasoline, and ordered that "gasoline and other products, such as naphthas not used for the testing of carburetors, are to be subordinated to the extent required for the manufacture of this carburetor naphtha." By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government controlled how the refinery operated on a day-to-day basis.

53.     The Roosevelt Mount Pleasant Refinery also converted its operations to produce certain products, particularly intermediate products, like kerosene and diesel fuel. Compliance with wartime requests to increase production of intermediate products, and decrease gasoline production, required the Roosevelt Mount Pleasant Refinery to shut down a cracking unit. As noted above, the Government also dictated that the refinery produce special naphtha used in testing carburetors. In a letter to the PAW, the refinery noted "how completely we have transformed our operations to the war effort. We do not believe any refinery in the country can show a better percentage of shift from peace time commercial activities to a furtherance of the war effort." Because the Government dictated these and other changes, the Government controlled day-to-day operations at the refinery.

54.     In addition to controlling the inputs and outputs at the Roosevelt Mount Pleasant Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold.  The PAW controlled supply chain logistics and maintained authorization power over the sale of war products.  While some negotiation over price occurred during the wartime period, profits were routinely limited and the PAW maintained final price approval authority over wartime contracts.

55.     The Government's control over the Roosevelt Mount Pleasant Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Roosevelt Mount Pleasant Refinery.  PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters.  The Roosevelt Mount Pleasant Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Roosevelt Mount Pleasant

Refinery.  As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

56.    Investigations into contamination at the Roosevelt Mount Pleasant Refinery site have revealed the presence of CERCLA-listed hazardous substances. MDEQ determined that hazardous substances attributable to the site posed a migration risk with the potential to contaminate drinking water, adjacent surface water, and the Chippewa River.[2]  Several phases of environmental investigation identified contamination in soil, groundwater, surface water, and sediments at the site.  Investigation revealed volatile organic and semi-volatile organic compounds and metals, including mercury, chromium, arsenic, lead, copper, nickel, zinc, selenium, thallium, and cyanide.  MDEQ determined the comingled hazardous substances at the site posed a threat to human health and/or the environment, which could cause an imminent and substantial endangerment to public health, safety, and welfare.  These findings necessitated the response activities taken at the site and prompted two administrative consent orders pursuant to state law.

57.    MDEQ determined that response activities needed to be taken at the site, and such activities have been performed in substantial compliance with the NCP

---

[2] The Roosevelt Mount Pleasant Refinery site is bounded by the Chippewa River to the east and the western portion of the site contains wetlands.  Groundwater discharges to the Chippewa River and the primary site objective is the protection of the Chippewa River and river sediments from being adversely affected from venting groundwater. Releases stem from historic operations, including refinery processes, storage, waste handling and treatment, and handling of additives and petrochemical feedstocks.  Hydrocarbons and metals adhered to the soil matrix and dissolved in groundwater.

and under the supervision of and in coordination with MDEQ. For example, MDEQ required response activities and further investigation to determine the source, nature, extent, and impact of contamination at the site and actions to abate any threat to public health, safety, or welfare, or the environment, caused by the release or threatened release of hazardous substances, pollutants, or contaminants from the site. Sampling and investigation have been undertaken in accordance with MDEQ directives and guidance. Measures have been put in place to monitor and control groundwater contamination threats, including interim hydraulic control wells installed to intercept groundwater plumes near the Chippewa River. Response activities have also included a remedial investigation, feasibility study, and risk assessment report submitted to MDEQ. The Risk Assessment Addendum identified response action alternatives prior to implementation. Ecological risks were also evaluated and considered. Agency requirements, requests, submissions, and oversight (including as set forth or provided in the consent orders), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

58. The Roosevelt Mount Pleasant Refinery was shut down in the 1960's. Pursuant to an asset purchase agreement, in 2008 Plaintiff MRP purchased the Roosevelt Mount Pleasant Refinery site and acquired certain rights and benefits that encompass the right to pursue cost recovery claims. Since that time, MRP has

incurred and will continue to incur additional response costs in addressing contamination resulting, at least in part, from the Government's operations of the Roosevelt Mount Pleasant Refinery during the wartime period.

### 4.    The Bell Ardmore Refinery

59.    The former Bell Oil and Gas Company (through its wholly-owned subsidiary, the Ben Franklin Refining Company) owned and operated a refinery located in Ardmore, Oklahoma (the "Bell Ardmore Refinery").  During the wartime period, the Government exercised day-to-day control over the operations of the Bell Ardmore Refinery.

60.    The Bell Ardmore Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period.  The Bell Ardmore Refinery routinely requested additional allocations of crude oil (and tetra-ethyl lead) from the Government.  The PAW routinely denied these requests, only authorizing allocations in quantities limiting the throughput of the refinery, at least in part as a way to control the refinery's product runs and limit the manufacture of certain products the PAW deemed non-essential to the war effort.  By limiting the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Bell Ardmore Refinery.

61.    In addition to limiting the amount of crude available to the Bell Ardmore Refinery, the Government also controlled the type of crude oil allocated.

Most refineries in PAW-District II (which included the Bell Ardmore Refinery) were equipped to process "sweet" crude oil. As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which had a higher sulfur content and required additional refining and processing in order to manufacture finished products. Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil. By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

62.     The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Bell Ardmore Refinery during the wartime period. Such control extended to the type and specifications of the products and their level of production. For example, the Government directed the Bell Ardmore Refinery to make various grades of avgas, 80-octane all-purpose military gasoline, avgas components (including codimer), kerosene and other products. The Government also authorized certain product runs, and denied others, depending on changing priorities. For example, the Bell Ardmore Refinery was required by the Government to change its operations in order to maximize the production of Navy diesel fuel and kerosene during the wartime period. By dictating the products

manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

63.   The Bell Ardmore Refinery also converted its operations to produce critical wartime products, particularly codimer.  Such conversions were subject to Government approval before construction could begin.  By maintaining final authorization over construction projects, ultimately approving all construction designs, and allocating critical construction materials during the war, the Government was intimately involved with waste processing and disposal decisions at the refinery.

64.   In addition to controlling the inputs and outputs at the Bell Ardmore Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold.  For example, the Government established the formula for determining prices at which the Bell Ardmore Refinery could sell product to third parties in the Government-controlled supply chain.  While some negotiation over price occurred during the wartime period, profits were routinely limited and the PAW maintained final price approval authority over wartime contracts.

65.   The Government's control over the Bell Ardmore Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not only knew

about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Bell Ardmore Refinery. PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters. The Bell Ardmore Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time. Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Bell Ardmore Refinery. As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

66.    Investigations into contamination at the Bell Ardmore Refinery site have revealed the presence of CERCLA-listed hazardous substances, including but not limited to volatile organic compounds, semi-volatile organic compounds, and metals, including barium, chromium, arsenic, nickel, and lead. This contamination necessitated the response actions taken at the site to date, which have been performed in substantial compliance with the NCP under the supervision of and in coordination with EPA and the Oklahoma Department of Environmental Quality ("ODEQ").

67.    For example, ODEQ and EPA Region 6 have overseen the cleanup process and conducted inspections and evaluations of the site. Environmental

consultants were retained to investigate the site and numerous reports have been submitted to state and federal environmental agencies, including risk assessment reports, an RFI, and work plans.   The facility received a RCRA permit and constituents of concern were monitored and evaluated according to EPA risk-based screening values and/or naturally-occurring background levels.     Federal environmental agency sources were used to find toxicity reference values for contaminants of potential concern when evaluating risk.  Interim response actions were implemented to intercept migrating contamination and protect Sand Creek, which is located along the eastern boundary of the Bell Ardmore Refinery site.  EPA and ODEQ requirements, requests, submissions, and oversight, and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

68.    Plaintiff Valero-OK purchased the Bell Ardmore Refinery in 2006 and has since incurred and will continue to incur response costs in addressing contamination resulting, at least in part, from the Government's operations of the Bell Ardmore Refinery during the wartime period.

### 5.    The Vickers Potwin Refinery

69.    The former Vickers Petroleum Company owned and operated a refinery located in Potwin, Kansas (the "Vickers Potwin Refinery").  During the wartime

period, the Government exercised day-to-day control over the operations of the Vickers Potwin Refinery.

70. The Vickers Potwin Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period. Specifically, the Vickers Potwin Refinery fell under a series of PAW-District II crude oil allocation orders that authorized crude oil in limited quantities, at least in part, as a way to control refinery product runs and limit the manufacture of certain products the PAW deemed non-essential to the war effort. By limiting the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Vickers Potwin Refinery.

71. In addition to limiting the amount of crude oil available to the Vickers Potwin Refinery, the Government also controlled the type of crude oil allocated. Most refineries in PAW-District II (which included the Vickers Potwin Refinery) were equipped to process "sweet" crude oil. As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which had a higher sulfur content and required additional refining and processing in order to manufacture finished products. Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil. By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-

District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

72.    The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Vickers Potwin Refinery during the wartime period.  Such control extended to the type and specifications of the products and the level of production.  The Government authorized certain product runs, and denied others, depending on changing priorities.   For example, during the war, the Government directed the Vickers Potwin Refinery to immediately produce "maximum quantities of codimer" to meet increased need for high-octane avgas in the armed forces.  By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

73.    The Vickers Potwin Refinery also converted its operations to produce wartime products, including converting its non-selective catpoly plant to the production of codimer.  The Government approved the project design and scope, utilizing its final authorization power over steel allocation and construction decisions.  As noted in a letter from the PAW, "[s]ince no one has had much experience in manufacturing codimer, the process is one requiring rigid control . . . ."  Because the Government dictated and granted final approval authorizing this and other changes, the Government controlled day-to-day operations at the refinery.

74.    In addition to controlling the inputs and outputs at the Vickers Potwin Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold.  The PAW controlled supply chain logistics and maintained authorization power over the sale of war products.  The PAW determined the price at which Vickers Petroleum could sell its codimer and diverted shipments from certain customers to others.  For example, the Government diverted shipments of codimer during the war from Standard Oil (Louisiana) to Standard Oil (California).

75.    The Government's substantial control over the Vickers Potwin Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Vickers Potwin Refinery.  PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters.  The Vickers Potwin Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Vickers Potwin Refinery.  As

such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

76.    Investigations into contamination at the Vickers Potwin Refinery site have revealed the presence of CERCLA-listed hazardous substances.  Groundwater analysis shows contamination impacts the groundwater.   Constituents include volatile organic compounds, semi-volatile organic compounds, and metals, including antimony, beryllium, cobalt, chromium, lead, nickel, vanadium, zinc, and other CERCLA-listed hazardous substances.  Contamination in the groundwater was found to be detrimental to the environment and potentially a public health hazard. This contamination necessitated the response actions taken to date at the site, which have been performed in substantial compliance with the NCP and under the supervision of and in coordination with state regulators.

77.    For example, environmental consultants have completed assessment reports for the purpose of evaluating contamination, site conditions, and the impact of historic operations on the site.   Assessments included site inspection and interviews. The Kansas Department of Health and Environment ("KDHE") has been involved in the investigation and cleanup activities that have taken place at the site through consent orders. Groundwater wells were installed at the site.  Under the oversight of the KDHE, a Supplemental Work Plan was prepared to further characterize the perched aquifer impacts and evaluate the vapor migration pathway.

A Supplemental Comprehensive Investigation report was completed as part of an approved work plan with the goals of characterizing the soil, geology, surface water, and groundwater, and identifying possible source areas and potential contaminant migration pathways.[3]  Response activities and investigation have followed the KDHE risk-based cleanup levels and policies for soil and groundwater.  Agency requirements, permitting, requests, submissions, and oversight (including those set forth or provided in the consent orders), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

78.    The Vickers Potwin Refinery was shut down by 1964.  Pursuant to an asset purchase agreement, in 2008 Plaintiff MRP purchased a certain portion of the former Vickers Potwin Refinery site and acquired certain rights and benefits that encompass the right to pursue cost recovery claims.  Since that time, MRP has incurred and will continue to incur additional response costs in addressing contamination resulting, at least in part, from the Government's operations of the Vickers Potwin Refinery during the wartime period.

---

[3] The Vickers Potwin Refinery is located in the Flint Hills physiographic province.  Contamination impacted the Water River Basin.  Brush Creek bisects the southern portion of the property and Diamond Creek is located in the northwest corner of the site.  Brush Creek and Diamond Creek flow into the Whitewater River.

### 6.   The Delta Memphis Refinery

79.    The former Delta Refining Company owned and operated a refinery located in Memphis, Tennessee (the "Delta Memphis Refinery").   During the wartime period, the Government exercised day-to-day control over the operations of the Delta Memphis Refinery.

80.    The Delta Memphis Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period.   For example, while the Delta Memphis Refinery required 4,000 barrels of crude oil each day to run at full capacity, the PAW threatened to cut crude oil allocations to fewer than 2,000 barrels per day.   Delta notified the PAW that such an allocation would force the plant to shut down completely.   An intended effect of the PAW's crude oil allocations was to control the refinery's product yields and limit the manufacture of certain products that the PAW deemed non-essential to the war effort.   By limiting the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Delta Memphis Refinery.

81.    In addition to limiting the amount of crude oil available to the Delta Memphis Refinery, the Government also controlled the type of crude oil allocated. Most refineries in PAW-District II (which included the Delta Memphis Refinery) were equipped to process "sweet" crude oil.   As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which

had a higher sulfur content and required additional refining and processing in order to manufacture finished products.  Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil.  By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

82.    The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Delta Memphis Refinery during the wartime period.  Such control extended to the type and specifications of the products and the level of production.  The Government authorized certain product runs, and denied others, depending on changing priorities.  For example, Delta estimated losses of $6,000 per month because the PAW directed Delta to increase the manufacture of residual fuels, but did not allocate sufficient crude oil to allow Delta to manufacture non-essential gasoline products.  In August 1943, the Government directed the Delta Memphis Refinery to increase gasoline and distillate fuel yields.  The Government also directed the Delta Memphis Refinery that "[a]bsolute maximum amounts of kerosene should be made" to address a short-term wartime deficiency.  By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

83.    The Delta Memphis Refinery also converted its operations to produce wartime products and worked with the Government to expand capacity.  Early in the war, the Government "rendered to Delta Refining Company all necessary assistance in securing priorities for still, condenser, exchanger and boiler tubes, together with other materials incidental and necessary to the construction of the additional capacity."  The Government also maintained final approval authority over all wartime construction projects.  By maintaining final approval authority over all construction projects and allocating the specific materials necessary for such projects, the Government controlled both the short and long-term scope of refinery operations.

84.    In addition to controlling the inputs and outputs at the Delta Memphis Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold.  For example, the Office of Price Administration increased the price of the Tinsley crude oil that comprised the majority of the Delta Memphis Refinery's crude oil allocation, but refused to also raise the corresponding prices of the wartime products manufactured at the Delta Memphis Refinery.  Delta feared these price constraints could put it out of business, but the Office of Price Administration maintained the prices, at least in part, because the Delta Memphis Refinery was "not an especially important plant, either from a refining or supply standpoint."  The PAW also controlled the companies to whom

Delta was authorized and required to supply war products.  Through unprecedented control of the entire petroleum industry supply chain, the Government effectively operated the Delta Memphis Refinery, going as far as to set pricing controls and crude oil allocations that could, potentially, drive out of business "unimportant," smaller refineries like the Delta Memphis Refinery.

85.    The Government's substantial control over the Delta Memphis Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Delta Memphis Refinery.  PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters.  The Delta Memphis Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Delta Memphis Refinery.  As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

86.    The Delta Memphis Refinery is located adjacent to Nonconnah Creek and McKellar Lake.  Groundwater has shown a correlation with fluctuations in the depth of Mississippi River water levels.  The site has been evaluated and overseen by the Tennessee Department of Health and Environment ("TDHE") and EPA.

87.    Investigations into contamination at the Delta Memphis Refinery site have revealed the presence of CERCLA-listed hazardous substances.  EPA performed environmental sampling and prepared a report outlining the results of soil, subsurface soil, surface water, sediment, and groundwater samples.  Based on the potential for contaminated groundwater migration, EPA consultants recommended additional evaluation.  EPA prepared a Reassessment Report that evaluated the presence of inorganic contamination, including findings where arsenic exceeded EPA Preliminary Remediation Goals and the presence of other metals.  Target Analyte List metals, including aluminum, arsenic, cadmium, copper, lead, mercury, nickel, vanadium, and manganese, were detected at elevated concentrations.  Organic compounds, pesticides, PCBs, and other contaminants were also detected and evaluated.  TDHE conducted a preliminary assessment of the facility and identified disposed tank bottoms, reactor catalysts, and waste oil.  This contamination necessitated the response actions taken at the Delta Memphis Refinery site to date, which have been performed in substantial compliance with the

NCP and under the supervision of and in coordination with state and federal regulators.

88.    For example, an initial "Remedial Action Plan" outlined the investigation and additional testing necessary to evaluate and monitor threats at the Delta Memphis Refinery site and to properly delineate the horizontal extent of contamination through additional monitoring wells.  This report was submitted to and approved by TDHE.   EPA created a Reassessment Report summarizing investigation and contamination results.  A Groundwater Hydraulic Control System was implemented to control a contaminated plume through hydraulic control, the system is used on an ongoing basis, and monitoring and sampling continues under TDHE supervision.    Current response action activities and cleanup goals contemplate final remedial action when operations cease in order to permanently remediate the site.  Efforts continue to stabilize the contaminated plumes.  Agency requirements, requests, submissions, and oversight (including as set out or provided for in the state order), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

89.    Plaintiff Premcor purchased the Delta Memphis Refinery in 2003 and subsequently transferred it to Plaintiff Valero-TN in 2008.  Valero-TN has since incurred and will continue to incur response costs in addressing contamination

resulting, at least in part, from the Government's operations of the Delta Memphis Refinery during the wartime period.

### 7. The Kanotex Arkansas City Refinery

90.     The former Kanotex Refining Company owned and operated a refinery located in Arkansas City, Kansas (the "Kanotex Arkansas City Refinery"). During the wartime period, the Government exercised day-to-day control over the operations of the Kanotex Arkansas City Refinery.

91.     The Kanotex Arkansas City Refinery was subject to the Government's specific allocations of crude oil and other raw materials. At one point during the wartime period, refinery personnel wrote to the Government regarding the refinery's crude oil allocation: "We cannot make the suggested maximum amounts of critical materials due to this lack of crude. In other words, our crude position is desperate." Without an allocation of crude oil, the Kanotex Arkansas City Refinery simply could not run. By controlling the raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Kanotex Arkansas City Refinery.

92.     In addition to limiting the amount of crude oil available to the Kanotex Arkansas City Refinery, the Government also controlled the type of crude oil allocated. Most refineries in PAW-District II (which included the Kanotex Arkansas City Refinery) were equipped to process "sweet" crude oil. As the war progressed, though, the Government required that PAW-District II refineries process "sour"

crude oil, which had a higher sulfur content and required additional refining and processing in order to manufacture finished products. Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil. By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

93. The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Kanotex Arkansas City Refinery during the wartime period. Such control extended to the type and specifications of the products and the level of production. The Kanotex Arkansas City Refinery produced avgas components at the direction of the Government and entered into a contract to produce 7-0-2 diesel fuel for the Navy. The Kanotex Arkansas City Refinery converted its operations in order to maximize the production of both Navy diesel fuel and kerosene at various times during the wartime period. By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

94. The Government also impacted and controlled personnel and labor issues at the Kanotex Arkansas City Refinery. For example, the PAW prevented the

refinery's chief engineer from being drafted so that the refinery could continue to produce critical wartime products.

95.    The Government's control over the Kanotex Arkansas City Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Kanotex Arkansas City Refinery.  PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters.  The Kanotex Arkansas City Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Kanotex Arkansas City Refinery.  As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

96.    The Kanotex Arkansas City Refinery site is located at the confluence of the Arkansas and Walnut Rivers.  The site may be described as a complex leaky groundwater system with ready connection between surface water and the

segmented, underlying uppermost aquifer. Contaminated groundwater flows towards the Walnut River.

97. Investigations into contamination at the Kanotex Arkansas City Refinery site have revealed the presence of CERCLA-listed hazardous substances, including but not limited to volatile organic compounds, semi-volatile organic compounds and metals, such as arsenic, barium, cadmium, chromium, and lead. This contamination has necessitated the response actions taken at the site to date, which have been performed in substantial compliance with the NCP and under the supervision of and in coordination with EPA Region 7 and KDHE.

98. For example, multiple work plans, a corrective measures study, and multiple investigation reports have been submitted and approved. Environmental consultants were retained to investigate the site and numerous borings and wells were installed to characterize the subsurface and groundwater at the site. EPA conducted a RCRA Facility Assessment and approved a RCRA Facility Investigation that included multiple investigation reports. EPA also approved a Corrective Measures Study. A Human Health Risk Assessment was also submitted to KDHE and EPA for soil and groundwater as well as surface water and sediment. A Screening Level Ecological Risk Assessment for soil, groundwater, surface water, and sediment, and a Soil and Investigation Work Plan, were also required, which identifies data gaps required to be filled to complete the site-wide soil assessment

for surface soils to 10 feet below ground surface.  Groundwater containment and recovery and soil vapor recovery are ongoing.  Agency requirements, requests, submissions, and oversight, and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

99.    The Kanotex Arkansas City Refinery was shut down in 1996.  Pursuant to an asset purchase agreement, in 2008 Plaintiff MRP purchased the Kanotex Arkansas City Refinery site and acquired certain rights and benefits that encompass the right to pursue cost recovery claims.  Since that time, MRP has incurred and will continue to incur additional response costs in addressing contamination resulting, at least in part, from the Government's operations of the Kanotex Arkansas City Refinery during the wartime period.

### 8.    The Worth Blue Island Refinery

100.   The former Worth Refining Company owned and operated a refinery located in Blue Island, Illinois (the "Worth Blue Island Refinery").  During the wartime period, the Government exercised day-to-day control over the operations of the Worth Blue Island Refinery.  The Worth Blue Island Refinery was a small refinery, struggling with bankruptcy issues and governed by a trustee, and thus more susceptible to Government control.

101.   The Worth Blue Island Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period.  The Worth Blue Island Refinery regularly suffered from insufficient allocations of crude oil (and tetra-ethyl lead) from the Government.  The PAW authorized crude oil allocations in quantities limiting the throughput of the refinery, at least in part as a way to control the refinery's product runs and limit the manufacture of certain products the PAW deemed non-essential to the war effort.  The PAW rejected the Worth Blue Island Refinery's request to manufacture avgas, and the refinery was instructed to focus on production of motor gasoline, kerosene, distillates and residual fuels.  As a result, the PAW routinely limited the refinery's crude oil allocations.  At one point, the Worth Blue Island Refinery was forced to shut down operations due to a lack of crude oil.  By limiting the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Worth Blue Island Refinery.

102.   In addition to limiting the amount of crude oil available to the Worth Blue Island Refinery, the Government also controlled the type of crude oil allocated. Most refineries in PAW-District II (which included the Worth Blue Island Refinery) were equipped to process "sweet" crude oil.  As the war progressed, though, the Government required that PAW-District II refineries process "sour" crude oil, which had a higher sulfur content and required additional refining and processing in order

to manufacture finished products. Due to its higher sulfur content, sour crude oil was also highly corrosive and caused leaks and other problems in equipment designed at the time to process sweet crude oil. By dictating the type and amount of crude oil available to the refinery, and by allocating a type of crude oil that PAW-District II refineries were not equipped to process, the Government impacted the waste profile of the refinery.

103. The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Worth Blue Island Refinery during the wartime period. Such control extended to the type and specifications of the products and the level of production. Specifically, the Government refused to allow the Worth Blue Island Refinery to make various grades of avgas, but frequently directed the refinery to make various types and quantities of motor gasoline, kerosene and other products. The Government also issued directives that required compulsory participation in the Navy 7-0-2 diesel fuel program. The Government authorized certain product runs, and denied others, depending on changing priorities. For example, when the kerosene supply was facing an extreme shortage, the Worth Blue Island Refinery shifted operations almost entirely away from motor gasoline to produce yields of nearly half kerosene and range oil for an entire month. By dictating the products manufactured (*i.e.*, the outputs)—and their level of

production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

104.    The PAW approved a Worth Blue Island Refinery application for construction of equipment for 80-octane all-purpose military gasoline.  When the Worth Blue Island Refinery later attempted to convert its operations to produce critical war products, particularly 87-octane avgas, the PAW denied the request and instructed the Worth Blue Island Refinery to focus its operations on motor gasoline.  By maintaining the final authorization over construction projects and ultimately approving construction designs during the war, the Government assumed responsibility for the waste products and disposal practices inherent in refining operations of the time.

105.    The Government's control over the Worth Blue Island Refinery extended to hazardous waste generation, releases and disposal.  Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Worth Blue Island Refinery.  PAW-District II compiled monthly production statistics and submitted a summary of production yields, including "losses," to PAW's Headquarters.  The Worth Blue Island Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes

using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Worth Blue Island Refinery.  As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

106.   The State of Illinois entered into a consent order with Premcor under state law for investigation activities that would determine the nature and extent of contamination.  Investigations into contamination at the Worth Blue Island Refinery site have revealed the presence of CERCLA-listed hazardous substances in the soil and groundwater, including but not limited to volatile organic compounds, semi-volatile organic compounds, and metals, such as chromium, cobalt, cyanide, iron, nickel, manganese, thallium, and arsenic in concentrations above risk-based screening levels.  This contamination has necessitated the initial investigation and any other response actions taken at the site to date, which have been performed in substantial compliance with the NCP and under the supervision of and in coordination with the Illinois EPA.

107.   For example, environmental consultants have conducted investigation and prepared reports summarizing findings and characterizing the site.  The Illinois EPA Toxicity Assessment Unit has reviewed submissions and revisions to investigation reports.  A Remedial Investigation (RI) Report was submitted to

Illinois EPA and subsequently revised following input and comments. Approved investigation work plans for areas of the site were developed based on historical site operations and subsurface data collected from prior limited site investigations. A Screening Level Ecological Risk Assessment was developed in the RI Report. The nature and extent of contamination in site media was established by comparing investigation soil, groundwater, sediment, and surface water chemical results to a set of approved human health risk-based screening criteria predominantly comprised of EPA Regional Screening Levels. Illinois Tiered Approach to Corrective Action Objectives, Applicable or Relevant and Appropriate Requirements, and other guidance documents and standards were also considered. Monitoring wells were also installed to characterize the site. Upon selection of an appropriate response action in the Feasibility Study, Illinois EPA will solicit public comment. Agency requirements, requests, submissions, and oversight (including as set forth or provided in the consent order), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

108.   Plaintiff Premcor purchased the Worth Blue Island Refinery in 1988, and ceased refining operations in 2001. Since the shutdown, Premcor has incurred and will continue to incur response costs in addressing contamination resulting, at

least in part, from the Government's operations of the Worth Blue Island Refinery during the wartime period.

### 9.    The Gulf Port Arthur Refinery

109.    Gulf Oil Corporation ("Gulf") owned and operated the "Gulf Port Arthur Refinery" located in Port Arthur, Texas during the wartime period.  At the time, the Gulf Port Arthur Refinery had one of the largest throughput capacities in the nation.  Due to its size and capacity, the refinery was of particular interest to the Government in its efforts to control the petroleum supply chain and coordinate wartime manufacturing across the country.  As such, the Government exercised day-to-day control over the operations of the Gulf Port Arthur Refinery through various recommendations, directives, orders and other direct involvement during WWII.

110.    The Gulf Port Arthur Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period.  For example, in 1943, the PAW told Gulf it was "now directed to limit the total input including crude, casing head, condensate, and other raw materials for your Port Arthur plant to 120,809 barrels per calendar day."  One intended effect of PAW's crude oil allocations and precise throughput limitations was to control the refinery's product yields and limit non-essential products "which, if not controlled, will adversely affect the war program."  The Government also limited crude oil allocations with regard to specific refinery needs.  For example, Gulf requested

permission to run additional crude oil to produce No. 2 fuel oil, but the PAW denied the request, directing Gulf to simply acquire the No. 2 fuel oil from another refiner because "the position of this office has not changed," and "information available to this office indicates there is a great sufficiency of No. 2 oil in your immediate vicinity."  By dictating the amount of crude oil and other feed stocks the Gulf Port Arthur Refinery was authorized to run, the Government controlled the day-to-day operations of the refinery.

111.   The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Gulf Port Arthur Refinery during the wartime period.  Such control extended to the type and specifications of the products and the level of production.   Because the Gulf Port Arthur Refinery was capable of manufacturing 100-octane avgas, a critical war product, the Government paid particular attention to the refinery's avgas operations.  For example, as the war progressed, the PAW informed Gulf of "an acute shortage of 100 octane avgas" and instructed the refinery to "immediately increase its contribution to the 100 octane program," even if it shifted production away from other important war products.  On numerous occasions, Gulf took steps "at the request and with the approval of [PAW] to produce more aviation gasoline or aviation gasoline constituents or stock." Government control extended beyond 100-octane avgas, and the Government frequently prioritized other products as well.  For example, the Government advised

Gulf by telegram to "extract the maximum quantities of whichever of the following products are produced at your plant: 100 and 91 octane number aviation gasoline and components thereof, toluene, butadiene, petroleum synthetics and petroleum coke." By dictating the products manufactured (*i.e.*, the outputs)—and their level of production—the Government necessarily controlled how the refinery operated on a day-to-day basis.

112.   In addition to controlling the inputs and outputs at the Gulf Port Arthur Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold. For example, the PAW established the price Gulf could charge for avgas. The established price had to "meet two separate standards of measurement: (1) it must be intrinsically low enough to be economical for use under the prevailing circumstances and (2) however high or low it might be, it must be established to our satisfaction that it does not contain any abnormal profit element nor any improper amortization factor." The PAW also approved the price at which Gulf could sell its codimer products. Overall, the PAW controlled supply chain logistics and maintained final authorization and approval power over the sale and price of war products.

113.   The Government utilized the combination of its extensive war powers and a network of comprehensive contractual arrangements to maintain control over the Gulf Port Arthur Refinery. Because the Government controlled the entire

petroleum supply chain and could cut crude oil allocations or seize refineries that resisted Government production orders, refiners had little choice but to enter into contracts with the Government that limited profits and formalized some of the Government's authority over the facility.  For example, in 1942, the Government entered into a 100-octane avgas contract with Gulf.  The contract called for storage of a standing avgas inventory and facility expansion to meet wartime avgas demand.  Additionally, that same year, the Rubber Reserve Company entered into a contract with Gulf to supply feed stock for synthetic rubber production.  In accordance with the contract, the Government owned and operated a pipeline that traversed portions of the Gulf Port Arthur Refinery.

114.   The Gulf Port Arthur Refinery also converted its facilities to the manufacture of war products, particularly 100-octane avgas.  Gulf began to expand avgas production facilities "at the request of [the Office of Petroleum Coordinator for War] in the summer of 1941," before the United States' formal entrance into WWII.  Construction was started without a contract, but as the war progressed and the Government developed a network of contractual arrangements with various refiners, the Government and Gulf entered into a contract to formalize the construction plans.  The Government also controlled the allocation of steel and other necessary construction materials, and maintained final authorization and approval over all construction projects and designs.  In addition to total control over the entire

upstream and downstream supply chain, by requesting that the Gulf Port Arthur Refinery convert equipment to the manufacture of wartime products and authorizing, approving and controlling the construction of new processes that failed to prevent the release of hazardous waste, the Government effectively disposed of, or intentionally arranged for the disposal of, hazardous wastes during the war.

115.   The Government also exercised control over the labor force at Port Arthur.  In May 1945, following a dispute between a pipefitter and his foreman, the workers at the Gulf Port Arthur Refinery went on strike for four days.  In response, the PAW wrote to Gulf that "the strike on the part of the employees of your Port Arthur Refinery has resulted in extremely serious losses of petroleum products vitally needed by the armed forces… I therefore urge that you do everything within your ability to terminate the work stoppage at once and submit the issues which may be in dispute between you and your employees to those agencies of the government which have been established for the settlement of such disputes."  Ultimately, the Government's War Labor Board ended the strike, ordering "parties to this dispute to immediately place the plant back in operation… all striking employees are directed to report for work on regular shift and company is directed to accept them."  Had the War Labor Board not ended the strike, a local newspaper reported it was a "virtual certainty that if the controversy is not settled promptly the Army will move in and take charge of the plan[t]."

116.   The Government's substantial control over the Gulf Port Arthur Refinery extended to hazardous waste generation, releases and disposal.  Through control over the refinery's inputs and outputs, as well as final authorization powers over specific product runs, the Government not only knew about but dictated the amount and type of wastes (*i.e.*, "losses") generated at the refinery.  PAW identified such "losses" in production sheets, which were generally provided monthly to the refinery to set out expected yields for crude allocations.  The Gulf Port Arthur Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Gulf Port Arthur Refinery. As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

117.   Investigations into contamination at the Gulf Port Arthur Refinery site have revealed the presence of CERCLA-listed hazardous substances.   EPA performed a corrective action and compliance evaluation inspection and determined that historical releases have taken place at the site.  EPA found volatile organic compounds, semi-volatile organic compounds, and metals at the site.  EPA and the Texas Natural Resource Conservation Commission determined that imminent and

substantial endangerment conditions existed at the site, prompting the parties to enter into agreed orders and conduct urgent investigation and response activities. These EPA findings and the contamination at the site have necessitated the response actions taken at the site to date, which have been performed in substantial compliance with the NCP and under the supervision of and in coordination with EPA and the Texas Commission on Environmental Quality ("TCEQ").

118.   For example, EPA required the submission of a sampling and analysis work plan for monitoring, testing, analysis, and reporting to ascertain the nature and extent of the hazards posed by hazardous wastes that are present at or released from the site and implement that plan upon approval.  TCEQ approved numerous response action plans and other submissions at the site on an iterative basis.   Agency requirements, requests, submissions, and oversight (including as set forth or provided in the agreed orders), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

119.   Plaintiff Premcor acquired a portion of the Gulf Port Arthur Refinery in 1994 and has since incurred and will continue to incur response costs in addressing contamination resulting, at least in part, from the Government's operations of the Gulf Port Arthur Refinery during the wartime period.

### 10.    The Eastern States Houston Refinery

120.   The former Eastern States Petroleum Company owned and operated a refinery located in Houston, Texas (the "Eastern States Houston Refinery").  During the wartime period, the Government exercised substantial day-to-day control over the operations of the Eastern States Houston Refinery.  The Government also owned portions of the facility during the war, including avgas manufacturing facilities, easements, pipelines, tankage and other equipment.

121.  The Eastern States Houston Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period.  By controlling the supply of crude oil and other raw materials (*i.e.*, the inputs), the Government necessarily controlled the day-to-day operations of the Eastern States Houston Refinery.

122.  The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Eastern States Houston Refinery during the wartime period, with a focus on maximizing the refinery's output of aviation gasoline.  Such control extended to the type and specifications of the products and the level of production.

123.   In addition to controlling the inputs and outputs at the Eastern States Houston Refinery, the Government also exercised control over the prices at which, and the purchasers to whom, products were sold.  For example, per a Government

inspector, if Eastern States was "directed by PAW to sell base stock purchased by their Government-owned alkylation unit to some other refinery, it [was] not sold on its actual cost of production, but on a fixed price set by PAW." The PAW controlled supply chain logistics and maintained final authorization and approval power over the sale and price of war products.

124.   The Government utilized the combination of its extensive war powers and comprehensive contractual arrangements to maintain control over the Eastern States Houston Refinery. Because the Government controlled the entire petroleum supply chain and could cut crude oil allocations or seize refineries that resisted Government production orders, refiners had little choice but to enter into contracts with the Government that limited profits and formalized some of the Government's authority over the facility. For example, the Government entered into a series of 100-octane aviation gasoline contracts with Eastern States because "the production of 100-octane aviation gasoline and other aviation gasoline conforming to the specifications provided … and the expansion of refining capacity for such production within the United States are important to the interest of the National Defense Program of the Government of the United States." The contracts allowed the Government to set and adjust pricing, direct which suppliers of charge stocks and avgas components Eastern States could purchase from, control the delivery of

finished products to other locations or refineries, and granted the Government rights to purchase all of the avgas produced at the facility.

125.   The aviation gasoline contracts included a leasing agreement whereby the Government acquired property from Eastern States and then leased the property back to Eastern States to operate an avgas plant.  Under the contract, Eastern States was obligated to construct and operate the Defense Plant Corporation-owned aviation gasoline facilities that made up Plancor 911.  Per PAW's George Parkhurst, Plancor 911 was "built in conjunction with" Eastern States' existing refinery, was integrated into refinery equipment through various pipelines and required feed stock from the Eastern States Houston Refinery in order to produce aviation gasoline.  The Government owned the rights of way where pipelines connected the Plancor to the main refinery.  The Government also furnished storage tanks to meet the entire storage requirement for avgas produced at the facilities, releasing Eastern States from any obligation to furnish its own tankage for avgas operations.  As such, the Government is a former owner and operator of the integrated DPC avgas plant and Eastern States Houston Refinery, including pipelines, rights of way, storage tankage and other equipment used during the war.

126.   The Government also owned a second Plancor at the Eastern States Houston Refinery during the war, Plancor 1534, which was approximately 20 acres in size and located within the boundaries of the original Eastern States Houston

Refinery.   In constructing Plancor 1534, the Rubber Reserve Company (a Government corporation and subsidiary of the Reconstruction Finance Corporation) authorized the conversion of existing refinery equipment to the manufacture of butadiene, and the DPC authorized Eastern States to purchase up to $500,000 in machinery, materials and equipment "suitable for the manufacture of butadiene in the name and for the account of DPC."  The DPC approved each purchase order relating to the construction of Plancor 1534.  The ten-building Plancor 1534 was constructed "in accordance with plans and specifications under the supervision of the [DPC]."  On December 5, 1942, the Government and Eastern States entered into a leasing agreement for Plancor 1534.  Before the Plancor was completed, however, the DPC was forced to suspend construction work.  Ultimately, Plancor 1534 manufactured C-4 cut feedstock during the war, but the facilities "were never employed to capacity since [the] purification plant was never finished."

127.   Eastern States converted facilities and was forced to shift operations at the Houston Refinery to meet war product demands.  The Government maintained final approval authority over all wartime construction and conversion projects.  The Government also controlled steel allocations necessary for facility conversion projects, and allocated repurposed, low-quality metals that were purchased second-hand and subject to corrosion problems.  The DPC also approved Eastern States' construction contracts with various contractors.  Specifically, the construction of

Plancor 1534 included the conversion of an existing cracking plant into a butadiene manufacturing plant, which required pouring new foundations and dismantling or reconditioning equipment.  At Plancor 911, the Government arranged for Eastern States to construct the 100-octane avgas equipment necessary to meet wartime demands.  The Government, through its authority to control allocations of necessary construction materials and as an owner of the land during the time of construction, approved of and moved forward with Plancor facility designs despite waste generation inherent in operations and the inadequacy of waste disposal designs.  Because the Government was intimately involved in construction and conversion projects at the refinery, the Government was directly involved in waste operations and disposal at the site.

128.   In addition to allocating construction materials and approving designs for construction projects generally, certain Government projects were for the specific purpose of waste management and disposal.  The Eastern States Houston Refinery had significant corrosion issues, of which the Government was well aware. Plancor 911 required dozens of repair and replacement projects to address corrosion problems.  For example, during the war, in order to better contain releases it was "necessary to install a protective liner in the isomerization reactor column because of severe corrosion."  Surface water drainage at the Eastern States Houston Refinery was inadequate during the war and "an expensive additional outfall to the ship

channel was constructed to take care of excess surface water disposal." These projects demonstrate that the Government approved, authorized, supervised and directed the construction of projects related to releases of hazardous substances, waste management practices and actual waste disposal.

129.   The operation of the Government-owned avgas Plancor 911 changed the waste profile of the Eastern States Houston Refinery.  The Plancor was designed without any provision to treat or dispose of the 60 barrels/day of acid polymer waste. With the acid polymer waste mixed into the waste stream, Eastern States could not recover and re-run slop oil from the Plancor 911 separator.  As a result, Eastern States had to store this slop oil instead of re-running it, as was the practice at the main refinery.  Eastern States requested permission from the PAW to sell this acid polymer-contaminated slop oil, but the PAW required Eastern States to dispose of the slop oil from Plancor 911 at the main refinery (known as Plant 1), writing that "we do not doubt but that you would prefer to dispose of this stock elsewhere as you have mentioned before, but the Defense Plant was built in conjunction with your refinery in order to take advantage of the facilities in that refinery.  The recovery of slop oils, which is a necessary function in any refinery, can only be handled in Plant 1 because Plant 2 [the avgas Plancor] is not equipped for such operations, the facilities being already available in the existing refinery."  The PAW further informed Eastern States that slop oil should not be "burned in Plant 2 and under no

circumstances should slop disposition interfere with maximum production of 100 octane." These statements by George Parkhurst, PAW's Assistant Director of Refining, are indicative of the Government's policy to intentionally build Federally-owned wartime facilities at or adjoining petroleum refineries in order to use existing refinery waste handling infrastructure, and thereby avoid constructing separate facilities for managing wastes from the Federal facilities, even when it was known that the additional waste load would negatively impact existing refinery waste handling and disposal systems.

130.   The Government also exercised control over labor at the Eastern States Houston Refinery. The Government contracted with Eastern States to finance the necessary training of refinery personnel hired to operate the avgas Plancor located on Government-owned land during the war. A Government loan for training employees was paid back with a portion of the sales price of war products. During the war, the Government's War Labor Board established average wage rates for employees at the refinery's Plancor facilities. Finally, in at least some circumstances, the DPC reviewed, evaluated and approved, upon PAW's recommendation, employee salaries.

131.   The Government also conducted inspections of the refinery through the Bureau of Budget and U.S. Army. These on-site inspections allowed the Government to supervise, oversee and review operations at the refinery, including

waste management and disposal operations.  The Government was aware of and involved in waste management and disposal operations and decisions, as Government inspections noted numerous corrosion issues that caused equipment shutdowns.

132.    Through its day-to-day control over operations of the Eastern States Houston Refinery, including those directly related to waste, the Government acted as an operator of the facility.  As an owner of portions of the facility, the Government actually or constructively possessed hazardous materials stored in and/or released from Government equipment or located on Government land at the Eastern States Houston Refinery.  The Government disposed of hazardous waste during the war. As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

133.    Investigations into contamination at the Eastern States Houston Refinery site have revealed the presence of CERCLA-listed hazardous substances. Drainage from the site is into the Houston Ship Channel in Stream Segment No. 1007 of the San Jacinto River Basin.  This stream segment is used for industrial water supply and navigation.  During Texas Water Commission inspections, it was noted that oily water was being pumped out of recovery wells and oil seeped into the ship channel.  Groundwater contamination was verified with samples and further inspection.    The plumes were determined to be comingled with hazardous

substances, including priority volatile organic compounds and 16 detected semi-volatile compounds, which prompted an agreed order to be entered with the Texas Water Commission to protect the shipping channel.

134.  This contamination has necessitated the response actions taken at the site to date, which have been performed in substantial compliance with the NCP and in coordination with EPA and state regulators. For example, initial response activities have followed EPA guidance documents, including the RCRA Ground-Water Monitoring Technical Enforcement Guidance Document for planning and installing monitoring wells.  Environmental consultants were hired and site conditions were evaluated pursuant to a Groundwater Quality Assessment report. Groundwater investigation was conducted and submitted to the Texas Water Commission.  Sampling analysis followed EPA methods and were analyzed for priority pollutant volatile organic and semi-volatile organic compounds.  Subsequent investigation and reports were submitted to TCEQ and reviewed by professional geoscientists.  Response activities are being undertaken under TCEQ oversight and are designed to prevent discharges of contaminated groundwater to the Houston Ship Channel.  Agency requirements, requests, submissions, and oversight (including as set forth or provided in the agreed order), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

135.   Plaintiff Valero-TX acquired the Eastern States Houston Refinery in 1986 and has since incurred and will continue to incur response costs in addressing contamination resulting, at least in part, from the Government's ownership and operations of the Eastern States Houston Refinery during the wartime period.

### 11.    The Caminol Hanford Refinery

136.   The former Caminol Company owned and operated a refinery located in Hanford, California (the "Caminol Hanford Refinery").   During the wartime period, the Government exercised day-to-day control over the operations of the Caminol Hanford Refinery.

137.   The Caminol Hanford Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period and experienced delays in receiving those supplies.  Without timely allocations of crude oil and other supplies, the Caminol Hanford Refinery simply could not run.  By controlling the raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Caminol Hanford Refinery.

138.   The  Government  also  directed  and  controlled  the  products manufactured (*i.e.*, the outputs) at the Caminol Hanford Refinery during the wartime period.  Such control extended to the type and specifications of the products and the level of production.  Specifically, the Caminol Hanford Refinery produced avgas and alkylation feed at the direction of the Government.  Upon confirmation of the

refinery's ability to produce avgas, the Government requested that Caminol immediately rearrange its yields to maximize production of critical war products. In fact, the Government requested that the Caminol Hanford Refinery limit the production of more profitable motor gasoline in order to maximize production of avgas and residual fuel. The Government "appreciate[d] the fact that the refining companies [were] being asked to absorb a reduced profit by doing so."

139. In addition, the Caminol Hanford Refinery converted its operations to the production of wartime products, submitting proposals to the PAW for authorization and approval of such projects. Specifically, the Caminol Hanford Refinery converted equipment to make more butanes, constructed equipment to produce naphtha, and remodeled its cracking furnace, all of which was subject to PAW authorizations. The PAW reviewed designs for these construction plans and approved the changes. By reviewing, approving and maintaining final authorization over construction plans at the refinery, the Government assumed responsibility for the waste products and disposal practices inherent in these operations.

140. The Government's control over the Caminol Hanford Refinery extended to hazardous waste generation, releases and disposal. Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but oversaw the amount and type of wastes (*i.e.*, "losses") generated (and ultimately released) at the Caminol Hanford Refinery. The PAW identified

such "losses" in monthly production sheets.  The Caminol Hanford Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using typical methods of the time.  Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Caminol Hanford Refinery.  As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

141.  The Caminol Hanford Refinery lies within the Tulare Lake Basin Hydrologic Unit, designated as beneficial for municipal, domestic, agricultural, and industrial water supply.  Investigations at the Caminol Hanford Refinery site have revealed the presence of CERCLA-listed hazardous substances and other contamination, including but not limited to petroleum hydrocarbons, volatile organic compounds, and lead in soil and groundwater.  Groundwater containing comingled contaminants presented a migration threat, which required additional investigation. This contamination was determined to pose a threat to human health and/or the environment and necessitated the response actions taken at the site to date, which have been performed in substantial compliance with the NCP and under the supervision of and in coordination with state regulators.

142.   For example, environmental consultants were retained and numerous site assessments were performed to characterize the site.   Appropriate response action alternatives were evaluated before selection and implementation of a preferred alternative.   Further, work plans have been developed to ensure proper implementation of the selected response action and have included elements required by the NCP. The existing site-specific Health and Safety Plan was amended in accordance with applicable federal and state regulations, all appropriate well permits were obtained, and the Central Valley Regional Water Quality Control Board (CVRWQCB) has had significant involvement at the site.   Groundwater and soil vapor systems are in place. Finally, CVRWQCB requirements, requests, submissions, and oversight, and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

143.   Plaintiff Ultramar (f/k/a The Caminol Company, Ltd.) constructed the Caminol Hanford Refinery in the 1930s, whose operations have been shut down since 1985.  More recently, Ultramar has incurred and will continue to incur response costs in addressing contamination resulting, at least in part, from the Government's operations of the Caminol Hanford Refinery during the wartime period.

## 12.    The Caminol Santa Fe Springs Refinery

144.   The former Caminol Company also owned and operated a refinery located in Santa Fe Springs, California (the "Caminol Santa Fe Springs Refinery"). During the wartime period, the Government exercised substantial day-to-day control over the operations of the Caminol Santa Fe Springs Refinery.

145.   The Caminol Santa Fe Springs Refinery was subject to specific Government allocations of crude oil and other raw materials during the wartime period and, like the Caminol Hanford Refinery, experienced delays in receiving those supplies.  Without timely allocations of crude oil and other supplies, the Caminol Santa Fe Springs Refinery simply could not run.  By controlling the raw materials (*i.e.*, the inputs), the Government controlled the day-to-day operations of the Caminol Santa Fe Springs Refinery.

146.   The Government also directed and controlled the products manufactured (*i.e.*, the outputs) at the Caminol Santa Fe Springs Refinery during the wartime period.  Such control extended to the type and specifications of the products and the level of production.  In fact, the Caminol Santa Fe Springs Refinery at one point planned to change more than 80% of its production "into uses essential to the war effort[,]" including  avgas and avgas blending stock manufactured at the direction of the Government.  As noted above, the Government requested that

Caminol limit the production of more profitable motor gasoline at the Santa Fe Springs Refinery in order to maximize production of critical wartime products.

147. The Caminol Santa Fe Springs Refinery, also at the request of the Government, installed specific equipment and facilities to make various grades of avgas and alkylation feed and naphtha blending stock as needed by the Government. PAW maintained final authorization over wartime construction projects and approved designs. Specifically, the Caminol Santa Fe Springs Refinery installed facilities to make 91-octane avgas and aviation fuel base stock, constructed a reforming unit to make naphtha, and remodeled its cracking unit. By reviewing, approving and maintaining final authorization over construction plans at the refinery, the Government assumed responsibility for the waste products and disposal practices inherent in these operations.

148. The Government's substantial control over the Caminol Santa Fe Springs Refinery extended to hazardous waste generation, releases and disposal. Through direction, management and control over the refinery's inputs and outputs, the Government not only knew about but directed the amount and type of acceptable wastes (*i.e.*, "losses") generated at the refinery. PAW identified such "losses" in monthly production sheets. The Caminol Santa Fe Springs Refinery experienced losses in different ways, some of which took the form of normal releases from 1940-era equipment and operating units or through disposal of process wastes using

typical methods of the time. Regardless, by dictating the production of war products, which necessitated changes in refining processes, the Government controlled and acted as an operator of the Caminol Santa Fe Springs Refinery. As such, the Government is responsible for the releases and disposal of the hazardous wastes or substances generated or caused during such time.

149.    The Caminol Santa Fe Springs Refinery site is located in the Downey Plain of the Central Groundwater Basin of the Los Angeles Coastal Plain in a highly-industrialized area of Santa Fe Springs. Investigations have revealed the presence of CERCLA-listed hazardous substances, including but not limited to volatile organic compounds, semi-volatile organic compounds, and metals, such as chromium and lead, and other contaminants of concern.

150.    This contamination has necessitated the response actions taken at the site to date, which have been performed in substantial compliance with the NCP and in coordination with the Los Angeles Regional Water Quality Control Board ("LARWQCB"). The site is under regulatory oversight of the LARWQCB, which ordered the assessment of the facility under the California Water Code. For example, environmental consultants conducted a Phase I Environmental Site Assessment to evaluate the nature and extent of environmental contamination at the site and alternatives for cleanup. The report ultimately called for additional investigation and characterization work. Additional investigations, including a Phase II

Environmental Site Assessment and Site Characterization Report, were then conducted by environmental consultants. The goal of the Site Characterization Report was to characterize the site and determine the necessary response actions. The Site Characterization Report also contained a Human Health Risk Evaluation. Response actions were taken after consideration of the recommended performance criteria of the Department of Toxic Substance Control and Guidance for the Evaluation and Mitigation of Subsurface Vapor Intrusion to Indoor Air. Groundwater monitoring wells and soil vapor systems were put in place on site. Samples were analyzed for California Administrative Manual 17 metals, such as chromium, mercury, lead, iron and manganese. Following further correspondence with the LARWQCB, additional investigation, modeling, and mapping was completed.   LARWQCB requirements, requests, submissions, and oversight (including those set forth or provided in the state order), and other community relations and notice activities, have satisfied any applicable public information and community relations requirements.

151.   Plaintiff Ultramar (f/k/a The Caminol Company, Ltd.) purchased and/or constructed the Caminol Santa Fe Springs Refinery in the 1930s.  More recently, Ultramar has incurred and will continue to incur response costs in addressing contamination resulting, at least in part, from the Government's operations of the Caminol Santa Fe Springs Refinery during the wartime period.

## FIRST CAUSE OF ACTION:

### Response Cost Recovery under CERCLA 107(a), (42 U.S.C. § 9607(a))

152.    Paragraphs 1 - 151 are incorporated herein by reference.

153.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, *inter alia*:

Notwithstanding any other provision of rule of law, and subject only to the defenses set forth in subsection (b) of this section –

(1)    the owner and operator of a vessel or a facility,

(2)    any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3)    any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity containing such hazardous substances, and

(4)    any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --

…

(B)    any other necessary costs of response incurred by any other person consistent with the national contingency plan…

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs [(B)].

154.    Defendant is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

155.    Plaintiffs are informed and believe, and on that basis allege, that there have been releases and threatened releases of "hazardous substances," within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22), at or near the Sites. Plaintiffs are further informed and believe, and on that basis allege, that the releases or threatened releases are ongoing.

156.    All releases of hazardous substances have occurred at a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

157.    Plaintiffs have incurred and will incur necessary costs of response pursuant to CERCLA §107(a), 42 U.S.C. § 9607(a), consistent with the NCP 42 U.S.C. § 9607(a)(4), as a result of releases and/or threatened releases (within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22)) of hazardous substances at and from the Sites. In addition, by contract Plaintiff MRP has the right to seek recovery of certain additional response costs.

158.    As a separate claim for relief, certain costs of investigation and monitoring are recoverable from "covered persons" as defined under CERCLA § 107(a), 42 U.S.C. § 9607(a), regardless of whether such costs are NCP-compliant.

The Valero Companies have respectively incurred initial or preliminary costs related to investigating or monitoring each of the Sites that were necessary and are separately recoverable. These costs are divisible from other response costs and will be separately proven at trial with additional evidence.

159.   Defendant is a covered person defined in CERCLA § 107(a)(1), (2), (3), and/or (4), 42 U.S.C. § 9607(a)(1 – 4).   Defendant is therefore jointly and severally liable for all response costs incurred or to be incurred by Plaintiffs.

### SECOND CAUSE OF ACTION:

### Declaratory Relief Under CERCLA § 113(g)(2)(42 U.S.C. § 9613(g)(2)) and the Declaratory Judgment Act(28 U.S.C. § 2201)

160.   Paragraphs 1 - 159 are incorporated herein by reference.

161.   CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides in pertinent part: In any action described in this subsection the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

162.   The Declaratory Judgment Act, 28 U.S.C. § 2201(a), further states: In a case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration.

163.   An actual controversy now exists between Plaintiffs and Defendant in that Plaintiffs contend that Defendant is a party liable under CERCLA § 107(a), 42

U.S.C. § 9607(a) for all response costs incurred and to be incurred by Plaintiffs in connection with the release or threatened release of hazardous substances at or around the Sites.

164.  Plaintiffs seek a judicial declaration of rights with respect to the Defendant pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, binding the Defendant in any subsequent action or actions to recover further response costs or other damages incurred by Plaintiffs, as appropriate and in the interest of justice.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as follows:

### FIRST CLAIM FOR RELIEF

For payment of the Government's fair share of all necessary costs of response incurred by Plaintiffs, or for which Plaintiffs have a right of recovery, as a result of any release or threatened release of hazardous substances at the Sites.

### SECOND CLAIM FOR RELIEF

For a declaratory judgment that Defendant is jointly and severally liable for all (or some portion) of any costs, damages and liability Plaintiffs may incur as a result of any release or threatened release of hazardous substances at the Sites.

## THIRD CLAIM FOR RELIEF

For payment of the Government's fair share of all necessary costs of initial investigation or monitoring incurred by Plaintiffs, or for which Plaintiffs have a right of recovery, in evaluating or addressing any potential release or threatened release of hazardous substances at the Sites.

## ON ALL CLAIMS FOR RELIEF

a.      For Plaintiffs' costs of suit herein;

b.      For interest on any money judgment;

c.      For Plaintiffs' reasonable attorneys' fees; and

d.      For such other and further relief as the Court may deem just or equitable.

Dated: June 1, 2018                          Respectfully submitted,

                                             /s/ William J. Jackson
JOHN A. FERROLI (MI 35869)                   WILLIAM J. JACKSON (TX 00784325)
DYKEMA GOSSETT PLLC                          WILLIAM C. PETIT (TX 24042289)
300 Ottawa Avenue, N.W., Suite 700           GIVONNA S. LONG (IL 6290076)
Grand Rapids, MI 49503-2306                  MARK V. DONATIELLO (TX 24101706)
Telephone: (616) 776-7542                    KELLEY DRYE & WARREN LLP
jferroli@dykema.com                          515 Post Oak Blvd., Suite 900
                                             Houston, TX 77027
                                             Telephone: (713) 355-5000
                                             bjackson@kelleydrye.com
                                             wpetit@kelleydrye.com
                                             glong@kelleydrye.com
                                             mdonatiello@kelleydrye.com

*Attorneys for Plaintiffs, MRP Properties Company, LLC, Valero Refining Company-Oklahoma, Valero Refining Company-Tennessee, L.L.C., The Premcor Refining Group Inc., Valero Refining-Texas, L.P. and Ultramar Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2018, I electronically filed the

foregoing PLAINTIFFS' SECOND AMENDED COMPLAINT via the Court's

CM/ECF system, which sends a Notice of Electronic Filing to counsel of record.

Dated: June 1, 2018                          /s/ William C. Petit
                                             WILLIAM C. PETIT (TX 24042289)
                                             KELLEY DRYE & WARREN LLP
                                             515 Post Oak Blvd., Suite 900
                                             Houston, TX 77027
                                             Telephone: (713) 355-5023
                                             wpetit@kelleydrye.com