UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MRP PROPERTIES CO., LLC, *et al.*,

        Plaintiffs,

v.

UNITED STATES OF AMERICA,

        Defendant.

_____/

Case No. 1:17-cv-11174

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND
OVERRULING DEFENDANT'S OBJECTION AS MOOT**

This matter is before this Court upon cross-motions for summary judgment from Plaintiffs MRP Properties, *et al.*, ECF No. 68, and the United States ("the Government"), ECF No. 81, as well as the Government's objection to two of Plaintiffs' expert reports, ECF No. 80. Plaintiffs claim they "have incurred and will continue to incur response costs consistent with the National Contingency Plan ('NCP')" related to "wartime contamination." ECF No. 43 at PageID.709. After failed negotiations with the Government, Plaintiffs brought this action seeking "payment of the Government's fair share." *Id.* at PageID.699, 778–79. For the reasons stated hereafter, Plaintiffs' Motion will be granted in part and denied in part, the Government's Motion will be granted in part and denied in part, and the Government's objection will be overruled as moot.

**I.**

This case is rooted in the complex history of the United States's efforts to coordinate the domestic processing of petroleum oil to win World War II (WWII).

**A.**

In December 1941, Congress declared war on Japan and Germany following the Imperial Japanese Navy's attack on Pearl Harbor. *Compania Maritima v. United States*, 145 F. Supp. 935, 937 (Ct. Cl. 1956); *id.* at 944 (Littleton & Madden, JJ., dissenting). Later that month, Congress enacted the First War Powers Act, empowering President Roosevelt to puppeteer executive agencies for the war effort. *See generally Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111 (1947). In March 1942, Congress enacted the Second War Powers Act, granting the President license to jigger the war economy, which included the production of petroleum. *Louisville Flying Serv. v. United States*, 64 F. Supp. 938, 941 (W.D. Ky. 1945).

Petroleum was critical to the United States during WWII, yielding everything from tires to bombs to heat for hospitals and kitchens. ECF No. 74-1 at PageID.4487.[1] Indeed, the armed services regularly used over 500 different petroleum products, without which "the warrior could neither fight nor live." ECF No. 68-2 at PageID.1115 (quoting J. A. KRUG, HAROLD L. ICKES & RALPH K. DAVIS, U.S. PETROL. ADMIN. FOR WAR, A HISTORY OF THE PETROLEUM ADMINISTRATION FOR WAR, 1941–1945, at 1 (John W. Frey & H. Chandler Ide eds., 1946)). But "business as usual would not work," as crude was in short supply nationwide, and the Allies[2] required nearly seven billion barrels of petroleum—six billion of which came from the United States alone. ECF Nos. 74-1 at PageID.4477; 74-2 at PageID.4499; 81-2 at PageID.7793.

---

[1] All citations to the record containing a "subnumber" (e.g., ECF No. 74-1; 77-47; 81-2) are citations to exhibits attached to the parties' briefs.

[2] The Allies, which later formed the United Nations, were an international military coalition formed during WWII to defeat the Axis powers. Although eventually including over 25 countries, during WWII the Allies principally consisted of the "four Powers": the United Kingdom, the United States, the Soviet Union, and China. *See* Richard W. Van Alstyne, *The United States and Russia in World War II: Part I*, 19 CURRENT HIST. 257, 260 (1950).

To ensure victory, the United States created an oil agency called the Petroleum Administration for War ("PAW").[3] ECF No. 81-2 at PageID.7789. PAW "exercised significant control over," among other things, the prices, profits, and allocation of petroleum products and the raw materials needed to create them. *See United States v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002). But overseeing the nation's petroleum refineries proved daunting.

To alleviate congestion at its centralized office in Washington, D.C., PAW divided the United States into five Districts[4]: District I (East Coast), District II (Midwest), District III (Gulf Coast), District IV (Rocky Mountain), and District V (West Coast). ECF No. 74-1 at PageID.4479. The five Districts were more "familiar with local situations" and "provided necessary supervision over" the petroleum refineries. *Id.* Each District's director "had over-all responsibility for activities in the district." *Id.* Each District entailed "successive delegations of authority" to administer PAW's orders and directives to petroleum refineries. *Id.* And each District included subdivisions that supervised, among other things, the production, refining, supply, transportation, distribution, and marketing of petroleum products. *Id.*

In December 1942, President Roosevelt issued Executive Order 9276, providing PAW with practically unfettered control over the petroleum industry. *See MRP Props., LLC v. United States*, 308 F. Supp. 3d 916, 920 (E.D. Mich. 2018). Thus empowered, PAW went to great lengths to plan the allocation of crude oil to petroleum refineries for up to a year in advance. ECF No. 74-1 at PageID.4479. There was no room for "failure in meeting the war requirements for oil," so PAW

---

[3] At its inception on May 28, 1941, PAW was called "The Office of Petroleum Coordinator for National Defense." ECF No. 74-1 at PageID.4477. After WWII began, it was called the "Office of Petroleum Coordinator for War." *Id.* On December 2, 1942, "its authority was strengthened" as the "Petroleum Administration for War." *Id.*

[4] Although officially called Petroleum Administration for Defense Districts (PADDs), the parties and sources refer to the PADDs as "Districts."

issued directives as necessary to acquire the "materials that it needed to fulfill the petroleum industry's responsibility." *Id.*; ECF No. 43 at PageID.705. But "there was never a time when crude supply was not a problem somewhere in the country." ECF No. 74-1 at PageID.4482.

To mitigate the effects of the crude-oil shortage, PAW tracked each refinery's "crude stocks, runs, yields, and other pertinent information." *Id.* at PageID.4483. Armed with that data, PAW diverted supplies to "refineries that were in the greatest need" from those "in [a] relatively comfortable position." *Id.* To ensure maximum output of wartime products and to "keep *all* refineries operating," PAW allocated "*specific* volumes of crude to *specific* refiners" every month and then divided all remaining crude equitably. *Id.* The refiners did "the greatest share of the work," but PAW was *always* responsible for final approval. *Id.*

Among the most intrusive conditions of PAW's supervision over petroleum refineries was its frequent directives for them to change yields. *Id.* at PageID.4487. For example, PAW would telegram refineries to increase gasoline yields and decrease fuel-oil yields but then telegram the opposite soon after—often requiring refineries to change operations and equipment "virtually overnight." *Id.* Unfortunately, as PAW's Assistant Director of Refining put it, cleaning hazardous waste was a "necessary" part of the refineries' operations. *See* ECF No. 78-28.

To the extent PAW supervised refineries' operations, it "told the refiners what to make, how much of it to make, and what quality" to make it. ECF No. 74-1 at PageID.4483. According to another high-ranking PAW official, the petroleum industry had "no choice." ECF No. 74-30 at PageID.5274. The refineries "either produced the . . . products in accordance with the instructions and directives of PAW . . . . or they wouldn't have any business to operate." *Id.* Although "nobody wanted it to be that way," it was "the only way to do it in wartime." ECF No. 74-1 at PageID.4487.

**B.**

- 4 -

Plaintiffs are six wholly owned subsidiaries or affiliates of the Valero Energy Corporation.[5] In April 2017, Plaintiffs filed a complaint against the Government under § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), seeking response costs arising from the investigation and cleanup of pollution created by processing petroleum. ECF No. 43. To that end, Plaintiffs seek declaratory relief under § 113(g)(2) of CERCLA regarding the government's liability.[6] *Id.* at PageID.777–78. Plaintiffs contend that the Government "operated" 12 of their refineries before and during WWII and also "owned" one of them. This case is divided into two phases: liability and damages. ECF Nos. 47; 48; 49. Factual discovery closed in August 2019. ECF No. 52. Discovery for the liability phase ended on May 4, 2020. *Id.*

In September 2020, Plaintiffs filed a motion for summary judgment. ECF No. 68. In October 2020, the Government filed a combined cross-motion for summary judgment and response to Plaintiffs' Motion. ECF Nos. 81; 86. On November 9, 2020, Plaintiffs filed a combined reply and response to Defendant's Motion. ECF No. 91. On November 23, 2020, Defendant filed a combined sur-reply to Plaintiff's Motion and reply to Plaintiff's Response to its Motion. ECF No. 96. On December 7, 2020, Plaintiffs filed a sur-reply to Defendant's Motion. ECF No. 99.

**C.**

---

[5] For a self-reported history of the Valero Corporation, see Valero Energy Corp., *Our History*, VALERO (2021), https://www.valero.com/about/our-history [https://perma.cc/2ZVD-7ESE].

[6] Although Plaintiffs have not yet proven recovery costs, they need not do so when seeking declaratory relief under § 113(g)(2). *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994); *see also* Rachael A. Doyle, Comment, *Obtaining A Declaratory Judgment Under CERCLA: Should the Past Control the Future?*, 46 WAKE FOREST L. REV. 359, 368, 381 (2011) (stating that mandatory declaratory relief under CERCLA "allows for expedited responses and settlement, and encourages private parties to clean up according to the NCP after the defendant is declared liable, thereby serving CERCLA's broader purposes" and "allowing the PRP to plan ahead").

A motion for summary judgment should be granted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the initial burden of "identifying those portions of [the record that], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence and draw all reasonable inferences in favor of the nonmovant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

The burden then shifts to the nonmovant, who must set out specific facts showing "a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation omitted). The nonmovant must show more than "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the "mere existence of a scintilla of evidence" in support of the nonmovant does not establish a genuine issue of material fact. *Anderson*, 477 U.S. at 252.

Summary judgment will be granted if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). The standard is the same when "the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

**D.**

- 6 -

Congress enacted CERCLA in 1980 to mitigate "the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 602 (2009); *see also CTS Corp. v. Waldburger*, 573 U.S. 1, 4 (2014); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). As amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. No. 99–499, 100 Stat. 1613, CERCLA provides several causes of action. At the heart of this case is § 107(a).

Section 107(a) identifies four categories of potentially responsible parties (PRP)[7] who may be liable for the costs of cleaning hazardous waste. *See* 42 U.S.C. § 9607(a)(1)–(4). As relevant, PRPs include "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *Id.* § 9607(a)(2). Such "owners" and "operators" are liable for not only "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan," but also "any other necessary costs of response incurred by any other person consistent with the national contingency plan." *Id.* § 9607(a)(4). CERCLA also provides a narrow set of defenses to § 107(a), none of which the parties have raised yet. *See, e.g.*, *id.* §§ 9607(b), (e).

If the Government is a PRP, it is "jointly and severally liable for any hazardous material that is found, whatever its source, unless [it] can show divisibility." *United States v. Twp. of Brighton (Brighton I)*, 153 F.3d 307, 317 (6th Cir. 1998) (citing 42 U.S.C. § 9607(a)(2)). Lower courts must follow the Restatement (Second) of Torts § 433A to determine whether harm is divisible in any specific case, which occurs when "there is a reasonable basis for determining the contribution of each cause to a single harm." *Burlington*, 556 U.S. at 614. The burden of proof is

---

[7] CERCLA defines a "potentially responsible party or PRP" as "any person who may be liable pursuant to section 107(a) of CERCLA, 42 U.S.C. 9607(a), for response costs incurred and to be incurred by the United States not inconsistent with NCP." 40 C.F.R. § 304.12.

on defendants to establish that such a reasonable basis exists. *See* RESTATEMENT (SECOND) OF

TORTS § 433B(2) (Am. L. Inst. 1965); *Burlington*, 556 U.S. at 617 (there must be "facts contained

in the record reasonably support[ing] the apportionment of liability"). In this way, "responsible

parties rarely escape joint and several liability," and a single PRP may be held responsible for the

entire cost of a cleanup even though many contributed the waste. *O'Neil v. Picillo*, 883 F.2d 176,

178–79 (1st Cir. 1989).

To mitigate frequently harsh results of making one or a few PRPs foot the bill for many,

Congress authorizes PRPs to bring contribution actions under § 113, which provides:

> Any person may seek contribution from any other person who is liable or
> potentially liable under [§ 107(a)], during or following any civil action under [§
> 106 or 107(a)]. . . . In resolving contribution claims, the court may allocate response
> costs among liable parties using such equitable factors as the court determines are
> appropriate. Nothing in this subsection shall diminish the right of any person to
> bring an action for contribution in the absence of a civil action under [§ 106 or 107].

42 U.S.C. § 9613(f)(1). Section 113(f) enables a party liable for response costs to seek contribution

from any other party liable or potentially liable under § 107(a). Under § 113, a PRP that "has

resolved its liability to the United States or a State in an administrative or judicially approved

settlement" is immune from contribution claims made by other PRPs "regarding matters addressed

in the settlement." *Id.* § 9613(f)(2). But a settling PRP may seek contribution under § 113(f)(3)

from PRPs who have not settled. *Id.* § 9613(f)(3)(B). And § 107(a) allows a plaintiff to recover

100% of its response costs from all liable parties, including those who have settled their CERCLA

liability with the Government. *Id.* §§ 9613(g)(2), 9607(a).

Section 113's right to contribution is narrower than § 107's. Section 107 has a six-year

statute of limitations; § 113 has a three-year statute of limitations in certain scenarios. Under §

107, plaintiffs may recover only costs beyond their equitable share and may not recover from

parties who have settled. *Id.* § 9613(f)(1), (f)(2), (g)(3). Federal and state governments may sue

PRPs for response costs and may also be liable as PRPs for response costs others incur. *See id.* § 9607(a)(4)(A) and (B).

"To establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a 'facility'; (2) a release or threatened release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur 'necessary costs of response' consistent with the NCP; and (4) the defendant falls within one of the four categories of potentially responsible parties." *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001).

The Environmental Protection Agency (EPA) administers CERCLA. 42 U.S.C. §§ 9604, 9606. But states, tribes, and citizens may also enforce CERCLA. States may file a citizen suit against a federal agency to enforce interagency agreements (IAG) under § 310. *Id.* § 9659. Section 126 requires the EPA to afford Indian tribes substantially the same treatment as a State with respect to certain CERCLA provisions. *Id.* § 9626. With some exceptions, § 310(a) allows citizens to file a civil action against any person or entity that is alleged to be in violation of any CERCLA standard, regulation, condition, requirement, order, or IAG. *Id.* § 9569(a)(1). In addition, § 310(a) allows citizens to file a civil action against the president or any other officer of the United States (including the EPA Administrator and the Administrator of the Agency for Toxic Substances and Disease Registry) for alleged failure to perform any nondiscretionary act or duty. *Id.* § 9569(a)(2).

This Court will next address Plaintiffs' operator-liability claims, *infra* Parts III, IV, V; Plaintiffs' owner-liability claim, *infra* Part VI; and the Government's objection, *infra* Part VII.

## II.

Although CERCLA "speak[s] for the trees," it defines potentially liable parties "only by tautology." *United States v. Bestfoods*, 524 U.S. 51, 56 (1998); *see* 42 U.S.C. § 9601(20)(A)(ii)

(defining "owner or operator" as "any person owning or operating such a facility"); DR. SEUSS, THE LORAX 22 (1971). Consequently, courts have not uniformly interpreted "operator."

### A.

In *FMC Corp. v. United States Department of Commerce*, the owner of a former rayon-textile facility brought an action under CERCLA to recover clean-up costs from the Government based on its role in operating the facility during World War II. 29 F.3d 833, 843 (3d Cir. 1994) (en banc). The *FMC* court noted that "the Government can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility." *Id.* at 840. In determining whether the Government was an operator, the *FMC* court considered whether the Government exercised "*actual and substantial control* over the corporation's day-to-day operations and its policy making decisions." *Id.* (emphasis added). The *FMC* court concluded that the Government exercised "substantial control" because it controlled the "product the facility would produce, the level of production, the price of the product, and to whom the product would be sold." *Id.*

In *United States v. Bestfoods*, the Government brought an action to recover the clean-up costs of a chemical plant's waste. 524 U.S. 51, 55 (1998). The issue before the *Bestfoods* Court was whether a parent corporation can "operate" a polluting facility that its subsidiary owns. The district court reasoned that:

> "[A] parent corporation is *directly liable* under section 107(a)(2) as an operator only when it has exerted power or influence *over its subsidiary* by actively participating in and exercising control *over the subsidiary's business* during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates 'operator' liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not."

*Id.* at 59 (emphases added) (quoting *CPC Int'l, Inc. v. Aerojet–Gen. Corp.*, 777 F. Supp. 549, 572 (W.D. Mich. 1991)).

- 10 -

The district court applied the "participation and control" test and determined that the parent entity was liable as an operator, because it exercised control over the subsidiary's business by selecting its board of directors, populating its ranks with officials, and playing a significant role in shaping its environmental policy. *Id.* In addition to direct liability, it observed that the parent entity may also be subject to indirect or vicarious liability for the subsidiary's actions if the corporate veil was pierced under state law. *Id.*

The Sixth Circuit Court of Appeals reversed the district court in part, rejecting the direct-liability analysis (largely without explanation) and finding that piercing the corporate veil does not establish indirect liability. *Id.* at 59–60 (citing *United States v. Cordova Chem. Co. of Mich.*, 59 F.3d 584 (6th Cir. 1995)).

The Supreme Court reversed the Sixth Circuit, finding that "the Court of Appeals correctly rejected the District Court's analysis of direct liability" but "erred in limiting direct liability under the statute to a parent's sole or joint venture operation." *Id.* In this way, the *Bestfoods* Court rejected the "participation-and-control test" for determining direct liability as an operator under CERCLA. *Id.* at 68.

That is, the *Bestfoods* Court found that the proper focus of direct operator liability is control over the polluting facilities' operations. *Id.* at 67–68. The *Bestfoods* Court elaborated on the activities that might lead to operator liability:

> "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.*

*Id.* at 72 (emphasis added) (internal citation omitted). To elaborate, the *Bestfoods* Court clarified the definition of "operator":

> So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, *operations having to do with the leakage or disposal of hazardous waste*, or decisions about compliance with environmental regulations.

*Id.* at 66–67 (emphasis added). Indeed, the Court underscored that "Congress intended the verb "'to operate' . . . to contemplate 'operation' as including the *exercise of direction over the facility's activities*." *Id.* at 71. (emphasis added).

In *United States v. Township of Brighton (Brighton I)*, the Government brought an action against a township and property owner to recover response costs incurred from cleaning a dumpsite. 153 F.3d 307, 314 (6th Cir. 1998) (Boggs, C.J.). Brighton Township had contracted with the property owner to use his land as a dumpsite for township residents. *Id.* at 310. The district court found that both the property owner and township were liable as operators. *Id.* The Sixth Circuit vacated and remanded to the district court.

Chief Judge Boggs noted that mere "authority to control" does not give rise to operator liability; instead, "actual control" is required. *Id.* at 313. Chief Judge Boggs elaborated that the plain meaning of the word "operator," as set forth by the *Bestfoods* Court, applies regardless of whether the case involves a corporation or governmental entity. *Id.* at 313. Even though *FMC* predates *Bestfoods*, Chief Judge Boggs found *FMC* instructive in determining that "mere regulation does not render the Government liable, but actual operation (or 'macromanagement') does." *Id.* at 316. Under that standard, Chief Judge Boggs concluded that it could not determine the township's operator liability because:

> [T]he agreement with Collett specified that the dump "meet the specifications of and be under the supervision of the Board of Appeals." The township was not operating at arm's length with a contractor. Rather, it made repeated and substantial ad hoc appropriations, and it made arrangements (including with the local Junior Fire Department) for bulldozing and other maintenance when Collett himself proved unequal to the task. It also took responsibility for ameliorating the unacceptable condition of the dump, before and after scrutiny from the state government, at least as early as 1965.

*Id.* at 315 (footnote omitted).

Judge Moore concurred that the "actual control" standard applied but noted that Chief Judge Boggs "fail[ed] to define this standard clearly so as to provide the lower courts with direct guidance as to when a governmental entity engages in regulatory activities extensive enough to make it an operator of the facility in question." *Id.* at 325 (Moore, J., concurring in the result). By contrast, Judge Moore defined governmental "actual control" as "involvement [that] extends beyond 'mere regulation' and amounts to 'substantial control,' or 'active involvement in the activities' at the facility." *Id.* at 325.

Judge Dowd dissented, disagreeing with the idea "that a governmental entity should be held to a lower threshold level of control which would give rise to liability."[8] *Id.* at 332 (Dowd, J., dissenting in part and concurring in part). Judge Dowd would have instead applied *Bestfoods*'s operator-liability standard "to both corporate form and the governmental entity situations." *Id.* Notably, like Chief Judge Boggs, Judge Dowd found *FMC* instructive but determined that a governmental entity is liable as an operator only when it manages "the day-to-day activities of a facility." *Id.* Under her standard, Judge Dowd would have found that the township was not an operator. *Id.*

---

[8] Chief Judge Boggs explicitly stated that his "opinion should not be read to suggest, as Judge Dowd characterizes it, that a Governmental entity should be held to a lower threshold level of control." *Id.* at 334 n.7 (Boggs, C.J.).

On remand, the district court again found that the township was an operator. On appeal, the same panel of the Sixth Circuit reversed the district court, again, because it did not apply any of *Brighton I*'s three standards. *United States v. Twp. of Brighton (Brighton II)*, 282 F.3d 915, 917 (6th Cir. 2002). Explaining *Brighton I*'s precedential value, the *Brighton II* court stated:

> *Brighton I* produced three separate opinions but no majority opinion; despite the fragmented nature of the panel, however, *Brighton I* provided the district court with standards for defining "operator" liability under CERCLA and for determining whether the recovery costs incurred by the Government were divisible. Specifically, Judges Boggs and Moore agreed that [*Bestfoods*] provided the appropriate standard for determining whether Brighton Township was liable as an "operator" of the facility in question . . . .

*Id.* at 918 (footnote omitted). Thus, *Brighton II* understands *Brighton I* to say that when determining the operator liability of either a governmental entity or a corporation, the court should apply *Bestfoods*'s "actual control" standard.

Thirteen years later, Exxon Mobile brought an action against the Government to recover response costs incurred in connection with the operation of oil refineries during World War II. *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015). On cross-motions for summary judgment, the *Exxon* court held, in relevant part, that the Government did not "operate" Exxon Mobil's oil refineries under CERCLA. *Id.* at 521. To that end, the *Exxon* court interpreted *Brighton I* as inconsistent with *Bestfoods*. *Id.* at 522 ("The distinction that [*Brighton I*] drew between the government-entity and private-entity cases, applying the 'regulation' versus 'macromanagement' test only when a government entity is involved is not consistent with *Bestfoods*.").

The *Exxon* court also found that *Bestfoods* rejected *FMC*'s "actual control" test as overbroad. *See id.* at 527–27. In reaching that conclusion, the *Exxon* court surveyed three decisions from other circuits that "recognized that *FMC*'s test is unhelpful after *Bestfoods*." *See id.* at 521

(citing *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 149 (D.D.C. 2014) (finding that the Government was not an operator of rocket-motor production facilities; observing that "*FMC*'s 'substantial control' test is in tension with *Bestfoods*'s focus on a party's particularized control over hazardous waste disposal processes"; and declining to opine as to whether *FMC* remains good law), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016)); *Id.* (citing *Miami-Dade Cnty. v. United States*, 345 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004) (finding that the Government was not an operator of an airport and that "*FMC* is inconsistent with *Bestfoods*")); *Id.* (citing *Steadfast Ins. v. United States*, 2009 WL 3785565, at *8 (C.D. Cal. Nov. 10, 2009) (mentioning *FMC*'s standard yet ultimately basing its holding on *Bestfoods*'s requirement that an operator "manage, direct, or conduct, operations specifically related to pollution" and concluding that the Government was not an operator of former explosive-material manufacturing sites)).

Applying *Bestfoods*, the *Exxon* court found that the Government engaged in "procurement activities" but did not "manage, direct, or conduct . . . operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 523. In this way, the *Exxon* court narrowed *Bestfoods* to require a "direct nexus between the Government's activities and the decisions in the refineries' waste leakage, disposal, or environmental compliance," and it found that no such nexus was present. *Id.* at 524.

## B.

*Bestfoods* did not elaborate on the meaning of operations "specifically related to pollution" or operations "having to do with leakage or disposal of hazardous waste." *See generally United States v. Bestfoods*, 524 U.S. 51 (1998). But *Brighton I* provided some guidance. *See Brighton II*, 282 F.3d 915, 918 (6th Cir. 2002) ("*Brighton I* produced three separate opinions but no majority opinion."). Chief Judge Boggs found *FMC*'s "actual control test" instructive and determined that

a governmental entity can be liable as an operator through "actual operation" or "macromanagement." *Brighton I*, 153 F.3d at 316 (Boggs, C.J.). By contrast, Judge Moore defined "actual control" as "involvement [that] extends beyond 'mere regulation' and amounts to 'substantial control,' or 'active involvement in the activities' at the facility." *Id.* at 325 (Moore, J., concurring in the result). And Judge Dowd restricted "actual control" to when an entity manages "the day-to-day activities of a facility." *Id.* at 332–35 (Dowd, J., dissenting in part and concurring in part). In this way, all three judges found *FMC* to be consistent with *Bestfoods*.

This Court previously found that *FMC* is "quite factually analogous" to this case. *MRP Props.*, 308 F. Supp. 3d at 929–30. The *FMC* court considered whether the Government exercised "actual and substantial control over the corporation's day-to-day operations and its policy making decisions." *FMC Corp.*, 29 F.3d at 843. In finding the Government liable, the *FMC* court principally relied on four "leading indicia of control": the Government's control over the "product the facility would produce, the level of production, the price of the product, and to whom the product would be sold." *Id.* Similarly, Plaintiffs have principally relied on *FMC*'s four "leading indicia of control" but have also invoked a litany of other factors courts have considered. Incidentally, this Court finds Judge Boggs's reliance on *FMC* to be consistent with *Bestfoods*, as it is most consistent with CERCLA's broad remedial purpose. Consequently, *Exxon*, upon which the Government principally relies, is not instructive. *See MRP Props.*, 308 F. Supp. 3d at 930–34.

Indeed, *Bestfoods* did not explicitly disturb *FMC*'s holding. Rather, *Bestfoods* "sharpen[ed]" the definition of an "operator" for CERLCA purposes by broadening the "actual control" inquiry to include control over "operations *having to do with* leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. 51 at 61 (emphasis added). *Bestfoods* did not redefine "operator" to render operator liability

indistinguishable from arranger liability[9] and, therefore, inconsistent with CERCLA's text and remedial purpose. *Contra Exxon Mobil*, 108 F. Supp. 3d at 521.

Contrary to the *Exxon* court's reading, *Bestfoods*'s definition of "operator" must not be read in a vacuum. *Id.* at 520 ("A court must decide whether a contractor is an operator after considering the totality of the circumstances concerning its involvement at the site."); *accord United States v. Sterling Centrecorp Inc.*, 977 F.3d 750, 757 (9th Cir. 2020) (holding that operator liability "may be inferred from the totality of the circumstances"); *Brighton I*, 153 F.3d at 326 (Moore, J., concurring in the result) (stating that operator liability "requires a fact-intensive inquiry and consideration of the totality of circumstances"). Instead, *Bestfoods*'s definition of "operator" should be read in the context of its considerations regarding operator liability:

> The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary.
>     . . . .
>     . . . The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Bestfoods*, 524 U.S. at 68–72 (cleaned up). In other words, the operator-liability standard is broader than the *Exxon* court construed it.

CERCLA's text supports that conclusion. First, CERCLA operator liability applies to "any person." 42 U.S.C. § 9607(a)(2). Congress has defined "person" to connote more than human

---

[9] Arranger liability is the third type of liability available under § 107(a)(3) and attaches to:

> [A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3) (2018).

beings and include governmental entities. *See Dictionary Act*, 1 U.S.C. § 1 (defining "person" to include inanimate entities). Further, all CERCLA's textual references to contractual relationships are expansive. *See* 42 U.S.C. § 9607(a)(3) (applying arranger liability to those who arranged for waste disposal "by contract, agreement, or otherwise"); *id.* § 9607(b)(3) (excluding from CERCLA's third-party defense those "whose act or omission occurs in connection with a contractual relationship, existing *directly or indirectly*, with the defendant" (emphasis added)); *id.* § 9607(n)(8)(B) (expressly allowing claims against an "independent contractor retained by a fiduciary" despite the statute's fiduciary damage cap); *id.* § 9607(q)(1)(A)(ii)(I) (creating strict liability for owners of property that others' property polluted if they were in a contractual relationship that was not only for goods or services).

Construing CERCLA liability broadly makes sense because the more PRPs, the more likely they will clean the site, which consigns CERCLA's priority of cleanliness over godliness. *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 136 (2007) ("Moreover, [CERCLA] defines PRPs so broadly as to sweep in virtually all persons likely to incur cleanup costs."); Jacob Podell, Note, *Resolving "Resolved": Covenants Not to Sue and the Availability of CERCLA Contribution Actions*, 119 Mich. L. Rev. 205, 207 (2020) ("CERCLA created a complicated structure designed to effect two goals: (1) make sure hazardous-waste sites are cleaned up in a timely manner and (2) make those who caused the contamination pay for the cleanup."); *see also Brighton I*, 153 F.3d at 315 n.10 (noting "the passive and expansive language of" 42 U.S.C. § 9607(a)(2)).

Unfortunately, CERLCA's "legislative history is, at best, messy." Podell, *supra*, at 207; *see Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 885 (9th Cir. 2001) (en banc) ("Any inquiry into CERCLA's legislative history is somewhat of a snark hunt."). *See generally* Frank P. Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and*

*Liability ("Superfund") Act of 1980*, 8 COLUM. J. ENV'T L. 1 (1982) (discussing comprehensively CERCLA's legislative history). But even a cursory review demonstrates Congress was predominantly concerned with "the long-term dangers inherent in the manufacture and use of hazardous and toxic substances." *E.g.*, 125 CONG. REC. S15,003 (daily ed. Nov. 29, 1980) (statement of Sen. Patrick Leahy); *see also* H.R. REP. NO. 96-1016, pt. 1, at 22 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6125 ("It is the intent of the Committee in [CERCLA] to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites.").

Broad applicability seems even more persuasive considering, among other things,[10] the bifurcated nature of CERCLA proceedings: phase one merely determines whether a party is liable to *any* extent; phase two determines the extent of any liability—much like the damages scheme for comparative negligence. Therefore, after this Order (phase one), the parties' respective degrees of culpability will still have to be determined (phase two).

The Government relies on two CERCLA cases that have emerged since the last Order in this case. First, the Government relies on *PPG Industries, Inc. v. United States*, in which the owner of a chromite-ore processing plant sued the Government under CERCLA to recover response costs. 957 F.3d 395 (3d Cir. 2020). The *PPG* court held that *FMC* was consistent with *Bestfoods*. *Id.* at 402 ("In sum, consistent with *FMC*, the *Bestfoods* standard (1) focuses on the relationship between the purported operator and the facility at issue; and (2) further focuses on 'operations specifically related to pollution.'" (quoting *Bestfoods*, 524 U.S. at 66)). The *PPG* court elaborated that:

> *Bestfoods* did not address when the government can be held liable as an operator, [but] this distinction is irrelevant. At no point, regardless of how the test was

---

[10] *See* Jacob Podell, Note, *Resolving "Resolved": Covenants Not to Sue and the Availability of CERCLA Contribution Actions*, 119 MICH. L. REV. 205, 210–11 (2020) (outlining CERCLA's five sweeping mechanisms to ensure polluted sites are cleaned).

> formulated, has any court said that the test for determining operator liability should be different depending on whether the potentially responsible party is the government, a parent or subsidiary, or some other type of corporation. Thus, the *Bestfoods* operator definition is not limited to the parent-subsidiary context and applies when the question is whether the government can be held liable as an operator.

*Id.* (internal citations and footnote omitted). Thus, under *PPG* the Government is as subject to CERCLA as private companies.

Second, the Government relies on *United States v. Sterling Centrecorp Inc.*, in which a corporation filed a CERCLA contribution suit against the Government for its role in operating a mine during World War II. 977 F.3d 750 (9th Cir. Oct. 5, 2020). The *Sterling* court reiterated that "an operator's relationship to the facility at issue must, at least in part, focus on 'operations specifically related to pollution.'" *Id.* at 758 (quoting *Bestfoods*, 524 U.S. at 66). The *Sterling* court concluded that "operator liability requires . . . . some level of direction, management, or control over the facility's *polluting activities*." *Id.* at 758 (emphasis added). Thus, under *Sterling*, the Government's must have managed, directed, controlled, or conducted some activity that contributed to the facility's pollution.

Therefore, the Government will be liable as an "operator" if, to any extent, it managed, directed, controlled, or conducted any of the facility's activities that produced "pollution."

## C.

At issue here is whether PAW exercised sufficient control over 12 petroleum refineries. All 12 refineries responded to the Government's directives in different ways. But one thing was clear: if they defied the Government's directives, they faced dire repercussions. Indeed, the record contains no evidence of a refinery opposing a governmental directive without facing repercussion or receiving an exception. Therefore, it would not be reasonable to infer that the Government did not have enough management, direction, or control over the refineries' pollution-producing

- 20 -

operations to be considered an "operator." Yet before delving into that discussion, two points deserve elaboration.

### i.

First, some courts seemingly absolve the Government from CERCLA recovery costs owing to a voluntary contractual relationship. *See, e.g.*, *Exxon*, 108 F. Supp. 3d at 523 ("The government 'played the role of a very interested consumer' in its wartime contracts with suppliers, including Exxon's predecessors. But the contracts gave [them] bargaining power." (citing *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1277, 1284 n.14 (E.D. Cal. 1997)); *Rospatch Jessco Corp. v. Chrysler Corp.*, 962 F. Supp. 998, 1005 (W.D. Mich. 1995), *as amended* (Aug. 11, 1995) (finding that the Government did not get involved in the contractor's "management of its operations" or "management decisions" and that the contractor was not forced into doing the work but rather had "sought out such work").

But in the context of the defense market, that deference misapplies the "actual control" standard. Although it might not render the Government an "operator" of the other party's polluting activities, the mere existence of a contractual relationship does not absolve the Government of operator liability. *See, e.g.*, *Lockheed*, 35 F. Supp. 3d at 132 (finding it "impossible" to allocate the parties' respective operator liability without considering "the extent of the government's involvement," because the contamination stemmed from "government contracts"); *Brighton I*, 153 F.3d at 315 ("The township was not operating at arm's length with a contractor."); *FMC*, 29 F.3d at 837 ("Under its contract with Rust, the government had substantial control over and participation in the work related to the DPC equipment."); *see also Bestfoods*, 524 U.S. at 57 n.5 (affirming Michigan Court of Appeals's determination that CERCLA liability may be precluded by a

contract's indemnification provision). As indicated, even with a voluntary contractual relationship, the Government could be an operator.

CERCLA's operator-liability inquiry is straightforward: Based on the totality of the circumstances, did the Government—to any extent—manage, direct, control, or conduct any of the facility's activities that produced pollution? The WWII defense industry, then, is a relevant consideration among the totality of the circumstances.

A "monopsony" is a market situation in which there is only "*one buyer*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) (emphasis added). And "[t]here is only one military customer that matters, the government, and thus the defense market has the characteristics of a monopsony." Loren Thompson, *Five Factors That Should Drive the FTC's Assessment of a Lockheed-Aerojet Merger*, FORBES (Sept. 7, 2021, 9:41 AM), https://www.forbes.com/sites/lorenthompson/2021/09/07/five-factors-that-should-drive-the-ftcs-assessment-of-a-lockheed-aerojet-merger/?sh=5527e8d7c0b8 [https://perma.cc/HK3H-ADYL]. Therefore, when it comes to wartime products, the Government innately has "the power to set wages below competitive levels" and the "power to exact an unequal distribution of the relationship-specific surplus." *See* Hiba Hafiz, *Structural Labor Rights*, 119 MICH. L. REV. 651, 653 (2021). So, defense contracts are products of the Government's monopsony power over the wartime market.

Because of its immense defense-market power, voluntary contracts cannot weigh against the Government's operator liability. Indeed, a private actor's voluntary contractual relationship with the Government does not immunize the Government from operator liability. *See* 42 U.S.C. § 9607(q)(1)(A)(ii)(I) (creating strict liability for owners of contiguous property that others' property polluted if they were in a contractual relationship not solely for goods or services); *cf. United States*

*v. Souza*, 223 F.3d 1197 (10th Cir. 2000) (considering a private party that the Government encouraged and assisted to be an agent of the Government); *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981) (applying Fourth Amendment to private citizens who voluntarily assist the Government). In other words, a contract giving the Government discretion to operate a facility does not mean the Government did not "operate" the facility.

In this way, a defense-market contract not within CERCLA's defenses, if anything, is weightless. But in light of the command to draw all reasonable inferences in favor of the nonmovant, this Court assumes that the voluntary relationship between the parties weighs against CERCLA liability.

### ii.

Second, some courts have granted the Government a higher degree of discretion owing to wartime conditions. Donald M. Carley, Note, *Environmental Law—The Federal Government Must Share in the Pain of CERCLA Cleanup Costs—FMC* Corp. v. United States Department of Commerce*, 29 F.3d 833 (3d Cir. 1994).*, 14 TEMP. ENV'T L. & TECH. J. 93, 113 (1995) (noting "some may argue that the government . . . was simply attempting to mobilize the United State[s's] war machine"); *see, e.g.*, *Exxon*, 108 F. Supp. 3d at 523 ("The federal government's wartime influence over these refineries stemmed from its voluntary contractual relationships with Exxon's predecessors."); *Rospatch*, 962 F. Supp. at 1005–06 (holding the government was not an operator when it did not "twist [the] arm" of contractor to produce wartime materials); *cf.* Tricia R. Russo, FMC Corp. v. United States Department of Commerce*: An Overexpansion of "Operator" Liability Under CERCLA*, 7 VILL. ENV'T L.J. 157, 179 (1996) (arguing "the costs of cleanup should be internalized through the [private] company" to preserve sovereign immunity).

But that conclusion misunderstands the goings-on of war. *See* Christopher J. Plaisted, Note, *Environmental Law—Too Much of a Good Thing: When Government Involvement in Waste Disposal Crosses the Line Between Regulating and "Operating" Under CERCLA*, 22 W. NEW ENG. L. REV. 221, 261 (2000) ("[I]t is common for government involvement in the waste disposal process to be predicated upon the responsibilities the government actor bears as the sovereign."). The United States Government does not pass the "actual control" test by exercising more control than it otherwise would have without war. *See FMC*, 29 F.3d at 840. Indeed, the United States has been "at war" for about 230 years of its 245-year existence.[11]

Granted, during war the Government and all those who assist it are literally up in arms, conducting 24-hour operations with the haste of Hermes. But after the dust settles, the Government, like those who assisted it, must collect its dead and, similarly, share in the costs to clean up the messes that it managed, directed, controlled, or conducted. *See Bestfoods*, 524 U.S. at 66; *Brighton I*, 153 F.3d at 314; *MRP Props.*, 308 F. Supp. 3d at 922. That is CERCLA's mandate. And nothing in its text says otherwise.

Recall that Congress intended CERCLA to apply broadly. *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 136 (2007). The more potentially liable parties, the more likely the disposal site would be cleaned. *See* discussion *supra* Section II.B (discussing CERLCA's priority of "cleanliness over godliness"). And by construing liability to cover any management, direction, or control "having to do with" a facility's pollution, the Supreme Court interpreted CERCLA's text

---

[11] Martin Kelly, *American Involvement in Wars from Colonial Times to the Present: Wars from 1675 to the Present Day*, THOUGHTCO (Nov. 4, 2020), https://www.thoughtco.com/american-involvement-wars-colonial-times-present-4059761 [https://perma.cc/PE8P-VLYN]; Sabir Shah, *The US Has Been at War 225 out of 243 Years Since 1776*, NEWS INT'L (Jan. 9, 2020), https://www.thenews.com.pk/print/595752-the-us-has-been-at-war-225-out-of-243-years-since-1776 [https://perma.cc/EM82-H3U].

broadly to include any reasonable inference of influence over any of a facility's polluting activities. *See Bestfoods*, 524 U.S. at 66.

Therefore, wartime control, which is among the most powerful in existence, either increases the Government's likelihood of operator liability or is irrelevant. *See* Carley, *supra*, at 113 ("In reality, the government is the only proper party to pay for past pollution, especially when it was caused in connection with the United State's war effort during World War II."); *cf. Ex parte Milligan*, 71 U.S. 2, 120–21 (1866) ("The Constitution of the United States is a law for *rulers and people, equally in war and in peace*, and covers with the shield of its protection all classes . . ., at all times and under all circumstances." (emphases added)).

In the sovereign's interest, this Court assumes that wartime control is irrelevant. *See Mones v. Com. Bank of Kuwait*, S.A.K., No. 18 MISC. 0302(SAS), 2007 WL 2815626, at *1 (S.D.N.Y. Sept. 25, 2007) ("[A] court in the United States must balance the interests of its citizens in pursuing litigation against the interests of a sovereign state, and that balance tips in favor of deference to the sovereign state."); *id.* at 932 n.5 ("The idea of comity-of treating sovereigns . . . with greater respect than other litigants counsels us to exercise forbearance in construing legislation to intrude upon the central regulatory functions of a sovereign entity.").

### III.

Plaintiffs claim that the Government operated eight refineries in District Two ("the Eight"): Leonard's refinery in Alma, Michigan ("Leonard"); Mid-West's refinery in Alma, Michigan ("Mid-West"); Bell Oil/Ben Franklin's refinery in Ardmore, Oklahoma ("Bell"); Kanotex's refinery in Arkansas City, Kansas ("Kanotex"); Worth's refinery in Blue Island, Illinois ("Worth"); Delta's refinery in Memphis, Tennessee ("Delta"); Roosevelt's Oil refinery in Mount Pleasant, Michigan ("Roosevelt"); and Vickers's refinery in Potwin, Kansas ("Vickers").

**A.**

According to Plaintiffs, the Government required the Eight to convert equipment and operations, including production methods, to make WWII petroleum products.[12] Further, the Government dictated the "kind and quantity" of the Eight's petroleum products through, for example, "enumerated temperature specifications" and a maximum "octane number" for manufacturing gasoline.[13] And the Government controlled and adjusted the "amount, source, and price" of the Eight's raw materials.[14] Moreover, the Government controlled the sales price and purchasers of the Eight's petroleum products.[15] The Government also required approval of Leonard's employee's salaries and bonuses and conducted on-site safety inspections at seven of the Eight related to waste.[16] Finally, Plaintiffs contend that the Government's involvement in the Eight's operations affected "pollution and the disposal of hazardous substances" because directives affecting production and yields of petroleum affected waste streams.[17]

**B.**

---

[12] ECF No. 68-2 at PageID.1135 (Leonard); *id.* at PageID.1140 (Mid-West); *id.* at PageID.1144–45 (Bell); *id.* at PageID.1148 (Kanotex); *id.* at PageID.1151–52 (Worth); *id.* at PageID.1156–57 (Delta); *id.* at PageID.1160 (Roosevelt); *id.* at PageID.1164 (Vickers).

[13] ECF No. 68-2 at PageID.1135–36 (Leonard); *id.* at PageID.1140–41 (Midwest); *id.* at PageID.1145 (Bell); *id.* at PageID.1148–49 (Kanotex); *id.* at PageID.1152–53 (Worth); *id.* at PageID.1157 (Delta); *id.* at PageID.1160–61 (Roosevelt); *id.* at PageID.1164–65 (Vickers).

[14] ECF No. 68-2 at PageID.1136 (Leonard); *id.* at PageID.1141–42 (Mid-West); *id.* at PageID.1145–46 (Bell); *id.* at PageID.1149 (Kanotex); *id.* at PageID.1153–54 (Worth); *id.* at PageID.1157–58 (Delta); *id.* at PageID.1161–62 (Roosevelt); *id.* at PageID.1165–66 (Vickers).

[15] ECF No. 68-2 at PageID.1137 (Leonard); *id.* at PageID.1142 (Mid-West); *id.* at PageID.1146 (Bell); *id.* at PageID.1149–50 (Kanotex); *id.* at PageID.1154 (Worth); *id.* at PageID.1158 (Delta); *id.* at PageID.1162 (Roosevelt); *id.* at PageID.1166 (Vickers).

[16] ECF No. 68-2 at PageID.1138 (Leonard); *id.* at PageID.1142–44 (Mid-West); *id.* at PageID.1146–47 (Bell); *id.* at PageID.1154–55 (Worth); *id.* at PageID.1158–59 (Delta); *id.* at PageID.1162 (Roosevelt); *id.* at PageID.1166–67 (Vickers).

[17] ECF No. 68-2 at PageID.1138–39 (Leonard); *id.* at PageID.1143–44 (Mid-West); *id.* at PageID.1147–48 (Bell); *id.* at PageID.1150–51 (Kanotex); *id.* at PageID.1155–56 (Worth); *id.* at PageID.1158–59 (Delta); *id.* at PageID.1162–63 (Roosevelt); *id.* at PageID.1167–69 (Vickers).

The Government's arguments regarding the Eight vary by refinery.

**i.**

According to the Government, Leonard, "[l]ike other District Two refineries," experienced a shortage of crude oil. ECF No. 81-2 at PageID.7793. Because of that shortage, Leonard sought and secured contracts with the Government to process crude oil for WWII. *Id.* at PageID.7794. Accordingly, Leonard sought and received "the necessary equipment to co[n]vert" its production facilities from the Government. *Id.* The Government characterizes its relationship with Leonard as a voluntary contractual relationship, in which Leonard would make suggestions to PAW and vice versa. *See id.* at PageID.7795–96. Further, the Government claims that Leonard processed "sweet crude oil" but not "sour." *Id.* at PageID.7796. The Government also notes its approval for Leonard to build a machine to "produce high-octane avgas for the war effort." *Id.* And the Government contends that, though it inspected Leonard's refinery "for security and safety," it did not have sufficient control over Leonard because it approved the salaries of only "key employees." *Id.* at PageID.7797.

**ii.**

According to the Government, it approved Mid-Wests's "proposal to produce codimer." ECF No. 81-2 at PageID.7798. The Government claims it "directed" Mid-West to sell its products to a refinery that could not use them, leaving the details of the "arrangement" to Mid-West. *Id.* at PageID.7800–01. The Government states that it frequently required Mid-West to "promptly" inform the Government about its petroleum production capacity. *Id.* at PageID.7801. The Government also notes that it denied Mid-West's requests for more crude. *Id.* at PageID.7802–03. The Government indicates that Mid-West stated it was "not following [one] directive," because it was physically impossible to comply. *Id.* at PageID.7803. The Government also recounts a letter

in which Mid-West expressed its dismay about not receiving more sour crude because it "made extensive improvements" based on the Government's directives. *See id.* at PageID.7803–04. The Government admits to inspecting Mid-West for "security and safety." *Id.* at PageID.7804. Finally, the Government discusses two other contracts it entered with Mid-West for war-time production, from which Mid-West profited. *Id.*

### iii.

According to the Government, it solicited Bell to produce petroleum products, and Bell "was eager." ECF No. 81-2 at PageID.7809. The Government also suggests that it granted Bell permission to "modify its refining equipment" at its own expense to produce petroleum products for the Government. *Id.* at PageID.7810–11. Further, the Government mentions two negotiated contracts through which it paid Bell for the products. *Id.* at PageID.7810. And the Government explains that it had ultimate approval authority over the sales prices of such products, which it later audited. *Id.* at PageID.7810–11, 7812. The Government also acknowledges that Bell "cooperated" with the Government's directive to maximize crude production. *Id.* at PageID.7812–13. Moreover, the Government notes that it approved Bell's requests to receive more crude, share its crude with another Bell-owned refinery, and process more crude to compensate for underproduction. *Id.* at PageID.7813–14. Ultimately, the Government characterizes its directives to Bell as "not . . . coercive dictates." *Id.* at PageID.7814.

### iv.

According to the Government, Kanotex "sought" to produce petroleum products for WWII. ECF No. 81-2 at PageID.7823. The Government also claims that Kanotex did not interpret PAW's directives as "coercive" and bragged about already meeting the requirements of one such directive. *Id.* at PageID.7823–24, 7826. Further, the Government mentions that it granted Kanotex an

exception to a directive to conserve natural gas. *Id.* at PageID.7824. And the Government claims that PAW "did not manage Kanotex's operations" because it merely "suggested" that Kanotex change its production output. *Id.* Moreover, the Government admits that it required Kanotex to comply with "new gasoline specifications," for which the Government granted Kanotex "a thirty-day extension." *Id.* at PageID.7825. The Government also discusses a conversation in which Kanotex "acknowledged" PAW's crude production requirements. *Id.* at PageID.7826. And the Government notes that Kanotex provided more petroleum products than their contract required. *Id.* at PageID.7825–26. Finally, the Government reveals that it inspected Kanotex "on at least three occasions." *Id.* at PageID.7827.

**v.**

According to the Government, Worth produced the same products before and during WWII. ECF No. 81-2 at PageID.7828. The Government asserts that it considered letting Worth close after it asked the Government to make other refineries send it crude. *Id.* at PageID.7828–29. The Government also states that it found a producer to send Worth "90,000 barrels of crude oil" but was not "involved in . . . the sale." *Id.* at PageID.7829–30. And the Government says that its "assistance was temporary" and Worth eventually closed "due to a lack of crude oil." *Id.* at PageID.7830. Further, the Government reveals a letter from PAW's chief counsel, J. Howard Marshall, discussing PAW's "statutory authority" to require "one man to sell . . . crude oil [] to another . . . where it clearly appears that such action is necessary for the prosecution of the war." *Id.* at PageID.7831. Moreover, the Government claims both that Worth's participation was "voluntary" and that Worth's processing of sour crude did not lead to hazardous waste spills. *Id.* Finally, the Government asserts that "PAW's directives did not materially change the product specifications of Worth's [petroleum products]." *Id.* at PageID.7833.

**vi.**

According to the Government, Delta "intend[ed] to cooperate in every possible way." ECF No. 81-2 at PageID.7818. The Government characterizes its relationship with Delta as an "arm's-length" contract. *Id.* The Government claims that Delta complied with several directives that often "had no effect on Delta's operations." *Id.* at PageID.7819. The Government also explains that it required Delta to use less crude, after which a Tennessee Senator "intervened on Delta's behalf" to convince the Government to grant Delta permission to obtain and process more crude. *Id.* at PageID.7820. The Government later granted a second increase. *Id.* at PageID.7821. Moreover, the Government states that it increased the price Delta had to pay for crude while prohibiting Delta from raising its sales prices, which Delta said would make it "impossible" to stay in business. *See id.* at PageID.7821. The Government also acknowledges that Delta "had been operating at a loss" because of the price the Government mandated and Delta's high operation costs. *Id.* at PageID.7821–22. Finally, the Government claims it "lacked detailed knowledge" of Delta's operations, noting the Government's months-long ignorance of a destructive fire. *Id.* at 7822.

**vii.**

According to the Government, "there is no evidence that Roosevelt produced critical war products." ECF No. 81-2 at PageID.7805. But the Government points out that its petroleum-production directives to Roosevelt "required the company to shut down its cracking unit." *Id.* The Government also notes that Roosevelt "sought [its] assistance to acquire materials" to meet the Government's directives. *Id.* at PageID.7806. Further, the Government asserts that it gave Roosevelt "the opportunity to present [its] case" after Roosevelt requested steady crude shipments because it feared not meeting the Government's need. *Id.* The Government also indicates that Roosevelt griped that it would have received more crude if it had fewer private contracts. *Id.* at

PageID.7807. And the Government admits to investigating Roosevelt's claimed need, for which the Government allotted more crude. *Id.* at PageID.7807. The Government also discusses it contract with Roosevelt to produce petroleum products. *Id.* at PageID.7808. Finally, the Government admits to at least three inspections of and four recommendations to Roosevelt. *Id.*

### viii.

According to the Government, Vickers produced petroleum products for WWII. ECF No. 81-2 at PageID.7815. The Government also notes that it gave Vickers permission to "alter its equipment to produce codimer," and later sought information on Vickers's progress. *Id.* at PageID.7815–16. Further, the Government acknowledges auditing Vickers's costs before approving its sales price for codimer. *Id.* at PageID.7816. Moreover, the Government explains that after Vickers recovered its conversion costs, the Government "re-negotiated" and ultimately lowered the sales prices of Vickers's codimer. *Id.* at PageID.7816–17. Finally, the Government mentions that Vickers "touted its participation in the war," had "little thought of personal benefit," and "praised" the Government. *Id.* at PageID.7817–18.

### C.

Plaintiffs have demonstrated that there is no genuine issue of material fact regarding whether the Government was one of each of the Eight's "operators." Construing the facts in the light most favorable to the Government, this Court finds that, based on the totality of the circumstances, every reasonable juror would conclude that the Government operated each of the Eight to some extent.

Under CERCLA, "an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). More sharply, an operator must have "manage[d], direct[ed], or conduct[ed] operations specifically

related to pollution." *Id.* Therefore, the Government operated Leonard if, based on "a fact-intensive inquiry and consideration of the totality of the circumstances," it exercised some extent of management, direction, or control leading Leonard to take affirmative acts that anyway affected "leakage or disposal of hazardous waste." *Id.*; *Brighton I*, 153 F.3d at 326. Accordingly, the Government needs to be merely *one* operator, not *the* operator. *See Brighton I*, 153 F.3d at 318–19 (distinguishing "the divisibility defense to joint and several liability from the equitable allocation principles available under CERCLA's contribution provision").

In *FMC*, the Third Circuit held that the "leading indicia of control" in finding operator liability were whether the Government determined (1) the product the facility could produce; (2) the level of production; (3) the products' price; and (4) to whom the product could be sold. *FMC*, 29 F.3d at 843; *see also PPG*, 957 F.3d at 403 (considering factors three and four); *Steadfast*, 2009 WL 3785565, at *6 (same).

The record comprises over 11,500 pages replete with communications between the Eight and the Government that, if viewed in isolation, might be interpreted as either cooperative or coercive. But in viewing the record as a whole, no reasonable juror could disagree that the Government exercised all four of *FMC*'s four leading indicia of control over Leonard, Mid-West, Bell, Kanotex, Delta, Roosevelt, and Vickers and three of four over Worth.

The record indicates that the Government dictated which petroleum products the Eight could produce. *See, e.g.*, ECF No. 74-21 at PageID.5072 ("I hereby direct that you shall not manufacture or blend any civilian gasoline except such as will conform to the following . . . ."); *see also* ECF Nos. 74-40; 75-1 (Leonard, Delta, and Roosevelt); 75-14 (Mid-West); 75-16; 77-19. The Government also repeatedly determined the Eight's production levels (i.e., yields). *See, e.g.*, ECF No. 74-50 at PageID.5942 ("Therefore, effective immediately and until further advised you

are hereby directed to increase the percentage yields of motor gasoline . . . and of distillate fuels . . . based on crude input . . . at your . . . refinery(ies).”); *see also* ECF Nos. 74-21; 74-42; 74-49; 74-50 (Leonard, Kanotex, and Delta); 75-1 (Leonard, Delta, and Roosevelt); 75-2 (Leonard, Kanotex, Delta, and Roosevelt); 75-3 (Leonard); 75-14 (Mid-West); 75-16; 75-43 (Bell); 75-50; 76-1 (Bell, Kanotex, and Vickers); 77-19. Moreover, the Government decided to whom the Eight could sell petroleum products. *See* ECF No. 74-21 at PageID.5072 (“TYPES A, B, AND C [motor fuel] *SHALL* BE MARKETED IN SUCH LOCALITIES AND DURING SUCH SEASONS AS ARE INDICATED . . . IN US ARMY SPECIFICATION 2-114.” (emphasis added)); *see also* ECF Nos. 75-14 (Mid-West); 75-15 (Mid-West); 75-41 (Bell); 75-43 (Bell); 76-2 (Kanotex). Further, the Government controlled the product prices for the Eight minus Worth. *See* ECF Nos. 75-4 (Leonard); 75-28 (Mid-West); 75-41 (Bell); 75-42 (Bell); 75-45 (Kanotex); 76-2 (Kanotex); 76-18 (Delta); 82-16 (Leonard); 82-28 (Mid-West); 83-4 (Roosevelt); 83-14 (Bell); 83-15 (Bell); 83-32 (Vickers); 83-36 (Vickers).

Plus, the Government publicly declared its control over the petroleum refineries and their employees; seized at least one other petroleum refinery; conducted hourly militaristic inspections of nearly every aspect of the petroleum refineries; determined and adjusted the petroleum concentration of the Eight’s petroleum products, which inherently affected pollution levels; and was aware that processing petroleum created such waste. In sum, among other factors from operator-liability cases that suggest the Government exercised actual and substantial management, direction, or control over a refinery’s pollution-producing operations to some extent, 26 factors are present regarding Leonard; 25 regarding Bell; 24 regarding Mid-West; 23 regarding Kanotex,

Delta, Roosevelt, and Vickers; and 22 regarding Worth.[18] Therefore, no reasonable juror could find that the extent of the Government's management, direction, and control over the Eight had nothing "to do with" the amount of waste they produced. *See Bestfoods*, 524 U.S. at 66.

---

[18] First, the Government required the Eight to process different petroleum products. *See FMC*, 29 F.3d at 853; *Steadfast*, 2009 WL 3785565, at *6, 2; ECF Nos. 74-21; 74-31 at PageID.5410 (Roosevelt); 74-49; 74-50 (Leonard, Kanotex, and Delta); 75-1 (Leonard, Delta, and Roosevelt); 75-14 (Mid-West); 75-16; 77-19 at PageID.6956 (Kanotex). Second, the Government directed and supervised the Eight's production process by, for example, mandating product specifications and petroleum concentration. *See PPG*, 957 F.3d at 397; *FMC*, 29 F.3d at 843; *Exxon*, 108 F. Supp. 3d at 525; *Miami-Dade*, 345 F. Supp. 2d at 1341, 1344, 1346; ECF Nos. 74-21; 74-42; 74-49; 74-50 (Leonard, Mid-West, Delta,  and Roosevelt); 75-1 (Mid-West, Delta, Roosevelt, and Vickers); 75-2 (Roosevelt and Vickers); 75-10 (Mid-West); 75-14 (Mid-West); 75-16; 75-29 (Mid-West); 75-50; 76-1 (Bell, Kanotex, and Vickers); 77-19 at PageID.6956. Third, the Government had seized at least one other petroleum processing plant. *See PPG*, 957 F.3d at 404; *FMC*, 29 F.3d at 936; *Exxon*, 108 F. Supp. 3d at 524; *Steadfast*, 2009 WL 3785565, at *4–6; ECF Nos. 77-49; 77-50 at PageID.7203; 78-1; 94-14 at PageID.11060. Fourth, the Government was aware that processing petroleum created pollution and that the Eight's petroleum processing created pollution. *See FMC*, 29 F.3d at 838; *Exxon* 108 F. Supp. 3d at 529; ECF Nos. 77-47 (inspecting nearly every inch of the refinery from storage capacity of crude oil to "control of dust, fumes, and vapors"); 78-19 at PageID.7538; 78-20 at PageID.7569; 78-28 ("The recovery of slop oils, which is a necessary function in any refinery . . . ."); 78-29; 94-14 (ordering "personnel working on . . . . waste oil separators" to "[r]eturn to work"). Fifth, through inspections, the Government was aware of and monitored the Eight's production of petroleum waste. *See FMC*, 29 F.3d at 838; *Brighton I*, 153 F.3d at 327 (Moore, J. concurring in the result); ECF Nos. 77-47; 78-19 at PageID.7538 (Delta, Roosevelt, and Vickers); 78-20 at PageID.7569 (Delta, Roosevelt, and Vickers); 78-28 (Delta, Roosevelt, and Vickers); 78-29 (Roosevelt and Vickers); 94-14 at PageID.11060. Sixth, the Government had expertise and knowledge of the dangers of waste created by processing petroleum. *Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 77-47; 78-28; 78-29; 94-14 at PageID.11060. Seventh, the Government determined the Eight's operational plans. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 74-22 (Leonard); 74-42; 74-50 (Leonard, Delta, and Roosevelt); 75-1 (Leonard, Delta, Roosevelt, and Vickers); 75-15 (Mid-West); 75-50; 76-1 (Bell, Kanotex, and Vickers). Eighth, the Government publicly declared responsibility over all petroleum refineries and their employees with words and actions. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 77-19 at PageID.6958 (announcing nationwide that "[a]ll U. S. refiners were notified of the change in octane rating of house brand gasoline"); 94-14 at PageID.11060; *see, e.g.*, 77-47 at PageID.7151 (showing at least 126 armed military guards were permanently stationed at some refineries, conducting hourly "watchmen" inspections under 24-hour ops). Ninth, the Government had more than a mere contractual relationship with the Eight. *See Brighton I*, 153 F.3d at 315–16; ECF Nos. 74-42; 77-47. Tenth, the Government had quality control employees and other representatives on site. *See Miami-Dade*, 345 F. Supp. 2d at 1341–42; ECF No. 77-47. Eleventh, the Government's directives to the Eight led to changes in their waste management. *See Steadfast*, 2009 WL 3785565,

**IV.**

Plaintiffs claim that the Government operated two refineries in District Five: Caminol's refinery in Hanford, California ("Hanford") and Caminol's refinery in Santa Fe Springs, California ("Springs").

---

at \*5; ECF No. 74-31 at PageID.5422. Twelfth, the Government determined which petroleum products the Eight had to produce. *See Steadfast*, 2009 WL 3785565, at \*5–6; ECF Nos. 74-49 (Mid-West); 74-50 (Kanotex and Delta); 75-14 (Mid-West); 75-16; 75-40 (Leonard). Thirteenth, the Government set and adjusted the Eight's production quotas. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at \*4–6; ECF Nos. 74-21; 74-50 (Leonard and Delta); 75-1 (Leonard and Delta); 75-4 (Leonard); 75-18 at PageID.4964 (Kanotex); 76-1 (Bell, Kanotex, and Vickers); 76-2 (Kanotex). Fourteenth, the record indicates that the Government's directives to the Eight were direction, not mere guidance. *See Steadfast*, 2009 WL 3785565 at \*7; ECF Nos. 74-42; 74-43; 74-45 at PageID.5902; 74-47 (Mid-West); 74-50 (Leonard, Kanotex, and Delta); 75-1 (Leonard, Mid-West, Delta, Roosevelt, and Vickers); 75-50; 76-1 (Bell, Kanotex, and Vickers); 77-47. Fifteenth, the Government inspected the Eight's disposal sites. *See Steadfast*, 2009 WL 3785565, at \*1, \*4, \*5, \*7, \*8; ECF Nos. 77-47; *see also* 81-2 at PageID.7797 (Leonard, Mid-West, Bell, Kanotex, and Roosevelt). Sixteenth, the Government had officials who worked on site. *See Exxon*, 108 F. Supp. 3d at 526; ECF No. 77-47. Seventeenth, the Government determined who could purchase the Eight's petroleum products. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at \*4–6; ECF Nos. 74-21; 75-15 (Mid-West); 75-21 (Delta, Roosevelt, and Vickers); 75-43 (Bell). Eighteenth, the Government was permanently stationed on site. *See Exxon*, 108 F. Supp. 3d at 525–26, 532; ECF No. 77-47. Nineteenth, the Eight resembled a military base. *See Exxon*, 108 F. Supp. 3d at 533; ECF No. 77-47. Twentieth, the Government required the Eight to send regular reports regarding petroleum processing. *See Exxon*, 108 F. Supp. 3d at 509, 527, 532; ECF Nos. 74-20; 74-21; 74-45 at PageID.5902; 74-49 (Leonard); 75-50; 76-1 (Bell, Kanotex, and Vickers). Twenty-first, the Government controlled the priority of orders for petroleum products at the Eight. *See PPG*, 957 F.3d at 397, 403; ECF No. 74-21. Twenty-second, the Government participated in decisions related to the Eight's pollution. *See Exxon*, 108 F. Supp. 3d at 527; *Steadfast*, 2009 WL 3785565, at \*8; ECF No. 74-31 at PageID.5422. Twenty-third, the Government determined sales prices for Leonard, Mid-West, Bell, Kanotex, Delta, Roosevelt, and Vickers. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at \*4–6; ECF Nos. 75-28 (Mid-West); 75-45 (Kanotex); 76-18 (Delta); 82-16 (Leonard); 82-28 (Mid-West); 83-4 (Roosevelt); 83-14 (Bell); 83-15 (Bell); 83-32 (Vickers); 83-36 (Vickers). Twenty-fourth, the Government audited some of the pollution-related costs at Mid-West and Bell. *See Miami-Dade*, 345 F. Supp. 2d at 1341, 1344; ECF Nos. 75-26 (Mid-West); 75-28 (Mid-West); 75-41 (Bell). Twenty-fifth, the Government dictated the quantity of petroleum products Bell could sell. *See PPG*, 957 F.3d at 403; ECF No. 75-43. Twenty-sixth, the Government required approval for Leonard's "'key employee' bonuses." *See PPG*, 957 F.3d at 403; ECF No. 81-2 at PageID.7797. Twenty-seventh, the Government approved Leonard's expansion projects. *See* PPG, 957 F.3d at 398; ECF Nos. 74-46. Twenty-eighth, the Government required approval for changes to Leonard's facility. *See Exxon*, 108 F. Supp. 3d at 495, 502–03; ECF Nos. 75-8 at PageID.5994; 78-2.

**A.**

According to Plaintiffs, the Government required Hanford to convert equipment and operations to make WWII products. ECF No. 68-2 at PageID.1169 (Hanford). Further, the Government dictated the "kind and quantity" of Hanford's petroleum products. *Id.* at PageID.1169–70 (Hanford). And the Government controlled and adjusted the "amount, source, and price" of Hanford's raw materials. *Id.* at PageID.1170–71 (Hanford). Moreover, the Government controlled the sales price and purchasers of Hanford's petroleum products. *Id.* at PageID.1171 (Hanford). Plaintiffs also contend that the Government conducted safety inspections at Hanford related to waste. *See id.* at PageID.1171–72 (Hanford). Finally, Plaintiffs contend that the Government's involvement in Hanford's operations affected "pollution and the disposal of hazardous substances" because directives affecting production and yields of petroleum affected waste streams. *See id.* at PageID.1172 (Hanford).

**B.**

The Government's arguments regarding Hanford and Springs vary by refinery.

**i.**

According to the Government, Hanford processed petroleum products for the Government under five contracts. ECF No. 81-2 at PageID.7854, 7856. The Government contends that its contractual right to control the location and quantity of the sale of Hanford's petroleum products does not amount to control. *See id.* at PageID.7861. And the Government presents one instance in which Hanford was unable to follow a directive to adjust the concentration of its petroleum products. *See id.* at PageID.7857. But the Government concedes that Hanford changed its concentration of "91-octane avgas" at the Government's request. *See id.* at PageID.7856. The Government also contends that the record contains contradictory evidence as to whether Hanford

expanded its petroleum-processing facility at PAW's request. *See id.* at PageID.7858. But the Government believes that its approval of new production equipment at Hanford is not relevant to operator liability. *See id.* at PageID.7861. The Government elaborates that it offered to remove a restriction it placed on Hanford if it manufactured different "critical war products," but Hanford did not comply. *See id.* at PageID.7858–59. Moreover, the Government claims that its directive to adjust the petroleum concentration of Hanford's gasoline production "did not manage . . . or dictate" Hanford's production, despite Hanford's compliance. *See id.* at PageID.7859–60. The Government also declares that no evidence shows it "controlled" Hanford's daily production of crude. *Id.* at PageID.7860. Further, the Government admits that it inspected Hanford for "safety and security." *Id.* at PageID.7862. The Government concludes that sending directives to all District Five refineries does not mean it individually controlled Hanford. *See id.* at PageID.7862.

### ii.

According to the Government, Springs processed petroleum products for the Government under two contracts. *Id.* at PageID.7854, 7856. The Government contends that its contractual right to control the location and quantity of the sale of Springs's petroleum products does not amount to control. *See id.* at PageID.7861. And the Government presents one instance in which Springs was unable to follow a directive to adjust the concentration of its petroleum products. *See id.* at PageID.7857. But the Government concedes that Springs changed its concentration of "91-octane avgas" at the Government's request. *See id.* at PageID.7856. Further, the Government believes that its approval of new production equipment at Springs is not relevant to operator liability. *See id.* at PageID.7861. Moreover, the Government claims that its directive to adjust the petroleum concentration of Springs's gasoline production "did not manage . . . or dictate" Springs's production, despite Springs's compliance. *See id.* at PageID.7859–60. The Government also

declares that no evidence shows it "controlled" Springs's daily production of crude. *See id.* at PageID.7860. The Government also denies inspecting Springs. *Id.* at PageID.7862. The Government concludes that sending directives to all District Five refineries does not mean it individually controlled Springs. *See id.* at PageID.7862.

### C.

Plaintiffs have demonstrated that there is no genuine issue of material fact regarding whether the Government was an "operator" of both Hanford and Springs. Construing the facts in the light most favorable to the Government, this Court finds that, based on the totality of the circumstances, a trier of fact could not reasonably conclude that the Government did not operate Hanford and Springs to some extent.

The same CERCLA standard for operator liability applies to Hanford and Springs. *See* discussion *supra* Sections II.A, II.B, II.C, III.C. The record comprises over 11,500 pages replete with communications between the Government and Hanford and Springs that, if viewed in isolation, might be interpreted as either cooperative or coercive. But in viewing the record as a whole, no reasonable juror could disagree that the Government exercised all four of *FMC*'s four leading indicia of control over both Hanford and Springs.

The Government determined which products Hanford and Springs could produce. *See* ECF Nos. 77-1 at PageID.6816 ("THEREFORE ALL PERSONS IN DISTRICT FIVE ARE HEREBY NOTIFIED TO COMPLY WITH THE FOLLOWING OPERATING INSTRUCTIONS . . . ."); *see also* 74-19 at PageID.5055; 76-50; 77-8. The Government also repeatedly determined Hanford's and Springs's production levels (i.e., yield). *See* ECF Nos. 74-19; 76-50; 77-1; 77-8. Moreover, the Government decided to whom Hanford and Springs could sell their products. *See*

ECF Nos. 77-8; 77-12 (Hanford); 77-13; 77-14. Further, the Government controlled the product prices for Hanford and Springs. *See* ECF Nos. 77-10; 77-11; 77-12 (Hanford).

Plus, the Government publicly declared its control over the petroleum refineries and their employees; seized at least one other petroleum refinery; conducted hourly militaristic inspections of nearly every aspect of the petroleum refineries; determined and adjusted the petroleum concentration of Hanford's and Springs's petroleum products, which inherently affected pollution levels; and was aware that processing petroleum created such waste. In sum, among other factors from operator-liability cases that suggest the Government exercised actual and substantial management, direction, or control over a refinery's pollution-producing operations to some extent, 30 factors are present regarding both Hanford and Springs.[19] Therefore, no reasonable juror could

---

[19] First, the Government required Hanford and Springs to process different petroleum products. *See FMC*, 29 F.3d at 853; *Steadfast*, 2009 WL 3785565, at *6, 2; ECF Nos. 74-19 at PageID.5055; 76-50; 77-1; 77-8. Second, the Government directed and supervised the production process at Hanford and Springs by, for example, mandating product specifications and petroleum concentration. *See PPG*, 957 F.3d at 397; *FMC*, 29 F.3d at 843; *Exxon*, 108 F. Supp. 3d at 525; *Miami-Dade*, 345 F. Supp. 2d at 1341, 1344, 1346; ECF Nos. ECF Nos. 74-19 at PageID.5055; 76-50 at PageID.6793; 77-1 at PageID.6816; 77-4; 77-8 at PageID.6867; 77-19 at PageID.6956. Third, the Government had seized at least one other petroleum processing plant. *See PPG*, 957 F.3d at 404; *FMC*, 29 F.3d at 936; *Exxon*, 108 F. Supp. 3d at 524; *Steadfast*, 2009 WL 3785565, at *4–6; ECF Nos. 77-49; 77-50 at PageID.7203; 78-1; 94-14 at PageID.11060. Fourth, the Government was aware that processing petroleum created pollution and that petroleum processing created pollution at Hanford and Springs. *See FMC*, 29 F.3d at 838; *Exxon* 108 F. Supp. 3d at 529; ECF Nos. 77-47 (inspecting nearly every inch of the refinery from storage capacity of crude oil to "control of dust, fumes, and vapors"); 78-19 at PageID.7538; 78-20 at PageID.7569; 78-28 ("The recovery of slop oils, which is a necessary function in any refinery . . . ."); 78-29; 94-14 (ordering Gulf's "personnel working on . . . . waste oil separators" to "[r]eturn to work"). Fifth, through inspections, the Government was aware of and monitored the production of petroleum waste at Hanford and Springs. *See FMC*, 29 F.3d at 838; *Brighton I*, 153 F.3d at 327 (Moore, J. concurring in the result); ECF Nos. 76-34; 77-47; 78-19 at PageID.7538; 78-20 at PageID.7569; 78-24 at PageID.7666; 78-28; 78-29; 94-14 at PageID.11060. Sixth, the Government had expertise and knowledge of the dangers of waste created by processing petroleum. *Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 77-47; 78-28; 78-29; 94-14 at PageID.11060. Seventh, the Government determined the operational plans for Hanford and Springs. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 74-19 at PageID.5055; 76-50 at PageID.6793; 77-1 at PageID.6816; 77-8 at PageID.6867. Eighth, the Government publicly

declared responsibility over all petroleum refineries and their employees with words and actions. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 77-19 at PageID.6958 (announcing nationwide that "[a]ll U. S. refiners were notified of the change in octane rating of house brand gasoline"); 94-14 at PageID.11060; *see, e.g.*, 77-47 at PageID.7151 (showing at least 126 armed military guards were permanently stationed at some refineries, conducting hourly "watchmen" inspections under 24-hour ops). Ninth, the Government had more than a mere contractual relationship with Hanford and Springs. *See Brighton I*, 153 F.3d at 315–16; ECF Nos. 77-9 at PageID.6871 (Hanford); 77-21 at PageID.6973 (Springs); 77-47. Tenth, the Government had quality control employees and other representatives on site. *See Miami-Dade*, 345 F. Supp. 2d at 1341–42; ECF No. 77-47. Eleventh, the Government's directives to Hanford and Springs led to changes in their waste management. *See Steadfast*, 2009 WL 3785565, at *5; ECF No. 74-31 at PageID.5422; 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973 (Springs). Twelfth, the Government determined which petroleum products Hanford and Springs had to produce. *See Steadfast*, 2009 WL 3785565, at *5–6; ECF Nos. 74-19 at PageID.5055; 76-50; 77-1; 77-8. Thirteenth, the record indicates that the Government's directives to Hanford and Springs were direction, not mere guidance. *See Steadfast*, 2009 WL 3785565 at *7; ECF Nos. 74-19 at PageID.5055; 76-50 at PageID.6793; 77-1 at PageID.6816; 77-8 at PageID.6867. Fourteenth, the Government inspected and approved the disposal sites at Hanford and Springs. *See Steadfast*, 2009 WL 3785565, at *1, *4, *5, *7, *8; ECF Nos. 76-34; 77-47; 78-7 at PageID.7286; 78-31; 78-32; 78-33; 78-34; 78-35. Fifteenth, the Government had officials who worked on site. *See Exxon*, 108 F. Supp. 3d at 526; ECF No. 77-47. Sixteenth, the Government was permanently stationed on site. *See Exxon*, 108 F. Supp. 3d at 525–26, 532; ECF No. 77-47; 94-14 at PageID.11060. Seventeenth, Hanford and Springs resembled a military base. *See Exxon*, 108 F. Supp. 3d at 533; ECF No. 77-47. Eighteenth, the Government participated in decisions related to pollution at Hanford and Springs. *See Exxon*, 108 F. Supp. 3d at 527; *Steadfast*, 2009 WL 3785565, at *8; ECF No. 74-31 at PageID.5422. Nineteenth, the Government approved expansion projects at Hanford and Springs. *See PPG*, 957 F.3d at 398; ECF Nos. 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973. Twentieth, the Government required approval for changes to Hanford's and Springs's facility. *See Exxon*, 108 F. Supp. 3d at 495, 502–03; ECF Nos. 77-1; 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973 (Springs). Twenty-first, the Government, in part, established and designed Hanford and Springs. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); *See Exxon*, 108 F. Supp. 3d at 526; ECF Nos. 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973 (Springs). Twenty-second, the Government designed, specified, or provided some of the equipment and machinery needed to process petroleum at Hanford and Springs. *See FMC*, 29 F.3d at 838; *Steadfast*, 2009 WL 3785565, at *5–6; ECF Nos. 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973 (Springs). Twenty-third, the Government set and adjusted Hanford's and Springs's production quotas. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at *4–6; ECF Nos. 76-50; 77-8; 77-9; 77-21. Twenty-fourth, the Government determined who could purchase petroleum products from Hanford and Springs. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at *4–6; ECF Nos. 77-8; 77-12 (Hanford); 77-13; 77-14. Twenty-fifth, the Government controlled the product prices for Hanford and Springs. *See* ECF Nos. 77-10; 77-11; 77-12 (Hanford). Twenty-sixth, the Government required Hanford and Springs to send regular reports regarding petroleum processing. *See Exxon*, 108 F. Supp. 3d at 509, 527, 532; ECF Nos. 74-19; 76-50. Twenty-seventh, the Government determined Hanford's and Springs's sales prices. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*,

find that the extent of the Government's management, direction, and control over Hanford and Springs had nothing "to do with" the amount of waste it produced. *See Bestfoods*, 524 U.S. at 66.

**V.**

Plaintiffs claim that the Government operated two refineries in District Three: Gulf Oil's refinery in Port Arthur, Texas ("Gulf") and Eastern States's refinery in Houston, Texas ("Eastern").

**A.**

According to Plaintiffs, the Government required Gulf and Eastern to convert equipment and operations to make WWII products. ECF No. 68-2 at PageID.1176–77 (Gulf); *id.* at PageID.1187 (Eastern). Further, the Government dictated the "kind and quantity" of Gulf's and Eastern's petroleum products through, for example, "enumerated temperature specifications" and a maximum "octane number" for manufacturing gasoline. *Id.* at PageID.1177–78 (Gulf); *id.* at PageID.1187 (Eastern). And the Government controlled and adjusted the "amount, source, and price" of Gulf's and Eastern's raw materials. *Id.* at PageID.1178–79 (Gulf); *id.* at PageID.1187 (Eastern). Moreover, the Government controlled the sales price and purchasers of Gulf's and Eastern's petroleum products. *Id.* at PageID.1179–80 (Gulf); *id.* at PageID.1187 (Eastern). Plaintiffs also contend that the Government controlled Eastern's employees' salaries. *See id.* at PageID.1187–88. Plaintiffs also contend that the Government conducted safety inspections at Gulf

---

2009 WL 3785565 at *4–6; ECF Nos. 77-10; 77-11; 77-12 (Hanford). Twenty-eighth, the Government had unfettered control over waste-related activities at Hanford and Springs. *See Steadfast*, 2009 WL 3785565; ECF Nos. 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973 (Springs). Twenty-ninth, the Government allowed Hanford and Springs to request exceptions from its mandates. *See* ECF Nos. 77-1; 77-9 at PageID.6870–71 (Hanford); 77-10; 77-11 (Hanford); 77-21 at PageID.6973 (Springs). Thirtieth, the Government admitted to delaying the improvement of the disposal process at Hanford and Springs. *See Exxon*, 108 F. Supp. 3d at 531; ECF No. 77-9 at PageID.6870–71 (Hanford); 77-21 at PageID.6973 (Springs).

related to waste. *See id.* at PageID.1180–81. Plaintiffs also contend the Government nearly seized Gulf. *Id.* at PageID.1181. Finally, Plaintiffs contend that the Government's involvement in Gulf's and Eastern's operations affected "pollution and the disposal of hazardous substances" because directives affecting production and yields of petroleum affected waste streams. *See id.* at PageID.1181–82 (Gulf); *id.* at PageID.1188–89 (Eastern).

### B.

The Government's arguments regarding Gulf and Eastern vary by refinery.

### i.

According to the Government, "at PAW's request" and not under contract, Gulf expanded its facilities and installed "additional equipment" to produce petroleum products for the Government. ECF No. 81-2 at PageID.7835. The Government also discusses its approval of Gulf's proposed cost analysis. *Id.* at PageID.7836. Further, the Government notes its failed attempt to control the price of Gulf's private contracts for petroleum products. *Id.* at PageID.7837–38. And the Government mentions its self-deferential "fair and reasonable" approval standard by which it would "certify" Gulf's proposed sales prices. *Id.* at PageID.7838. The Government elaborates that it granted Gulf reimbursements for some losses incurred from the Government's directives. *Id.* at PageID.7839. And the Government acknowledges that it required a 4¢ lower sales price than what Gulf requested. *Id.* at 7839–40. The Government also claims that its directives to Gulf limiting crude input led to an increase in both yields of petroleum products and crude throughput. *Id.* at PageID.7840–41. Further, the Government contends that its directives not to use benzol to produce crude did not direct Gulf to "discontinue production of certain products." *Id.* at PageID.7841. The Government also asserts that "Plaintiffs selectively quote and mischaracterize" three PAW directives. *Id.* at PageID.7841–42. Moreover, the Government admits to rejecting Gulf's

"proposed construction projects" but claims they were not related to hazardous waste disposal. *Id.* at PageID.7834. Finally, the Government concedes that it "prepared" a draft executive order to seize Gulf, which was not executed because it became moot. *Id.* at PageID.7844.

### ii.

According to the Government, Eastern processed petroleum products for WWII on its own volition. ECF No. 81-2 at PageID.7845. The Government discusses how Eastern asked the Government to fund Eastern's refinery, which PAW supported. *Id.* The Government elaborates that it purchased and owned the land upon which Eastern "was responsible for constructing and operating the plant." *Id.* The Government also claims it negotiated Eastern's sales prices. *Id.* Moreover, the Government admits that it was aware that Eastern created waste when it processed petroleum. *See id.* at PageID.7846. The Government claims Eastern was the only operator of its facility because it publicly said so. *See id.* at PageID.7846–50. The Government also indicates that Eastern could not convert its facility's production capacities without governmental approval pursuant to their contract. *Id.* at PageID.7847. And the Government admits that it inspected Eastern and surveyed its employees. *Id.* at PageID.7847–49. Moreover, the Government concedes that it was aware that Eastern was not cleaning up its hazardous waste properly, which the Government considered "systemic" to refinery culture. *See id.* at PageID.7849–50. The Government also contends that Eastern leased the Government's equipment to produce petroleum products. *Id.* at PageID.7850–51. Further, the Government acknowledges evidence that demonstrates it had the authority to approve or reject Eastern's employees' salaries. *Id.* at PageID. 7851. Finally, the Government admits that it was aware Eastern was disposing of hazardous waste and merely made suggestions instead of directives for disposal. *Id.* at PageID.7852.

### C.

Plaintiffs have demonstrated that there is no genuine issue of material fact regarding whether the Government was an "operator" of both Gulf and Eastern. Construing the facts in the light most favorable to the Government, this Court finds that, based on the totality of the circumstances, a trier of fact could not reasonably conclude that the Government did not operate Gulf and Eastern to some extent.

The same CERCLA standard for operator liability applies to Gulf and Eastern. *See* discussion *supra* Sections II.A, II.B, II.C, III.C. The record comprises over 11,500 pages replete with communications between the Government and Gulf and Eastern that, if viewed in isolation, might be interpreted as either cooperative or coercive. But in viewing the record as a whole, no reasonable juror could disagree that the Government exercised all four of *FMC*'s four leading indicia of control over Gulf and two of four over Eastern.

The record indicates that the Government determined which petroleum products Gulf and Eastern could produce. *See* ECF Nos. 74-21 (Gulf); 77-19; 77-31 (Gulf); 77-32; 77-33; 77-34 (Gulf); 77-35; 77-36 (Gulf); 77-37 (Gulf); 77-40 (Gulf); 77-45 (Gulf); 77-46; 78-3 (Eastern). The Government also repeatedly determined Gulf's and Eastern's production levels (i.e., yield). *See* ECF Nos. 74-21 (Gulf); 77-31 (Gulf); 77-32; 77-33; 77-34 (Gulf); 77-35; 77-36 (Gulf); 77-37 (Gulf); 77-45 (Gulf); 77-46; 78-3 (Eastern). Moreover, the Government decided to whom Gulf could sell petroleum products. *See* ECF No. 74-21; 77-30 at PageID.7097; 77-43; 77-44; 77-45; 77-46. Further, the Government controlled the product prices for Gulf. *See* ECF Nos. 77-43; 77-44.

Plus, the Government publicly declared its control over the petroleum refineries and their employees; seized at least one other petroleum refinery; conducted hourly militaristic inspections of nearly every aspect of the petroleum refineries; determined and adjusted the petroleum

concentration of Gulf's and Eastern's petroleum products, which inherently affected pollution levels; and was aware that processing petroleum created such waste. In sum, among other factors from operator-liability cases that suggest the Government exercised actual and substantial management, direction, or control over a refinery's pollution-producing operations to some extent, 41 factors are present regarding Gulf and 43 regarding Eastern.[20] Therefore, no reasonable juror

---

[20] First, the Government required Gulf and Eastern to process different petroleum products. *See FMC*, 29 F.3d at 853; *Steadfast*, 2009 WL 3785565, at *6, 2; ECF Nos. 74-21 (Gulf); 77-19; 77-31 (Gulf); 77-32; 77-33; 77-34 (Gulf); 77-35; 77-36 (Gulf); 77-37 (Gulf); 77-40 (Gulf); 77-45 (Gulf); 77-46 (Gulf); 78-3 (Eastern). Second, the Government directed and supervised the production process at Gulf and Eastern by, for example, mandating product specifications and petroleum concentration. *See PPG*, 957 F.3d at 397; *FMC*, 29 F.3d at 843; *Exxon*, 108 F. Supp. 3d at 525; *Miami-Dade*, 345 F. Supp. 2d at 1341, 1344, 1346; ECF Nos. 74-21 (Gulf); 77-19; 77-31 (Gulf); 77-32; 77-33; 77-34 (Gulf); 77-35; 77-36 (Gulf); 77-37 (Gulf); 77-40 (Gulf); 77-45 (Gulf); 77-46 (Gulf); 78-3 (Eastern); *see also* ECF No. 94-14 at PageID.11060 (Gulf). Third, the Government had seized at least one other petroleum processing plant. *See PPG*, 957 F.3d at 404; *FMC*, 29 F.3d at 936; *Exxon*, 108 F. Supp. 3d at 524; *Steadfast*, 2009 WL 3785565, at *4–6; ECF Nos. 77-49; 77-50 at PageID.7203; 78-1; 94-14 at PageID.11060 (Gulf). Fourth, the Government was aware that processing petroleum created pollution and that petroleum processing created pollution at Gulf and Eastern. *See FMC*, 29 F.3d at 838; *Exxon* 108 F. Supp. 3d at 529; ECF Nos. 77-47 (inspecting nearly every inch of the refinery from storage capacity of crude oil to "control of dust, fumes, and vapors"); 78-19 at PageID.7538; 78-20 at PageID.7569; 78-28 ("The recovery of slop oils, which is a necessary function in any refinery . . . ."); 78-29; 94-14 (ordering Gulf's "personnel working on . . . . waste oil separators" to "[r]eturn to work"). Fifth, through inspections, the Government was aware of and monitored the production of petroleum waste at Gulf and Eastern. *See FMC*, 29 F.3d at 838; *Brighton I*, 153 F.3d at 327 (Moore, J. concurring in the result); ECF Nos. 76-34 (Eastern); 77-47 (Gulf); 78-19 at PageID.7538 (Eastern); 78-20 at PageID.7569 (Eastern); 78-24 at PageID.7666 (Eastern); 78-28 (Eastern); 78-29 (Eastern); 94-14 at PageID.11060 (Gulf). Sixth, the Government had expertise and knowledge of the dangers of waste created by processing petroleum. *Brighton I*, 153 F.3d at 327 (Moore, J. concurring in the result); ECF Nos. 77-47; 78-28; 78-29; 94-14 at PageID.11060. Seventh, the Government determined the operational plans for Gulf and Eastern. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 74-25; 77-31 at PageID.7104 (Gulf); 77-32; 77-33; 77-34 (Gulf); 77-35; 77-36 (Gulf); 77-37 (Gulf); 77-40 (Gulf); 78-3 at PageID.7238, 7239 (Eastern). Eighth, the Government publicly declared responsibility over all petroleum refineries and their employees with words and actions. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 77-19 at PageID.6958 (announcing nationwide that "[a]ll U. S. refiners were notified of the change in octane rating of house brand gasoline"); 94-14 at PageID.11060 (Gulf); *see, e.g.*, 77-47 at PageID.7151 (showing at least 126 armed military guards were permanently stationed at some refineries, conducting hourly "watchmen" inspections under 24-hour ops). Ninth, the Government had more than a mere contractual relationship with Gulf and Eastern. *See Brighton I*, 153 F.3d at

315–16; ECF Nos. 77-47 (Gulf); 77-30 (Gulf); 78-3 at PageID.7234 (paying all Eastern's operational costs); 78-7 at PageID.7284, 7286 (Eastern); 78-14 (Eastern); 78-24 at PageID.7674 (approving Eastern's employees' salaries); 78-25 (Eastern); 78-26 (Eastern); 78-27 (rejecting Eastern's proposed employee salaries); 94-14 at PageID.11060 (Gulf). Tenth, the Government had quality control employees and other representatives on site. *See Miami-Dade*, 345 F. Supp. 2d at 1341–42; ECF No. 77-47. Eleventh, the Government's directives to Gulf and Eastern led to changes in their waste management. *See Steadfast*, 2009 WL 3785565, at *5; ECF Nos. 74-31 at PageID.5422; 94-14 at PageID.11060. Twelfth, the Government determined which petroleum products Gulf and Eastern had to produce. *See Steadfast*, 2009 WL 3785565, at *5–6; ECF Nos. 74-21 (Gulf); 77-19; 77-31 (Gulf); 77-32; 77-33; 77-34 (Gulf); 77-35; 77-36 (Gulf); 77-37 (Gulf); 77-40 (Gulf); 77-45 (Gulf); 77-46 (Gulf); 78-3 (Eastern). Thirteenth, the record indicates that the Government's directives to Gulf and Eastern were direction, not mere guidance. *See Steadfast*, 2009 WL 3785565 at *7; ECF Nos. 78-25 (Eastern); 78-26 (Eastern); 78-29 (Eastern); ECF No. 94-14 at PageID.11060 (Gulf). Fourteenth, the Government inspected the disposal sites at Gulf and Eastern. *See Steadfast*, 2009 WL 3785565, at *1, *4, *5, *7, *8; ECF Nos. 76-34 (Eastern); 77-47 (Gulf); 78-7 at PageID.7286 (Eastern); 78-31 (Eastern); 78-32 (Eastern); 78-33 (Eastern); 78-34 (Eastern); 78-35 (Eastern). Fifteenth, the Government had officials who worked on site. *See Exxon*, 108 F. Supp. 3d at 526; ECF No. 77-47. Sixteenth, the Government was permanently stationed on site. *See Exxon*, 108 F. Supp. 3d at 525–26, 532; ECF No. 77-47; 94-14 at PageID.11060. Seventeenth, Gulf and Eastern resembled a military base. *See Exxon*, 108 F. Supp. 3d at 533; ECF No. 77-47 (Gulf). Eighteenth, the Government controlled the priority of orders for petroleum products at Gulf and Eastern. *See PPG*, 957 F.3d at 397, 403; ECF No. 74-21 (Gulf); 74-45; 77-45 (Gulf); 77-46 (Gulf). Nineteenth, the Government participated in decisions related to pollution at Gulf and Eastern. *See Exxon*, 108 F. Supp. 3d at 527; *Steadfast*, 2009 WL 3785565, at *8; ECF No. 74-31 at PageID.5422; 77-30 at PageID.7097 (Gulf); 94-14 at PageID.11060 (Gulf). Twentieth, the Government approved expansion projects at Gulf and Eastern. *See* PPG, 957 F.3d at 398; ECF Nos. 77-30 at PageID.7097 (Gulf); 77-31 at PageID.7104 (Gulf); 77-39 (Gulf); 77-41 (Gulf); 78-3 (Eastern); 78-4 (Eastern); 78-5 (Eastern); 78-6 (Eastern); 78-7 (Eastern); 78-8 (Eastern); 78-9 (Eastern); 78-14 (Eastern). Twenty-first, the Government required approval for changes to Gulf's and Eastern's facility. *See Exxon*, 108 F. Supp. 3d at 495, 502–03; ECF Nos. 77-30 at PageID.7097 (Gulf); 77-31 at PageID.7104 (Gulf); 77-39 (Gulf); 77-41 (Gulf); 78-3 (Eastern); 78-4 (Eastern); 78-5 (Eastern); 78-6 (Eastern); 78-7 (Eastern); 78-8 (Eastern); 78-9 (Eastern). Twenty-second, the Government, in part, established and designed Gulf and Eastern. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); *See Exxon*, 108 F. Supp. 3d at 526; ECF Nos. 77-30 at PageID.7097 (Gulf); 77-39 (Gulf); 77-41 (Gulf); 78-3 at PageID.7238 (Eastern); 78-7 at PageID.7284, 7286 (Eastern); 78-14 (Eastern). Twenty-third, the Government, participated in the opening and closing of Gulf and Eastern. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 77-49 at PageID.7177 (Gulf); 78-7 at PageID.7284 (Eastern); 78-14 (Eastern). Twenty-fourth, the Government had some control over waste disposal at Gulf and Eastern. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); ECF Nos. 76-34 (Eastern); 77-30 at PageID.7097 (Gulf); 78-28 (Eastern). Twenty-fifth, the Government provided financial assistance to Gulf and Eastern to process petroleum. *See Miami-Dade*, 345 F. Supp. 2d at 1341; ECF Nos. 77-30 at PageID.7097 (Gulf); 77-46 (Gulf); 78-3 at PageID.7234 (Eastern); 78-8 at PageID.7284 (Eastern). Twenty-sixth, the Government supervised or was involved with the hiring and firing of employees involved in cleaning or producing

petroleum waste at Gulf and Eastern. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); *Exxon*, 108 F. Supp. 3d at 526; *Steadfast*, 2009 WL 3785565, at *6; *Miami-Dade*, 345 F. Supp. 2d at 1342; ECF Nos. 77-49 at PageID.7177 (Gulf); 78-24 at PageID.7666 (Eastern); 78-25 (Eastern); 94-14 at PageID.11060 (Gulf). Twenty-seventh, the Government owned some of the materials used at Gulf and Eastern. *See Steadfast*, 2009 WL 3785565, at *4; ECF Nos. 77-38 (Gulf); 78-7 at PageID.7284 (Eastern); 78-14 (Eastern). Twenty-eighth, the Government lent significant amounts of money to Gulf and Eastern to produce petroleum products. *See Steadfast*, 2009 WL 3785565, at *5; ECF Nos. 77-46 (Gulf); 78-3 at PageID.7234 (Eastern). Twenty-ninth, the Government told Gulf and Eastern whether, when, how, or where to dispose of waste. *See Exxon*, 108 F. Supp. 3d at 528; *Steadfast*, 2009 WL 3785565, at *8; ECF No. 76-34 (Eastern); 77-30 at PageID.7097 (Gulf). Thirtieth, the Government negotiated with Gulf and Eastern and specified how they should dispose of waste. *See Exxon*, 108 F. Supp. 3d at 525; ECF Nos. 76-34 (Eastern); 77-30 at PageID.7097 (Gulf); 78-24 at PageID.7666 (Eastern); 76-34 (Eastern). Thirty-first, the Government subsidized some of Gulf's and Eastern's purchases of the raw materials they used to process petroleum products. *See PPG*, 957 F.3d at 398; ECF Nos. 77-30 at PageID.7097 (Gulf); 77-46 (Gulf); 78-3 at PageID.7234 (Eastern). Thirty-second, the Government designed, specified, or provided some of the equipment and machinery needed to process petroleum at Gulf and Eastern. *See FMC*, 29 F.3d at 838; *Steadfast*, 2009 WL 3785565, at *5–6; ECF Nos. 77-30 at PageID.7097 (Gulf); 77-39 (Gulf); 77-41 (Gulf); 78-7 at PageID.7284 (Eastern); 78-14 (Eastern). Thirty-third, the Government dictated the quantity of petroleum products Gulf could sell. *See PPG*, 957 F.3d at 403; ECF No. 75-45 at PageID.7143. Thirty-fourth, the Government sent an on-site supervisor to Gulf. *See FMC*, 29 F.3d at 838; ECF No. 94-14 at PageID.11060. Thirty-fifth, the Government supervised some of Gulf's pollution-related employees. *See FMC*, 29 F.3d at 838; ECF No. 94-14 at PageID.11060. Thirty-sixth, the Government set and adjusted Gulf's production quotas. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at *4–6; ECF Nos. 74-21; 77-30 at PageID.7097; 77-43; 77-44; 77-45 at PageID.7143; 77-46. Thirty-seventh, the Government determined who could purchase Gulf's petroleum products. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at *4–6; ECF Nos. 74-21; 77-30 at PageID.7097; 77-43; 77-44; 77-45 at PageID.7143; 77-46. Thirty-eighth, the Government required Gulf to send regular reports regarding petroleum processing. *See Exxon*, 108 F. Supp. 3d at 509, 527, 532; ECF Nos. 74-21; 74-43; 74-44; 74-45 at PageID.7143; 74-48. Thirty-ninth, the Government determined Gulf's sales prices. *See PPG*, 957 F.3d at 397, 400, 403; *Steadfast*, 2009 WL 3785565 at *4–6; ECF Nos. 77-43; 77-44. Fortieth, at least one employee of the Government filled a position at Gulf. *See Miami-Dade*, 345 F. Supp. 2d at 13412; ECF No. 94-14 at PageID.11060. Forty-first, the Government reimbursed Gulf for the purchase of some of its petroleum-processing equipment. *See Steadfast*, 2009 WL 3785565, at *5; ECF No. 77-30 at PageID.7097. Forty-second, Eastern produced petroleum products exclusively for the Government. *See Bestfoods*, 524 U.S. at 72; ECF No. 78-8 at PageID.7290. Forty-third, the Government oversaw the hiring and firing of employees involved in cleaning or producing petroleum waste at Eastern. *See Brighton I*, 153 F.3d at 327 (Moore, J., concurring in the result); *Exxon*, 108 F. Supp. 3d at 526; *Steadfast*, 2009 WL 3785565, at *6; ECF Nos. 78-24 at PageID.7666, 7674; 78-25; 78-26; 78-27. Forty-fifth, the Government audited some of Eastern's pollution-related costs. *See Miami-Dade*, 345 F. Supp. 2d at 1341, 1344; ECF Nos. 78-3; 78-5 at PageID.7257; 78-7 at PageID.7285, 7286; 78-24 at PageID.7674; 78-25; 78-26; 78-27. Forty-sixth, Eastern believed that the Government was at least in part responsible for or involved with its waste-related operations. *See Miami-Dade*, 345 F. Supp. 2d at 1346; ECF

could find that the extent of the Government's management, direction, and control over Gulf and Eastern had nothing "to do with" the amount of waste it produced. *See Bestfoods*, 524 U.S. at 66.

## VI.

Plaintiffs also claim that "the Government is a 'prior owner' of the Houston Refinery and therefore is a 'potentially responsible party' subject to response costs under CERCLA." *See generally* ECF No. 68 at PageID.1073, 1104–06 (quoting 42 U.S.C. § 9607(a)(2)).

The following photograph illustrates the entire Houston "facility" (i.e., "Eastern"):



ECF No. 74-18 at PageID.4996 fig. 6.

---

No. 76-34. Forty-seventh, the Government leased or owned all the facilities and land at Eastern. *See Steadfast*, 2009 WL 3785565, at *4; *Miami-Dade*, 345 F. Supp. 2d at 1351, 1354–55; ECF Nos. 78-7 at PageID.7284; 78-14. Forty-eighth, the Government owned or leased some of the disposal sites at Eastern. *See Steadfast*, 2009 WL 3785565, at *4; *Miami-Dade*, 345 F. Supp. 2d at 1354–55; ECF Nos. 78-7 at PageID.7284; 78-14. Forty-ninth, the Government owned some of Eastern's land. *See Steadfast*, 2009 WL 3785565, at *4; ECF Nos. 78-7 at PageID.7284; 78-14. Fiftieth, the Government had unfettered control over waste-related activities at Eastern. *See Steadfast*, 2009 WL 3785565; ECF No. 76-34. Fifty-first, the Government directed some of Eastern's waste-disposal activities. *See Exxon*, 108 F. Supp. 3d at 495, 531; *Steadfast*, 2009 WL 3785565, at *5; ECF Nos. 76-34; 78-24 at PageID.7666. Fifty-second, the Government controlled Eastern's waste-disposal mechanics. *See Steadfast*, 2009 WL 3785565, at *6; ECF No. 76-34. Fifty-third, the Government authorized wage increases at Eastern. *See PPG*, 957 F.3d at 397; ECF Nos. 78-24 at PageID.7674; 78-25; 78-26; 78-27.

As shown above, Eastern consists of two Plancors[21]: Plancor 1534 to the West (entailing one facility within Plant 1 and one facility with Plant 3), and Plancor 911 to the East (entailing all of Plant 2). According to Plaintiffs, the Government owned all of Eastern, because Eastern is one "facility" under CERLCA and the Government owned part of it, specifically Plancor 911. But for the reasons discussed hereafter, the Government is not a "prior owner" of all of Eastern.

## A.

Owner liability involves less foggy criteria than operator liability. CERCLA imposes liability on the person or entity that possesses legal title to the contaminating facility. *United States v. A & N Cleaners & Launderers, Inc.*, 788 F. Supp. 1317, 1332 (S.D.N.Y. 1992) ("Mere ownership of the property on which the release took place is sufficient to impose liability under § 107(a), regardless of any control or lack or control over the disposal activities."). Indeed, courts have imposed liability on a facility's titleholder despite arguments that the owner had no responsibility or control over the disposal activity. *See, e.g.*, *United States v. Monsanto Co.*, 858 F.2d 160, 168 (4th Cir. 1988) ("The plain language of section 107(a)(2) extends liability to owners of waste facilities *regardless of their degree of participation* in the subsequent disposal of hazardous waste." (emphasis added)).

But some courts have extended owner liability to lessees who sublet a site but maintained control over it. *United States v. A & N Cleaners and Launderers, Inc.*, 788 F. Supp. 1317 (S.D.N.Y. 1992) (holding that lessee bank that subleased property to dry cleaner operator was an "owner" subject to liability under 42 U.S.C. § 9607(a)(2) since bank had site control and responsibility for

---

[21] The term "Plancor" was a contraction of "Plant Corporation" and was used by the Government to designate, administer, and monitor the plants built to support the war effort. Across the nation, there were as many as 2,511 Defense Plant Corporation "Plancor" facilities, designated as Plancor 1 through 2511. Don Strack, *Defense Plant Corporation: Overview*, UTAHRAILS.NET (Feb. 23, 2015), https://utahrails.net/industries/defense-plant-corp.php [https://perma.cc/W2GL-AMJ4].

the use of the site). Yet other courts have excluded from owner liability persons and entities that possess an easement but not legal title. *See, e.g.*, *Lincoln Props., Ltd. v. Higgins*, 823 F. Supp. 1528 (E.D. Cal. 1992) (county that had an easement in a sewer line but had no possessory interest or authority to determine how the line would be used under California law was not an owner under CERCLA).[22] So, where does a lessee that does not sublease the property fit into the owner-liability inquiry?

## B.

It is an elementary legal principle that owners and lessees have legally distinct property interests. The problem is that, as noted *supra* Part II, CERCLA defines "owner" by tautology as "any person . . . owning the facility." 42 U.S.C. § 9601(20)(A)(ii). So, who is "owning the facility"? An owner.

An "owner" is "[o]ne who has the legal or rightful title, *whether the possessor or not*." WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 1745 (1935) (emphasis added). Thus, possessor and titleholder are distinct identities—albeit not mutually exclusive. Indeed, a lease "divides the interests in property between a landlord and a tenant." LaVonda N. Reed-Huff, *Are You Still Settling for Cable? A Case for Broader Application of the FCC's Over-the-Air Reception Devices Rule*, 26 HASTINGS COMM. & ENT. L.J. 179, 215–16 (2004). Through a lease, a tenant generally receives "some but not all of the[] ownership interest," which is wholly distinct from a transfer of all rights. *Id.* at 216.

---

[22] Courts also agree that a parent corporation may be held liable as an owner of its subsidiary's facility if piercing the corporate veil is warranted. *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3rd Cir. 1993); *Joslyn Mfg. Co. v. T.L. James & Co.*, 893 F.2d 80 (5th Cir. 1990).

Because private property rights are creatures of state law, *see Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972), this Court must look to Texas law to determine what the Government "owned" under CERCLA. *See* ECF No. 68-2 at PageID.1182–83 (noting Eastern is in Houston, Texas).

Under Texas law, a title-holding lessor is a legal *owner* of property who gives a *lessee* the right to use or occupy the property for an agreed length of time. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 918 (Tex. 2013) (treating owners and lessees as having distinct property interests) (citing *ICM Mortg. Corp. v. Jacob*, 902 S.W.2d 527, 530 (Tex. App. 1994)); *see also Freestone Power Generation, LLC v. Texas Comm'n on Env't Quality*, 564 S.W.3d 1, 14 (Tex. App. 2017) (same under Texas environmental law), *aff'd sub nom. Texas Comm'n on Env't Quality v. Brazos Valley Energy, LLC*, 582 S.W.3d 277 (Tex. 2019). *See generally* TEX. PROP. CODE ANN. § 92 *et seq.* (same under Texas property law); *Marathon Oil Co. v. Rone*, 83 S.W.2d 1028 (Tex. Civ. App. 1935) (same during WWII).

So, the operative question is: Did the Government possess legal title to any property at Eastern other than Plancor 911? The answer is "No."

## C.

Eastern States Petroleum Corp. owned all the real property at Eastern except Plancor 911. Indeed, the record suggests that the Government merely leased and, therefore, did not own title to the land on which the Plancor 1534 facilities were located (i.e., Plant 1 and Plant 3). Specifically, the Government signed a lease agreement on December 5, 1942, to rent that land from Eastern

"for a term of 20 years at $1 per year." *See* ECF No. 78-3 at PageID.7231, 7234. Therefore, the Government did not "own" the Plancor 1534 facilities.[23]

Plaintiffs are correct that "[s]tatutory intent and case law supports treatment of the Houston Refinery as one integrated CERCLA facility." ECF No. 68 at PageID.1105 (citing 42 U.S.C. § 9601(9); then citing *Bestfoods*, 524 U.S. at 56; then citing *Exxon*, 108 F. Supp. 3d at 517–19; and then citing *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 708–10 (W.D. Ky. 2003)). Indeed, the Government conceded that its facility was "dependent upon [Eastern's]" and "could not operate within itself." ECF No. 78-9 at PageID.7343. But Plaintiffs conflate two of CERCLA's provisions, which "must 'be read as a whole.'" *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).

The inquiry regarding whether a property is a CERCLA-covered "facility" is distinct from whether a person or entity is an "owner" of that facility. Indeed, CERCLA contemplates situations involving property owners of contiguous facilities. *See* 42 U.S.C. § 9607(q)(1)(A)(ii)(I).

In other words, owners of separate real property are not necessarily liable for each other's clean-up costs simply because their respective properties are considered one "facility" under CERLCA. After determining whether a property is a "facility," the court must still determine if any affiliated parties are an "owner," "operator," "arranger," or some combination thereof. To hold otherwise would offend the rule against surplusage. *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) ("Where there are two ways to read the text—and the one that avoids surplusage makes the text ambiguous—applying the rule against surplusage is, absent other indications, inappropriate." (quotations and citation omitted)).

---

[23] The Government believes it "owned" the Plancor 1534 facilities. *See* ECF No. 81-2 at PageID.7485. But as discussed above, that is simply untrue as a matter of law. Therefore, this Court will not consider that issue further.

Nothing in CERCLA's text or history compels the adaptation of Plaintiffs' extratextual hybrid criteria. Although a leasehold interest in a property subject to CERCLA cost recovery might indicate some degree of operator liability, it says *nothing* of owner liability. *See Brighton I*, 153 F.3d at 315 n.10 ("Since . . . the entire site is defined as a single facility, if Brighton Township exercised *authority over the facility*, it is liable." (emphasis added)). That is, under CERCLA, "the things you [did not] used to own [do not] own you." *See* CHUCK PALAHNIUK, FIGHT CLUB 44 (2005). Therefore, the Government was an "owner" of only Plancor 911 and did not "own" all, or any other part, of Eastern.

## VII.

As a final matter, the Government objects to the admissibility of two of Plaintiffs' exhibits. It claims that the expert reports prepared by A.J. Gravel, ECF No. 74-18, and David Lerman, ECF No. 74-32, are "inadmissible hearsay" under Federal Rules of Evidence 801 and 802. ECF No. 80. But given the overwhelming evidence favoring operator liability for the Government, this Court did not consider those reports. Therefore, the Government's objection will be overruled as moot.

## VIII.

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 68, is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' Motion is **GRANTED** as to the request for a declaration that the Government is liable as an operator of all 12 facilities. Plaintiffs' Motion is **DENIED** as to the request for a declaration that the Government was an owner of the Plancor 1534 Facilities or the entire Eastern facility; the Government owned only the portion of Plancor 911 to which it held legal title.

Further, it is **ORDERED** that the Government's Motion for Summary Judgment, ECF No. 81, is **GRANTED IN PART AND DENIED IN PART**. The Government's Motion is

**GRANTED** as to the request for a declaration that the Government was not an owner of the Plancor 1534 Facilities or the entire Eastern facility; the Government owned only the portion of Plancor 911 to which it held legal title. The Government's Motion is **DENIED** in all other respects.

Further, it is **ORDERED** that Defendant's Objection, ECF No. 80, is **OVERRULED AS MOOT**.

Further, it is **ORDERED** that the case shall **PROCEED** to Phase 2 (Damages) regarding all remaining issues.

Dated: December 9, 2021                          s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge